**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF WISCONSIN**

| | | |
|---|---|---|
| IN RE FOREFRONT DATA BREACH LITIGATION<br><br>This Document Relates to: ALL ACTIONS. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Master File No. 1:21-cv-00887-LA |

---

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF UNOPPOSED MOTION
FOR PRELIMINARY APPROVAL OF THE CLASS ACTION SETTLEMENT**

---

# TABLE OF CONTENTS

**Page**

I. NATURE OF THE LITIGATION AND PROCEDURAL HISTORY ............................. 1

II. SUMMARY OF THE SETTLEMENT ...................................................................... 4

    A. The Settlement Class ............................................................................................. 4

    B. Settlement Benefits to Settlement Class Members ................................................ 4

    C. Prospective Relief .................................................................................................. 6

    D. The Release of Claims by the Settlement Class ..................................................... 7

    E. Class Representative Service Awards ..................................................................... 7

    F. Attorneys' Fees, Costs, and Expenses ................................................................... 7

    G. Settlement Administration and Notice .................................................................... 8

    H. Settlement Class Members' Right to Opt-Out ....................................................... 9

    I. Settlement Class Members' Right to Object ........................................................... 9

    J. Schedule for Settlement Administration ................................................................ 9

III. PRELIMINARY APPROVAL OF THE SETTLEMENT IS APPROPRIATE ............. 10

    A. Legal Standard ..................................................................................................... 10

    B. The Settlement Satisfies Seventh Circuit Factors ............................................... 12

        1. The Strength of Plaintiffs' Case Is Well-Balanced Against the Amount Offered in the Settlement and the Complexity, Length, and Expense of Further Litigation Favors Settlement Now ...................... 13

        2. Thus Far, There Has Been No Opposition to the Settlement and the Reaction of the Members of the Class to the Settlement Has Been Positive ........................................................................................... 15

        3. The Opinion of Competent Counsel Is That the Settlement Is Fair, Reasonable, and Adequate, and Should Be Approved ............................ 15

        4. The Stage of the Proceedings and the Amount of Discovery Completed Favors Settlement Now ....................................................... 15

    C. The Settlement Is Fair, Reasonable, and Adequate Under Rule 23(e)(2) ............. 16

        1. The Costs, Risks, and Delay of Trial and Appeal .................................... 18

        2. The Effectiveness of Any Proposed Method of Distributing Relief to the Class, Including the Method of Processing Class Member Claims .................................................................................................... 18

        3. The Terms of Any Proposed Fee Award and Costs, Including Timing of Payment .................................................................................. 19

       4.     The Presence of Any Agreements Between the Parties Separate from the Settlement Agreement ................................................................ 19

IV.    CERTIFICATION OF THE SETTLEMENT CLASS ..................................................... 20

    A.    The Requirements Under Fed. R. Civ. P. 23(a) Are Satisfied ............................ 20

        1.     The Settlement Class Is So Numerous That Joinder of Individual Members Is Impracticable .......................................................... 21

        2.     There Are Questions of Law and Fact Common to the Settlement Class ......................................................................................... 21

        3.     Plaintiffs' Claims Are Typical of the Claims of the Settlement Class ......................................................................................... 22

        4.     The Interests of Plaintiffs and Proposed Settlement Class Counsel Are Aligned with the Interests of the Settlement Class ......................... 23

    B.    The Requirements Under Fed. R. Civ. P. 23(b)(3) Are Satisfied ........................ 24

V.    APPOINTMENT OF SETTLEMENT CLASS REPRESENTATIVES AND SETTLEMENT CLASS COUNSEL .................................................................. 25

VI.    THE NOTICE PROGRAM SATISFIES ALL APPLICABLE REQUIREMENTS ........ 25

VII.    CONCLUSION ..................................................................................... 26

APPENDIX OF UNREPORTED AUTHORITIES ............................................................Appendix

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amchem Prod., Inc. v. Windsor,*
521 U.S. 591 (1997)...................................................................... 20

*Armstrong v. Board of Sch. Directors of City of Milwaukee,*
616 F.2d 305 (7th Cir. 1980) .................................................. 11, 17

*Butler v. Sears, Roebuck & Co.,*
727 F.3d 796 (7th Cir. 2013) .......................................................... 22

*Carson v. Am. Brands, Inc.,*
450 U.S. 79 (1981)......................................................................... 12

*Charron v. Wiener,*
731 F.3d 241 (2d Cir. 2013) .......................................................... 11

*Chesemore v. All. Holdings, Inc.,*
No. 09-cv-413-WMC, 2014 WL 12730484 (W.D. Wis. Apr. 9, 2014)............................ 11, 12

*Chicago Teachers Union, Local No. 1 v. Board of Educ. Of City of Chicago,*
797 F.3d 426 (7th Cir. 2015) .......................................................... 24

*Class Plaintiffs v. City of Seattle,*
955 F.2d 1268 (9th Cir. 1992) ........................................................ 17

*Cochran, et al. v. Kroger Co., et al.,*
No. 5:21-cv-01887-EJD (N.D. Cal.)................................................... 6

*De La Fuente v. Stokely-Van Camp, Inc.,*
713 F.2d 225 (7th Cir. 1983) .......................................................... 23

*Dickey's Barbeque Restaurants, Inc.,*
Case No. 20-cv-3424 (N.D. Tex.)...................................................... 5

*Donovan v. Estate of Fitzsimmons,*
778 F.2d 298 (7th Cir. 1985) ..................................................... 10, 13

*E.E.O.C. v. Hiram Walker & Sons, Inc.,*
768 F.2d 884 (7th Cir. 1985), *cert. denied*, 478 U.S. 1004 (1986)................... 12, 13

*Eisen v. Carlisle & Jacquelin,*
417 U.S. 156 (1974)....................................................................... 26

Case 1:21-cv-00887-LA   Filed 09/01/22   Page 4 of 76   Document 57

*Felzen v. Andreas*,
    134 F.3d 873 (7th Cir. 1998) .............................................................. 11

*G. F. v. Contra Costa Cnty.*,
    No. 13-cv-03667, 2015 WL 4606078 (N.D. Cal. July 30, 2015) ............................................ 18

*Gautreaux v. Pierce*,
    690 F.2d 616 (7th Cir. 1982) .............................................................. 11

*General Elec. Capital Corp. v. Lease Resolution Corp.*,
    128 F.3d 1074 (7th Cir. 1997) .............................................................. 14

*In re AT & T Mobility Wireless Data Servs. Sales Litig.*,
    270 F.R.D. 330 (N.D. Ill. 2010) ..................................................... 11, 14, 18

*In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prod. Liab. Litig.*,
    55 F.3d 768 (3d Cir. 1995) .............................................................. 20

*In re Herff Jones Data Breach Litig.*,
    No. 21-cv-1329 (S.D. Ind.) .............................................................. 6

*In re Holocaust Victim Assets Litig.*,
    105 F. Supp. 2d 139 (E.D.N.Y. 2000) .............................................................. 17

*In re Lorazepam & Clorazepate Antitrust Litig.*,
    205 F.R.D. 369 (D.D.C. 2002) .............................................................. 17

*In re Prudential Sec. Inc. Ltd. P'ship Litig.*,
    163 F.R.D. 200 (S.D.N.Y. 1995) .............................................................. 20

*Irish v. BNSF Ry. Co.*,
    No. 08-CV-469-SLC, 2009 WL 276519 (W.D. Wis. Feb. 4, 2009) ........................................ 21

*Isby v. Bayh*,
    75 F.3d 1191 (7th Cir. 1996) .............................................................. 12, 13

*Jones v. Crusin' Chubbys Gentlemen's Club*,
    No. 17-cv-125-JDP, 2018 WL 11236460 (W.D. Wis. Nov. 21, 2018) ................................. 12

*Mars Steel Corp. v. Cont'l Ill. Nat'l Bank & Tr. Co. of Chicago*,
    834 F.2d 677 (7th Cir. 1987) .............................................................. 17

*Mullane v. Cent. Hanover Bank & Tr. Co.*,
    339 U.S. 306 (1950) .............................................................. 26

*Mullins v. Direct Digital, LLC*,
    795 F.3d 654 (7th Cir. 2015) .............................................................. 24

*Nat'l Cas. Co. v. White Mountains Reinsurance Co. of Am.*,
   735 F.3d 549 (7th Cir. 2013) ............................................................. 10

*Reynolds v. Beneficial Nat'l Bank*,
   288 F.3d 277 (7th Cir. 2002) ............................................................... 6

*Rosario v. Livaditis*,
   963 F.2d 1013 (7th Cir. 1992) ........................................................... 22

*Susman v. Lincoln American Corp.*,
   561 F.2d 86 (7th Cir. 1977) ............................................................... 23

*Towers v. City of Chicago*,
   173 F.3d 619 (7th Cir. 1999) ............................................................. 25

*Wal-Mart Stores, Inc. v. Dukes*,
   564 U.S. 338 (2011) ........................................................................... 21

*Wong v. Accretive Health, Inc.*,
   773 F.3d 859 (7th Cir. 2014) ............................................................. 12

**Other Authorities**

Herbert B. Newberg & Alba Conte, *Newberg on Class Actions* (5th ed. 2011) .......................... 11

Moore's Federal Practice (3d ed. 2005) ............................................................. 12

**Rules**

Fed. R. Civ. P.
   Rule 12(b)(6) .......................................................................................... 3
   Rule 23(a) ................................................................................. 2, 20, 25
   Rule 23(a)(2) ............................................................................... 21, 24
   Rule 23(a)(3) ........................................................................................ 23
   Rule 23(b)(3) ............................................................... 4, 21, 24, 25
   Rule 23(c)(1)(B) ................................................................................. 25
   Rule 23(c)(2)(B) ................................................................................. 26
   Rule 23(e) ...................................................................... 1, 9, 11, 16
   Rule 23(e)(1) ........................................................................................ 25
   Rule 23(e)(1)(B) ................................................................................. 16
   Rule 23(e)(2) ........................................................................................ 16
   Rule 23(e)(2)(A) ................................................................................. 16
   Rule 23(e)(2)(B) ................................................................................. 16
   Rule 23(e)(2)(C)(i) ............................................................................ 18
   Rule 23(e)(2)(D) ................................................................................. 19
   Rule 23(g)(1)(A) ................................................................................. 25

Plaintiffs Judith Leitermann, Lynn Anderson, and Milan E. Kunzelmann, individually and on behalf of all others similarly situated (collectively, "Plaintiffs") submit this Memorandum of Law in support of their Unopposed Motion for Preliminary Approval of the Class Action Settlement with Defendants Forefront Dermatology, S.C. and Forefront Management LLC ("Forefront" or "Defendants," and, together with Plaintiffs, the "Parties"). This is a class action arising from the potential compromise of the Personal Information[1] of Plaintiffs and the Settlement Class, which was potentially subjected to unauthorized access in Forefront's systems between May 28, 2021 and June 4, 2021 (the "Attack" or "Ransomware Attack").

If approved, the proposed Settlement will provide immediate and significant benefits to all persons affected by the Ransomware Attack. As detailed below, Plaintiffs respectfully request that the Court preliminarily approve the Settlement because it will provide fair, reasonable, and adequate relief for the Class, includes a comprehensive Notice Plan that is the best means of providing Notice under the circumstances, and satisfies the requirements of Federal Rule of Civil Procedure 23(e). Defendant does not oppose the relief requested in the motion. Because the Settlement is "within the range of possible approval," preliminary approval is appropriate.

## I. NATURE OF THE LITIGATION AND PROCEDURAL HISTORY

This class action against Forefront results from the Ransomware Attack that allowed an unauthorized actor to potentially access, from May 28, 2021 to June 4, 2021, the Personal Information of approximately 2,413,552 of Forefront's patients, employees, employee beneficiaries, and other individuals. Forefront detected the intrusion on June 4, 2021 and announced the Ransomware Attack in a Notice of Data Breach sent to customers on June 24, 2021.

---

[1] All capitalized terms not defined herein shall have the same meanings as set forth in the Class Action Settlement Agreement and Release ("Settlement Agreement" or "Agreement," or "SA").

1

The Complaint herein was filed on July 28, 2021. It alleged, *inter alia*, that Forefront failed to take adequate measures to protect putative class members' Personal Information and failed to disclose that Forefront's systems were susceptible to a cyberattack. ECF No. 1. On July 29, 2021, Plaintiff Anderson filed suit against Forefront related to the Ransomware Attack. *Anderson v. Forefront Dermatology, S.C., et al.*, No. 1:21-cv-00891, ECF No. 1. On August 17, 2021, Plaintiffs Leitermann and Anderson moved to consolidate the actions under Federal Rule of Civil Procedure 42(a), and the Court granted that motion on August 19, 2022. ECF Nos. 9, 11. *See* Fed. R. Civ. P. 42(a). That same day, on August 19, 2021, Plaintiff Kunzelmann filed a class action complaint against Forefront. *Kunzelmann v. Forefront Dermatology SC et al*, Case No. 1:21-CV-00980, ECF No. 1. Plaintiffs Leitermann, Anderson, and Kunzelman thereafter moved to consolidate their cases[2] on September 7, 2021, and the motion was granted by the Court on September 21, 2021. ECF Nos. 19, 20.

On September 21, 2021, Jeanette Alonso filed a putative class action complaint against Forefront,[3] and, on November 11, 2021, she moved to consolidate her case with the Related Actions and simultaneously moved the Court to appoint her counsel as interim lead counsel. ECF Nos. 21, 22. Plaintiffs in the Related Actions and Forefront opposed the respective motions, and the Court ordered the *Alonso* action consolidated with the instant case but denied Alonso's motion to appoint interim lead counsel. ECF Nos. 31, 33. On January 27, 2022, the Court appointed Ahdoot & Wolfson, PC and Milberg Coleman Bryson Phillips Grossman, PLCC as interim co-lead counsel ("Class Counsel"). ECF No. 34. Plaintiffs Leitermann, Anderson, and Kunzelmann filed their Consolidated Complaint on February 28, 2022. ECF No. 35.

---

[2]     Hereinafter the "Related Actions."

[3]     *Alonso v. Forefront Dermatology SC et al*, Case No. 1:21-CV-01105, ECF No. 1.

On May 10, 2022, Defendant filed a Motion to Dismiss. ECF No. 42; Fed. R. Civ. P. 12(b)(6). During this time, the Parties continued to make meaningful progress towards a settlement and eventually agreed to explore a mediated resolution of the matter. *See* concurrently filed Declarations of Tina Wolfson ("Wolfson Decl.") ¶ 14; and of Gary M. Klinger ("Klinger Decl.") ¶ 36. Prior to mediation, the Parties negotiated a stipulated protective order, and Forefront produced documentation to Plaintiffs to allow for a meaningful evaluation of the claims and to better inform the parties in preparation of mediation. Klinger Decl. ¶ 36; Wolfson Decl. ¶ 15.

On June 10, 2022, the Parties attended an all-day mediation session with Jill Sperber of Judicate West. Klinger Decl. ¶ 37; Wolfson Decl. ¶ 14. While the Parties were unable to resolve the matter on June 10, they continued to negotiate with the assistance of Ms. Sperber. Klinger Decl. ¶ 37; Wolfson Decl. ¶ 17. After additional weeks of hard-fought negotiations, on June 28, 2022, the Parties agreed to a mediator's proposal that set forth a settlement in principle. Klinger Decl. ¶ 37; Wolfson Decl. ¶ 18. Thereafter, the Parties negotiated the myriad of details regarding the Settlement, circulating drafts back and forth of the Settlement Agreement and its many exhibits. Klinger Decl. ¶ 37; Wolfson Decl. ¶¶ 19-20. Plaintiffs also obtained competitive bids from various experienced Settlement Administrators and thereafter chose P&N to act as the Settlement Administrator, subject to the Court's approval. Klinger Decl. ¶ 38; Wolfson Decl. ¶ 21. The Settlement Agreement was finalized and executed on August 31, 2022. Klinger Decl. ¶ 39; Wolfson Decl. ¶ 22. Plaintiffs now move the Court for preliminary approval of the Settlement Agreement and for certification of the Settlement Class.

## II.  SUMMARY OF THE SETTLEMENT

### A.  The Settlement Class

Under the terms of the Settlement, the Parties agreed to certification pursuant to Rule 23(b)(3) of the following Settlement Class for settlement purposes only:

> All natural persons who are residents of the United States whose Personal Information was potentially compromised in the Ransomware Attack and were sent, either by U.S. Mail or e-mail, notice by Forefront that their Personal Information may have been compromised in the Ransomware Attack.

SA ¶ 1.45; Fed. R. Civ. P. 23(b)(3).[4] The Settlement Class consists of approximately 2,413,553 individuals. Klinger Decl. ¶ 41; Wolfson Decl. ¶¶ 23, 34.

### B.  Settlement Benefits to Settlement Class Members

Pursuant to the Settlement, Forefront will establish a $3,750,000 non-reversionary Settlement Fund. Settlement Class Members ("Class Members") will be have an opportunity to submit a Claim for either: (a) Credit Monitoring and Insurance Services ("CMIS") (two years of 3-bureau credit monitoring, up to $1,000,000 of coverage for identity theft, credit monitoring, fraud consultation, and identity theft restoration services), a payment to compensate for Documented Losses,[5] and/or a payment for Lost Time;[6] or, in the alternative to the foregoing, (b)

---

[4]    The Settlement Class excludes: (1) the Judges presiding over the Action and members of their families; (2) Forefront, its subsidiaries, parent companies, successors, predecessors, and any entity in which Forefront or its parents, have a controlling interest, and its current or former officers and directors; (3) natural persons who properly execute and submit a Request for Exclusion prior to the expiration of the Opt-Out Period; and (4) the successors or assigns of any such excluded natural person. SA ¶ 1.45.

[5]    "Documented Losses" are monetary losses (up to $10,000), supported by Reasonable Documentation, for attempting to remedy that are more likely than not traceable to the Ransomware Attack, and that are not otherwise recoverable through insurance. SA ¶¶ 1.16, 3.2(b).

[6]    "Lost Time Payments" means a Class Members' lost time (up to 5 hours at $25 per hour) resulting from efforts undertaken to prevent or mitigate fraud and identity theft following the announcement of the Ransomware Attack. SA ¶¶ 1.27, 3.2(c).

a Cash Fund Payment (described below). SA ¶¶ 3.1, 3.2(a)-(d). In addition to this direct relief, all Class Members will benefit from the Settlement's prospective relief which obligates Forefront to employ certain data security measures. *Id.* ¶ 2.1.

To submit a Claim, a Class Member need only submit a Claim Form prior to the Claim Deadline. SA ¶¶ 3.2, 3.4 & Ex. A. A Class Member may only choose from the two options described above (i.e., CMIS, and/or Documented Loss Payment, and/or Lost Time Payment, **or** alternative Cash Fund Payment). Class Members who submit a Claim Form for a Cash Fund Payment will not be entitled to select the CMIS, Documented Loss Payment, or Lost Time Payment benefits. *Id.* ¶ 3.2(d).

To calculate the Cash Fund Payment amount, the Settlement Administrator will first apply the Net Settlement Fund to pay for CMIS claimed by Class Members.[7] SA ¶ 3.7. If funds remain after paying for the CMIS, the Settlement Administrator will pay claims for Documented Loss Payments and Lost Time Payments. *Id*. Any remaining funds thereafter will be distributed, *pro rata*, to Class Members who made claims for the Cash Fund Payment. *Id*.

The Parties negotiated the Settlement Benefits (and the structure) as fair compensation by discussing the type of Personal Information potentially accessed by the unknown third-parties in the Ransomware Attack and the amount of both time and money Class Members may have spent responding to the Ransomware Attack. The Parties also considered similar settlements in comparable data breach cases.[8] Here, the benefits to the Class outweigh the risk, time delay, and

---

[7]    In the unlikely event the Net Settlement Fund is insufficient to cover the payment for the CMIS claimed by Class Members, the duration of the CMIS coverage will be reduced to exhaust the fund. SA ¶ 3.7.

[8]    *See, e.g., Dickey's Barbeque Restaurants, Inc.*, Case No. 20-cv-3424, ECF No. 62 (N.D. Tex.) (data breach class action involving more than three million people that settled for $2.3 million (or $0.76 per class member)); *In re Herff Jones Data Breach Litig.*, No. 21-cv-1329 (S.D.

net expected value of continued litigation. *Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277, 284 (7th Cir. 2002); *see also* Section III(B)(1) and Section III(C)(1)*, infra.*

### C. Prospective Relief

In addition to the benefits described above, Forefront will also implement the following valuable data security measures for a period of no less than two years from the Effective Date of the Settlement:

    a. Implement and maintain two-factor authentication throughout their systems, where reasonably appropriate and practicable;

    b. Retain qualified third-party vendor(s) to assist in augmenting Forefront's information and data security and Forefront's information and data security business practices;

    c. Retain qualified third-party vendor(s) to provide real-time support to Forefront regarding its information and data security;

    d. Implement, where reasonably appropriate and practicable, immutable storage across Forefront's information technology network(s) to avoid tampering with and/or deleting any backups;

    e. Implement single sign-on, lifecycle management, and adaptive, multi-factor authentication services, where available;

    f. Enhance endpoint management and security for all Forefront computers, including desktops, servers, and tablets; and

    g. Implement, where reasonably appropriate and practicable, best practices for active directories, servers, and work stations.

SA ¶ 2.1.

---

Ind.) (more than one million class members; $4.35 million settlement (or approximately $4.35 per person)); *Cochran, et al. v. Kroger Co., et al.,* No. 5:21-cv-01887-EJD (N.D. Cal.), ECF No. 115 ($5 million non-reversionary fund to class of 3.82 million people) (or $1.31 per class member where defendant paid a ransom for return of the information and no dark web activity detected)).

**D.      The Release of Claims by the Settlement Class**

In consideration of the Settlement Benefits (described in Section II(A)-(C), *supra*), the Class Representatives and all Class Members will release and discharge all Released Claims, including Unknown Claims, against each of the Released Parties and will agree to refrain from instituting, directing, or maintaining any lawsuit, contested matter, adversary proceeding, or miscellaneous proceeding against each of the Released Parties that relates to the Ransomware Attack or otherwise arises out of the same facts and circumstances set forth in the Consolidated Class Action Complaint in the Action. SA ¶¶ 1.38, 1.39, 4.1, 4.2.

**E.      Class Representative Service Awards**

Class Counsel will make an application to the Court for $2,500, to be paid from the Settlement Fund, for each of the three Class Representatives in recognition of their efforts spent in prosecuting this action on behalf of the Settlement Class. *Id.* ¶¶ 8.1, 8.2. The Parties did not discuss the payment of Service Awards to Class Representatives until after the substantive terms of the Settlement had been agreed upon. *Id.* ¶ 8.4. Plaintiffs' support for the Settlement as fair, reasonable, and adequate is not conditioned upon the Court's award of the requested Service Awards, and in the event the Court declines to approve, in whole or in part, the payment of the Service Awards, the remaining provisions of the Agreement shall remain in full force and effect. *Id.* ¶ 8.3. The finality or effectiveness of the Settlement will not be dependent on the Court awarding Class Representatives the Service Awards. *Id.*

**F.      Attorneys' Fees, Costs, and Expenses**

The Settlement allows Plaintiffs' Counsel to make an application to the Court for an award of reasonable attorneys' fees, costs, and expenses (i.e., the Fee Award and Costs) to be paid from the Settlement Fund. SA ¶ 9.1. The Parties did not discuss or agree to the amount to be applied for

7

(i.e., the Settlement does not include a "clear sailing provision"). Class Counsel intend to apply for an attorneys' fee award of up to one-third of Settlement Fund (i.e., $1,250,000) plus costs and expenses incurred. Klinger Decl. ¶ 70; Wolfson Decl. ¶ 53. The Long Form Notice discloses this amount. SA, Ex. D, ¶ 13.

G.      **Settlement Administration and Notice**

After competitive bidding, the Parties agreed to propose that Postlethwaite & Netterville ("P&N") serve as the Settlement Administrator subject to the Court's approval. Wolfson Decl. ¶ 21. P&N, established over 70 years ago, is an experienced and well qualified administrator. *See* www.pncpa.com/services/consulting/claims-administration/. P&N will provide notice to the Settlement Class (as described below) and process Class Member Claims. All Settlement administration and notice expenses will be paid from the Settlement Fund. SA ¶¶ 3.14, 6.2.

Pursuant to Rule 23(e), the Administrator will provide Class Members with the Summary Notice via email for any Class Member for whom an email address is available, and via U.S. mail in postcard form for all other Class Members for whom a physical mailing address is available. SA ¶¶ 6.3(a)-(b), Ex. F; *see also* concurrently filed Declaration of Brandon Schwartz ("Schwartz Decl.") (qualified class action notice expert at P&N) ¶ 12. Undeliverable email notices will result in a post card Summary Notice being sent via US Mail. SA ¶ 6.3(c); Schwartz Decl. ¶ 12. For Summary Notices returned as undeliverable via U.S. mail, the Administrator will re-mail the notice to any forwarding address identified on the return mail. SA ¶ 6.3(d); Schwartz Decl. ¶ 12.

The Administrator will also create and maintain a Settlement Website that contains all relevant information and documents regarding the Settlement through which Class Members can submit electronic Claims Forms and Requests for Exclusion. SA ¶ 6.7; Schwartz Decl. ¶ 13. The Settlement Website will also contain a toll-free telephone number and mailing address through

which Class Members can contact the Administrator. SA ¶ 6.7; Schwartz Decl. ¶ 14. The language of all Notice Forms (SA, Exs. A, D, F) is easily understandable and takes into account the education level or language needs of the proposed Class Members. Schwartz Decl. ¶¶ 16, 17.

The Notice Plan is the best practicable under the circumstances and is reasonably calculated to apprise Class Members of the action and their right to participate in, object to, or exclude themselves from the Settlement, and readily meets due process requirements under Rule 23(e). Schwartz Decl. ¶¶ 7, 19; Fed. R. Civ. P. 23(e).

### H. Settlement Class Members' Right to Opt-Out

Any Class Member seeking to opt-out of the Settlement must submit a Request for Exclusion from the Settlement Class to the Settlement Administrator—postmarked no later than seventy-five (75) days after the Notice Date. SA ¶ 6.8. Class Members who wish to opt-out may do so electronically via the Settlement Website or via U.S. Mail. *Id.* Class Members who properly file a timely request for exclusion will not release their claims pursuant to the Agreement. *Id.*

### I. Settlement Class Members' Right to Object

Any Settlement Class Member who does not opt out of the Settlement Class may object to the Settlement and/or any application for Service Awards or Plaintiffs' Counsel's application for a Fee Award and Costs. *Id.* ¶ 6.9. Written objections may be submitted to the Court either by mailing them to the Clerk's office, or by filing them in person at any location of the Court and must be filed or postmarked within seventy-five (75) days following the Notice Date. *Id*.

### J. Schedule for Settlement Administration

The Parties request that the Court set the following schedule for the Settlement:

- Within fourteen (14) days after entry of the Preliminary Approval Order, Forefront shall provide the Settlement Administrator with the name, address, e-mail, and other contact information (i.e., the Settlement Class List) that it has in its possession for each Settlement Class Member for which it has such information. *Id.* ¶ 6.4.

9

- The Notice Plan will commence no later than thirty-five (35) days of entry of the Preliminary Approval Order. *Id.* ¶ 1.30.

- Class Members may object or request to be excluded from the Settlement for seventy-five (75) days after the Notice Date. *Id.* ¶¶ 1.32, 1.33, 6.8, 6.9.

- Class Members shall have ninety (90) days after the Notice Date to submit a Claim Form. *Id.* ¶¶ 1.9, 1.10, 3.4.

- Plaintiffs' Counsel shall file their application for the Fee Award and Costs and Service Awards on or before twenty-one (21) days prior to the Objection Deadline. *Id.* ¶¶ 8.1, 9.1.

- The Preliminary Approval Order, filed herewith, shall request the Court set a date for a Final Approval Hearing. Plaintiffs shall move this Court to set a Final Approval Hearing to determine the fairness, reasonableness, and adequacy of the Settlement and to request the Court issue a Final Approval Order and Judgment in the Settlement. Plaintiffs shall file this Motion for Final Approval of the Class Action Settlement within fourteen (14) days prior to the Final Approval Hearing. *Id.* ¶ 5.4.

A table of proposed Settlement dates is provided in the proposed Preliminary Approval Order.

## III.   PRELIMINARY APPROVAL OF THE SETTLEMENT IS APPROPRIATE

### A.   Legal Standard

As a matter of public policy, the law favors and encourages settlements. *Nat'l Cas. Co. v. White Mountains Reinsurance Co. of Am.*, 735 F.3d 549, 556 (7th Cir. 2013). Indeed, there is an "overriding public interest in favor of settlement of class actions." *Donovan v. Estate of Fitzsimmons*, 778 F.2d 298, 307 (7th Cir. 1985) (quotation marks and citation omitted).

The Court's review of a proposed class action settlement generally involves three steps:

1.   Consideration of a written motion for preliminary approval;

2.   Dissemination of notice of the Settlement to Class Members; and

        3.     Conducting a final approval hearing where, among other things, Class Members have an opportunity to present their views regarding the settlement.

Fed. R. Civ. P. 23(e); *see also* Herbert B. Newberg & Alba Conte, *Newberg on Class Actions* §§ 11.22 *et seq.* (5th ed. 2011). Courts use this three-step process to act as an independent guardian of class interests and safeguard class members' procedural due process rights. *Charron v. Wiener*, 731 F.3d 241, 249 (2d Cir. 2013).

      Under this first step of the settlement process, the Court conducts a preliminary evaluation to determine "whether there is any reason to notify the class members of the proposed settlement and to proceed with a fairness hearing." *Gautreaux v. Pierce*, 690 F.2d 616, 621 n.3 (7th Cir. 1982) (internal citations omitted). Moreover, the main question the Court should ask at the preliminary stage is whether the proposed settlement falls "within the range of possible approval." *Chesemore v. All. Holdings, Inc.*, No. 09-cv-413-WMC, 2014 WL 12730484, at *1 (W.D. Wis. Apr. 9, 2014) (internal citations omitted); *In re AT & T Mobility Wireless Data Servs. Sales Litig.*, 270 F.R.D. 330, 346 (N.D. Ill. 2010); *Armstrong v. Board of Sch. Directors of City of Milwaukee*, 616 F.2d 305, 313 (7th Cir. 1980) *overruled on other grounds by Felzen v. Andreas*, 134 F.3d 873 (7th Cir. 1998) ("The courts of appeals have required that district court approval of a settlement pursuant to Rule 23(e) be given only where the district court finds the settlement fair, reasonable and adequate."). If the Court finds the Settlement within the range of possible approval at the time of preliminary approval, notice of the Settlement will be given to Class Members, and a hearing scheduled to consider final settlement approval.

      Accordingly, the Court assesses the ultimate question of fairness only after the final hearing, after notice of the settlement has been given to the class members, and after the class members have had the opportunity to voice their view of the settlement. Moore's Federal Practice,

23.165[3] (3d ed. 2005). Indeed, "[i]n this circuit, the practice is for the court to give its preliminary approval after reviewing the proposed settlement and then to give final approval after notifying the class members and holding a hearing." *Jones v. Crusin' Chubbys Gentlemen's Club*, No. 17-cv-125-JDP, 2018 WL 11236460, at *1 (W.D. Wis. Nov. 21, 2018).

However, the Supreme Court has cautioned that, in reviewing a proposed class settlement, a court should "not decide the merits of the case or resolve unsettled legal questions." *Carson v. Am. Brands, Inc.*, 450 U.S. 79, 88 n.14 (1981); *see also E.E.O.C. v. Hiram Walker & Sons, Inc.*, 768 F.2d 884, 889 (7th Cir. 1985), *cert. denied*, 478 U.S. 1004 (1986); *Isby v. Bayh*, 75 F.3d 1191, 1196-97 (7th Cir. 1996).

At this juncture, Plaintiffs request that the Court grant preliminary approval of the Settlement, which only requires that the Court find that the proposed Settlement is fair, reasonable, and adequate and "within the range of possible approval." *Chesemore*, 2014 WL 12730484, at *1.

## B.     The Settlement Satisfies Seventh Circuit Factors

Here, the Settlement before the Court is fair, reasonable, and adequate, and well within the range of possible approval because it provides credit monitoring and monetary benefits to Class Members, injunctive relief in the form of robust cybersecurity enhancements for Forefront's IT systems, avoids the uncertainty and expense of prolonged litigation, and avoids the need to resolve contentious factual and legal issues. The Settlement Agreement further satisfies the factors set forth by the Seventh Circuit in assessing whether a proposed settlement agreement is within the range of fairness, reasonableness, and adequacy:

> (1) the strength of the case for plaintiffs on the merits, balanced against the extent of settlement offer; (2) the complexity, length, and expense of further litigation; (3) the amount of opposition to the settlement; (4) the reaction of members of the class to settlement; (5) the opinion of competent counsel; and (6) stage of the proceedings and the amount of discovery completed.

*Wong v. Accretive Health, Inc.*, 773 F.3d 859, 863 (7th Cir. 2014) (citation omitted).

In weighing these factors, a district court should "recognize[] that the first factor, the relative strength of plaintiffs' case on the merits as compared to what the defendants offer by way of settlement, is the most important consideration." *Isby*, 75 F.3d at 1199. The Seventh Circuit has explained that district courts should "consider the facts in the light most favorable to the settlement." *Id.* at 1198-99 (internal quotations and citation omitted). Further, "[t]he essence of settlement is compromise . . . [t]hus, the parties to a settlement will not be heard to complain that the relief afforded is substantially less than what they would have received from a successful resolution *after* trial." *E.E.O.C.*, 768 F.2d at 889 (emphasis original). Indeed, a district court should not reject a settlement "solely because [the settlement] does not provide a complete victory to the plaintiffs." *Isby*, 75 F.3d at 1200. Consideration of these factors confirms that the proposed Settlement here is well "within the range of possible approval" and weighs in favor of the Court preliminarily approving the Settlement.

1.      **The Strength of Plaintiffs' Case Is Well-Balanced Against the Amount Offered in the Settlement and the Complexity, Length, and Expense of Further Litigation Favors Settlement Now**

"[A]n integral part of the strength of a case on the merits is a consideration of the various risks and costs that accompany continuation of the litigation." *Donovan*, 778 F.2d at 309. Here, Defendant disputes Plaintiffs' allegations and denies that it is liable for any harm caused to Plaintiffs from the cyberattack. Defendant indicated it will vigorously defend the case and has already filed an extensive motion to dismiss for failure to state a claim upon which relief can be granted. ECF No. 42. While Plaintiffs have arguments and authorities that can support their allegations, the number of issues in this case, which centers on a developing area of law—data breach litigation—creates significant uncertainty. Even assuming Plaintiffs can defeat Defendants' pending motion to dismiss, there is no guarantee that the Court or a jury would find Plaintiffs'

arguments more persuasive during a trial or subsequent appeals. Thus, despite Plaintiffs' confidence in the strength of this case, numerous legal issues and factual disputes exist that undermine the certainty of a more favorable outcome for the Class.

In addition, there are inherent risks associated with taking any data breach class action to trial, including pre-trial risks of obtaining class certification and defeating summary judgment. And plaintiffs in data breach cases often allege injuries, such as the risk of future identity theft, and loss of control of their sensitive information, which are the subject of intense controversy. Even if class certification is obtained and Plaintiffs are successful at trial, or if Forefront obtains summary judgment, Forefront or Plaintiffs would likely appeal, causing further delay and raising expenses. The Settlement allows for Class Members to obtain benefits within the near future—as opposed to potentially waiting for years—and eliminates the possibility of receiving no benefits. Resolution in the near-term also helps mitigate any harm that the Class Members may have suffered by providing access to credit monitoring benefits in the near-term, rather than after prolonged litigation.

Moreover, the complexity, length, and expense of further litigation favors settlement now. Continued litigation would likely involve motions to dismiss, costly discovery involving experts regarding damages, motions for summary judgment, a motion for class certification, and one or more interlocutory appeals, all of which would delay final resolution. Litigating this case to a favorable conclusion will require a considerable amount of time and resources, and weighs in favor of accepting the Settlement now. *General Elec. Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1082 (7th Cir. 1997); *see also In re AT & T Mobility Wireless Data Servs. Sales Litig.*, 270 F.R.D. at 347 ("Even if Plaintiffs were to succeed on the merits at some future date, a future victory is not as valuable as a present victory. Continued litigation carries with it a decrease in the time

value of money, for '[t]o most people, a dollar today is worth a great deal more than a dollar ten years from now.'") (internal citation omitted)). This factor also weighs in favor of preliminary approval. Thus, given the risks Plaintiffs face going forward, the amount offered in Settlement—both monetary and non-monetary—is well-balanced against the hurdles Plaintiffs will have to overcome to find success later down the road.

      **2.**    **Thus Far, There Has Been No Opposition to the Settlement and the Reaction of the Members of the Class to the Settlement Has Been Positive**

At the current stage of the litigation, prior to the dissemination of the class notice, no Class Members, including the named Plaintiffs, have indicated any objections to the proposed Settlement and have been in support of the Settlement. Accordingly, this factor is neutral in the analysis at this stage of the proceedings.

      **3.**    **The Opinion of Competent Counsel Is That the Settlement Is Fair, Reasonable, and Adequate, and Should Be Approved**

Class Counsel is familiar with data breach class action litigation and endorses the proposed Settlement. Indeed, the work of proposed Class Counsel in this action to date, as well as their experience prosecuting complex litigation matters, demonstrates that they are well-qualified to represent the Settlement Class and opine on the fairness of the proposed Settlement. Klinger Decl. ¶¶ 12-19, 78-79 & Exhibit A; Wolfson Decl. ¶¶ 37-38, 44-46, 54-70 & Exhibit A.

      **4.**    **The Stage of the Proceedings and the Amount of Discovery Completed Favors Settlement Now**

As discussed *infra*, the Parties have participated in informal confirmatory discovery. Plaintiffs requested, received, and reviewed information from Forefront in connection with mediation and settlement negotiations. Forefront also has a Rule 12(b)(6) motion pending before this Court. ECF No. 42. Plaintiffs have expended significant efforts researching and preparing their

oppositions to Defendant's motion and continued their factual investigation of the Ransomware Attack in anticipation of discovery. Klinger Decl. ¶ 73; Wolfson Decl. ¶¶ 44-51. Thus, this factor weighs in favor of Settlement now.

### C. The Settlement Is Fair, Reasonable, and Adequate Under Rule 23(e)(2)

Under Rule 23(e)(2), courts determining the fairness of a class action settlement must consider whether:

> (A) the class representatives and class counsel have adequately represented the class; (B) the proposal was negotiated at arm's length; (C) the relief provided for the class is adequate, taking into account: (i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class member claims; (iii) the terms of any proposed award of attorney's fees, including timing of payment; and (iv) any agreement required to be identified under Rule 23(e)(3); and (D) the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e). The proposed Settlement readily satisfies all of the foregoing factors such that the Court will likely be able to grant final approval of the Settlement. Fed. R. Civ. P. 23(e)(1)(B) (requiring courts at the preliminary approval stage to consider whether it will "likely be able to (i) approve the proposal [as fair, reasonable, and adequate] under Rule 23(e)(2); and (ii) certify the class for purposes of judgment on the propos[ed settlement].").

Here, the Class Representatives and Class Counsel adequately represent the Class and the Settlement was negotiated at arm's length. Fed. R. Civ. P. 23(e)(2)(A), (B). Class Counsel are highly experienced in complex consumer class-action litigation—in particular, data breach class action—and negotiated this Settlement at arm's length. Klinger Decl. ¶¶ 36-37, 12-19, 78-79; Wolfson Decl. ¶¶ 37, 54-70. Plaintiffs have no conflicts of interest with the other members of the Settlement Class, had their Personal Information allegedly comprised in the same Ransomware Attack as the other Class Members, and share the Class's interests of maximizing their recovery and preventing future harm. Klinger Decl. ¶ 77; Wolfson Decl. ¶ 50.

16

Additionally, Plaintiffs achieved an excellent result for the Class. All Class Members are eligible for two years of three bureau credit monitoring and up to $1,000,000 of coverage for identity theft incidents. SA ¶ 3.2(a). Class Members may also claim up to $10,000 in Documented Loss Payments and an additional Lost Time Payment for up to $125.00. *Id.* ¶ 3.2(b), (c). In the alternative to the foregoing, Class Members can elect a *pro rata* cash payment through an alternative Cash Fund Payment. *Id.* ¶ 3.2(d). Moreover, Forefront is implementing data security upgrades to prevent a reoccurrence of the harm that Plaintiffs allege resulted from its data security practices. *Id.* ¶ 2.1(a)-(g).

Further, a proposed settlement is presumed to be fair and reasonable when it is the result of arm's length negotiations. *Mars Steel Corp. v. Cont'l Ill. Nat'l Bank & Tr. Co. of Chicago*, 834 F.2d 677, 681-82 (7th Cir. 1987); *Armstrong*, 616 F.2d at 325; *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1276 (9th Cir. 1992); *In re Lorazepam & Clorazepate Antitrust Litig.*, 205 F.R.D. 369, 375-76 (D.D.C. 2002) ("A 'presumption of fairness, adequacy, and reasonableness may attach to a class settlement reached in arms-length negotiations'") (internal quotations and citation omitted)); *In re Holocaust Victim Assets Litig.*, 105 F. Supp. 2d 139, 145-46 (E.D.N.Y. 2000) (in determining fairness, the "consideration focuses on the negotiating process by which the settlement was reached") (internal quotation omitted)). This presumption is applicable here.

As discussed above, the Settlement is the result of prolonged arm's length negotiations, including a mediation and numerous telephone conferences and e-mails directly between experienced counsel who had a comprehensive understanding of the strengths and weaknesses of each party's claims and defenses. Klinger Decl. ¶¶ 37-40; Wolfson Decl. ¶¶ 37-40. The negotiations were mediated and facilitated by an experienced mediator with substantial experience in class actions, including data breach class actions. Klinger Decl. ¶ 37; Wolfson Decl. ¶ 40. The

involvement of a neutral mediator in the settlement process confirms a settlement as non-collusive. *See, e.g., G. F. v. Contra Costa Cnty.*, No. 13-cv-03667, 2015 WL 4606078, at *13 (N.D. Cal. July 30, 2015) ("[T]he assistance of an experienced mediator in the settlement process confirms that the settlement is non-collusive.") (internal quotation marks and citation omitted). Moreover, the Settlement was reached only after Class Counsel analyzed information provided by Forefront in informal and confirmatory discovery and performed other research and investigation related to the Ransomware Attack. Klinger Decl. ¶ 39; Wolfson Decl. ¶ 41. Given these facts, the Settlement is shown to be non-collusive.

The Settlement also proposes substantial relief to the Class and satisfies the third consideration, which focuses on the adequacy of relief to the class. To determine whether a proposed settlement affords adequate relief the Court must consider a set of four factors:

### 1. The Costs, Risks, and Delay of Trial and Appeal

The first of these factors is "[t]he costs, risks, and delay of trial and appeal." Fed. R. Civ. P. 23(e)(2)(C)(i). Here, this factor largely mirrors the first two *Wong* factors (the strength of plaintiffs' case compared to the terms of the proposed settlement and the complexity, length and expense of further litigation) (*see* Section III(B)(1) *supra*). Thus, as stated above, settlement now is favorable to all parties.

### 2. The Effectiveness of Any Proposed Method of Distributing Relief to the Class, Including the Method of Processing Class Member Claims

Here, the Settlement builds on the list of impacted individuals whose names, addresses, and other contact information are maintained by Forefront. Klinger Decl. ¶ 41; Wolfson Decl. ¶ 23. The Settlement Administrator will provide direct email notice to the Class or otherwise provide notice via U.S. Mail. *See In re AT & T Mobility Wireless Data Servs. Sales Litig.*, 270 F.R.D. at 351 (approving direct notice via email for former customers and via U.S. Mail if email notice was

ineffective). Accordingly, the Notice Plan includes a high rate of direct notice to Class Members. Further, the Settlement provides for a claims process that requires minimal documentation from Class Members while conferring significant benefits to the Class. SA ¶ 3.2. Each Class Member need only submit a Claim Form to benefit from the offered CMIS. *Id.* ¶ 3.2(a). To claim the Documented Loss Payment, Class Members must provide a mere attestation and Reasonable Documentation of any losses that resulted from the Ransomware Attack. *Id.* ¶ 3.2(b). Class Members making a claim for a Lost Time Payment must provide a brief narrative of the efforts undertaken and an attestation. *Id.* ¶ 3.2(c); SA, Ex. A. And Class Members who wish to submit a claim for an alternative Cash Fund Payment need only submit a claim and no documentation or attestation is required. *Id.* ¶ 3.2(d). Accordingly, the simplified claims process weighs in favor of preliminary approval of the Settlement.

### 3. The Terms of Any Proposed Fee Award and Costs, Including Timing of Payment

Class Counsel will separately file a motion for an award of attorneys' fees and reimbursement of litigation costs and expenses, i.e., a Fee Award and Costs. SA ¶ 9.1. Notably, there is no "free sailing" clause in the Settlement, and Plaintiffs' forthcoming application for a Fee Award and Costs will be subject to approval by this Court, and the Court itself will retain discretion to ensure that any Fee Award and Costs will be fair. *Id.* Finally, the Settlement Agreement's effectiveness and finality are not dependent on any award of fees, costs, and expenses. *Id.* ¶ 9.3.

### 4. The Presence of Any Agreements Between the Parties Separate from the Settlement Agreement

There are no such agreements in this case. Thus, this factor weighs in favor of preliminary approval. Accordingly, the fourth factor, whether class members are treated equitably relative to each other, Fed. R. Civ. P. 23(e)(2)(D), also supports preliminary approval. The proposed

Settlement treats Class Members equitably relative to each other, as all Class Members whose Personal Information was allegedly compromised in the Ransomware Attack will have the same remedy options. *See* Section (II)(B) *supra*.

## IV. CERTIFICATION OF THE SETTLEMENT CLASS

As the Supreme Court has recognized, the "settlement only class" has become a "stock device" and all federal Circuits have recognized its utility. *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 618 (1997); *see also In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prod. Liab. Litig.*, 55 F.3d 768, 784 (3d Cir. 1995) (stating that courts favor the use of settlement classes "to foster negotiated solutions to class actions"). A settlement class in complex litigation "actually enhances absent class members' opt out rights because the right to exclusion is provided simultaneously with the opportunity to accept or reject the terms of a proposed settlement." *In re Prudential Sec. Inc. Ltd. P'ship Litig.*, 163 F.R.D. 200, 205 (S.D.N.Y. 1995). When granting preliminary approval of a class action settlement, it is appropriate for a court to certify a class for settlement purposes only. *Amchem*, 521 U.S. at 620 (explaining that the same standards apply to class certification for purposes of settlement as to any other motion for class certification, except that an inquiry into trial management problems is unnecessary).

### A. The Requirements Under Fed. R. Civ. P. 23(a) Are Satisfied

Rule 23(a) sets forth the following prerequisites for certifying a class: "(1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a). Additionally, where certification is sought under Rule 23(b)(3), the plaintiffs must demonstrate that common questions of law or fact predominate

over individual issues and that a class action is superior to other methods of adjudicating the claims. Fed. R. Civ. P. 23(b)(3). These requirements are satisfied here.

1.      **The Settlement Class Is So Numerous That Joinder of Individual Members Is Impracticable**

Numerosity is satisfied because, according to Forefront's investigation into the Ransomware Attack, approximately 2,413,553 individuals comprise the Class. This easily meets the numerosity requirement. *Irish v. BNSF Ry. Co.*, No. 08-CV-469-SLC, 2009 WL 276519, at *13 (W.D. Wis. Feb. 4, 2009) (on motion to remand, Court found that proposed class consisting of up to 369 members satisfied numerosity).

2.      **There Are Questions of Law and Fact Common to the Settlement Class**

Second, there are questions of law and fact common to all Class Members. Rule 23(a)(2) is satisfied if class claims raise at least one common question that will generate "common answers" likely to "drive the resolution of the litigation." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). Here, there are questions of law and fact common to the proposed Settlement Class that predominate over any individual questions. These questions include, but are not limited to:

- whether Forefront owed a duty to Plaintiffs and members of the Class to adequately protect their Personal Information and to provide timely and accurate notice of the Ransomware Attack to Plaintiffs and the Class, and whether it breached these duties;

- whether Forefront violated federal and state laws thereby breaching its duties to Plaintiffs and the Class as a result of the Ransomware Attack;

- whether Forefront knew or should have known that its website was vulnerable to attacks from hackers and cyber-criminals;

- whether Forefront's conduct, including its failure to act, resulted in or was the proximate cause of the Ransomware Attack resulting in the theft of customers' Personal Information;

- whether Forefront wrongfully failed to inform Plaintiffs and members of the Class that it did not maintain website and other security procedures and precautions

21

sufficient to reasonably safeguard consumers' sensitive financial and personal data;

- whether Forefront failed to inform Plaintiffs and the Class of the Ransomware Attack in a timely and accurate manner;

- whether Forefront continues to breach duties to Plaintiffs and Class; and

- whether Forefront has sufficiently addressed, remedied, or protected Plaintiffs and Class members following the Ransomware Attack and has taken adequate preventive and precautionary measures to ensure the Plaintiffs and Class members will not experience further harm;

These common questions predominate over any individual questions that may exist. *Butler v. Sears, Roebuck & Co.*, 727 F.3d 796, 801 (7th Cir. 2013) ("predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation . . . common issues need only predominate, not outnumber individual issues.") (citations omitted)).

### 3. Plaintiffs' Claims Are Typical of the Claims of the Settlement Class

Third, Plaintiffs' claims and the defenses thereto are typical of the claims and defenses of the Settlement Class. "[A] plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and his or her claims are based on the same legal theory." *Rosario v. Livaditis*, 963 F.2d 1013, 1018 (7th Cir. 1992) (internal citations omitted). Here, Plaintiffs' claims are typical of the claims of the Settlement Class because both claims arise out of the same course of conduct by Forefront—the Ransomware Attack—and rest on exactly the same legal theory—whether Forefront owed Plaintiffs and Class Members a duty to adequately protect their Personal Information and to provide timely and accurate notice of the Ransomware Attack to Plaintiffs and Class Members, and whether it breached these duties. Moreover, "[t]he typicality requirement may be satisfied even if there are factual distinctions between the claims of the named plaintiffs and those of other class members." *De La Fuente v.*

*Stokely-Van Camp, Inc.*, 713 F.2d 225, 232 (7th Cir. 1983). The Rule 23(a)(3) typicality requirement is satisfied.

### 4. The Interests of Plaintiffs and Proposed Settlement Class Counsel Are Aligned with the Interests of the Settlement Class

Fourth, Plaintiffs and Class Counsel will fairly and adequately protect the interests of the Settlement Class. "Adequate representation depends on two factors: (a) the plaintiff's attorney must be qualified, experienced, and generally able to conduct the proposed litigation, and (b) the plaintiff must not have interests antagonistic to the class." *Susman v. Lincoln American Corp.*, 561 F.2d 86, 90 (7th Cir. 1977). Representative Plaintiffs have demonstrated that they are well-suited to represent the Settlement Class, as they have prosecuted this action on behalf of and to the benefit of the Settlement Class. Representative Plaintiffs have already provided information for pleadings and settlement discussions, informal discovery responses, engaged with Class Counsel regarding the litigation, participated in the settlement negotiations via email, phone, or text messaging, and approved the proposed Settlement terms. Klinger Decl. ¶ 75; Wolfson Decl. ¶¶ 48-51. Similarly, Class Counsel are well-qualified to represent the Settlement Class because Ahdoot & Wolfson and Milberg Coleman Bryson Phillips Grossman, PLLC are nationally-recognized class action law firms with particular expertise in the data privacy space, and the firms have handled many complex class actions, including a multitude of data breach class actions. Klinger Decl. ¶¶ 3-19, 78-79; Wolfson Decl. ¶¶ 54-70. Indeed, Class Counsel have worked diligently on behalf of the Class to obtain information from Forefront regarding the Ransomware Attack and used that information to negotiate the Settlement now before the Court. Klinger Decl. ¶¶ 27-29, 73; Wolfson Decl. ¶¶ 16, 26-35.

**B.     The Requirements Under Fed. R. Civ. P. 23(b)(3) Are Satisfied**

Rule 23(b)(3) requires that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating of the controversy." Fed. R. Civ. P. 23(b)(3).

Here, the numerous questions common to the Class, including those listed above, demonstrate commonality under Rule 23(a)(2), and predominate over any individual issues. The key elements of Plaintiffs' claims—the existence of inadequate data security protections, Forefront's knowledge or constructive knowledge of those failures, the exposure of Class Members' Personal Information as a result of the Ransomware Attack, and the existence and amount of resulting damages, for example—are common issues, and thus the class is "sufficiently cohesive to warrant adjudication by representation," *Chicago Teachers Union, Local No. 1 v. Board of Educ. Of City of Chicago*, 797 F.3d 426, 444 (7th Cir. 2015) (citation omitted). Moreover, the predominance requirement "scarcely demands commonality as to all questions." *Id.*

Further, class resolution is superior to other available means for the fair and efficient adjudication of the claims in this case. Here, the potential damages suffered by individual Class Members have relatively low dollar amounts and may be uneconomical to pursue on an individual basis given the burden and expense of prosecuting individual claims. Moreover, there is little doubt that resolving all Class Members' claims jointly, particularly through a class-wide settlement negotiated on their behalf by experienced counsel well-versed in class action litigation, is superior to a series of individual lawsuits and promotes judicial economy. *Mullins v. Direct Digital, LLC*, 795 F.3d 654, 658 (7th Cir. 2015).

In sum, because the requirements of Rule 23(a) and Rule 23(b)(3) are satisfied, certification of the proposed Settlement Class is appropriate.

## V.     APPOINTMENT OF SETTLEMENT CLASS REPRESENTATIVES AND SETTLEMENT CLASS COUNSEL

"An order certifying a class action . . . must also appoint class counsel under Rule 23(g)." Fed. R. Civ. P. 23(c)(1)(B). In appointing class counsel, courts should consider: (i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class. Fed. R. Civ. P. 23(g)(1)(A).

The work of proposed Class Counsel in this action to date, as well as their experience prosecuting complex litigation matters, demonstrate that proposed Class Counsel are well-qualified to represent the Settlement Class. Klinger Decl. ¶¶ 12-19, 27-29, 73, 78-79; Wolfson Decl. ¶¶ 44-47. Accordingly, the Court should appoint Tina Wolfson and Andrew W. Ferich of Ahdoot & Wolfson, PC and Gary M. Klinger of Milberg Coleman Bryson Phillips Grossman, PLLC as Class Counsel. The Court should also appoint, as Class Representatives, Plaintiffs Leitermann, Anderson, and Kunzelmann who have ably represented the interests of all class members. Klinger Decl. ¶¶ 73, 75; Wolfson Decl. ¶¶ 48-52.

## VI.     THE NOTICE PROGRAM SATISFIES ALL APPLICABLE REQUIREMENTS

Under Rule 23(e), the Court "must direct notice in a reasonable manner to all class members who would be bound by the proposal." Fed. R. Civ. P. 23(e)(1). Thus, Rule 23(e) requires notice that is "reasonably calculated, under all of the circumstances, to apprise interested parties of the pendency of the [settlement proposed] and afford them an opportunity to present their objections." *Towers v. City of Chicago*, 173 F.3d 619, 628 (7th Cir. 1999).

The proposed Notice meets these requirements. The Settlement Administrator will provide Notice pursuant to the Notice Plan as follows: the Settlement Administrator shall send the Summary Notice via E-mail to all Class Members for whom Forefront can ascertain an e-mail address from its records with reasonable effort. SA ¶ 6.3(a). And for any Class Members for whom email is not available, the Settlement Administrator will send the Summary Notice (in postcard form) by U.S. mail, postage prepaid. SA ¶ 6.3(b)-(d). The Summary Notice, attached as Exhibit F to the Settlement Agreement, is clear and concise and includes all information required by Rule 23(c)(2)(B).[9] Further, the Settlement Administrator will establish a Settlement Website and a toll-free telephone number that Class Members can call for more information regarding the Settlement. SA ¶ 6.7.

The proposed Notice Plan is "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950). Thus, the proposed method of Notice described above satisfies due process requirements. *See Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 173 (1974).

## VII.    CONCLUSION

For the reasons set forth herein, Plaintiffs respectfully request that the Court: (1) certify the Settlement Class for purposes of the Settlement; (2) preliminarily approve the Settlement as set

---

[9]      Specifically, it provides detailed information concerning: (a) the rights of Class Members, including the how and by when to lodge objections or opt out; (b) the nature of the litigation and the claims at issue; (c) the proposed Settlement; (d) the available recoveries to Class Members; (e) the process for filing a proof of claim; (f) that fees and expenses are to be sought by Plaintiffs' counsel from the Settlement Fund; and (g) the date of the Final Approval Hearing. It further advises Class Members on how to obtain additional information about the Settlement, including the Long Form Notice and Settlement Agreement, from the Settlement Website.

forth in the Settlement Agreement; (3) approve the form and manner of Notice of the Settlement

to the Settlement Class; and (4) set a hearing date for Final Approval of the proposed Settlement.

Dated: September 1, 2022          Respectfully submitted,

                                   */s/ Andrew W. Ferich*
                                   Andrew W. Ferich*
                                   **AHDOOT & WOLFSON, PC**
                                   201 King of Prussia Road, Suite 650
                                   Radnor, PA 19087
                                   Telephone: (310) 474-9111
                                   Facsimile: (310) 474-8585
                                   aferich@ahdootwolfson.com

                                   Tina Wolfson*
                                   Robert Ahdoot*
                                   **AHDOOT & WOLFSON, PC**
                                   2600 W. Olive Avenue, Suite 500
                                   Burbank, CA 91505-4521
                                   Telephone: (310) 474-9111
                                   Facsimile: (310) 474-8585
                                   twolfson@ahdootwolfson.com
                                   rahdoot@ahdootwolfson.com

                                   Gary M. Klinger*
                                   **MILBERG COLEMAN BRYSON
                                   PHILLIPS GROSSMAN, PLLC**
                                   227 W. Monroe Street, Suite 2100
                                   Chicago, IL 60606
                                   Telephone: 866.252.0878
                                   gklinger@milberg.com

                                   *Counsel for Plaintiffs and the Putative Class*

                                   * admitted *pro hac vice*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on September 1, 2022, the foregoing document was filed via the Court's ECF system, which will cause a true and correct copy of the same to be served electronically on the following ECF-registered counsel of record.

*/s/ Andrew W. Ferich*
Andrew W. Ferich

# APPENDIX OF UNPUBLISHED AUTHORITIES

| Tab | Case/Document |
|-----|---------------|
| 1 | *Chesemore v. All. Holdings, Inc.*, No. 09-cv-413-WMC, 2014 WL 12730484 (W.D. Wis. Apr. 9, 2014) |
| 2 | *G. F. v. Contra Costa Cnty.*, No. 13-cv-03667, 2015 WL 4606078 (N.D. Cal. July 30, 2015) |
| 3 | *Irish v. BNSF Ry. Co.*, No. 08-CV-469-SLC, 2009 WL 276519 (W.D. Wis. Feb. 4, 2009) |
| 4 | *Jones v. Crusin' Chubbys Gentlemen's Club*, No. 17-cv-125-JDP, 2018 WL 11236460 (W.D. Wis. Nov. 21, 2018) |

# TAB 1

Chesemore v. Alliance Holdings, Inc., Not Reported in Fed. Supp. (2014)

2014 WL 12730484

2014 WL 12730484
Only the Westlaw citation is currently available.
United States District Court, W.D. Wisconsin.

Carol CHESEMORE, Daniel Donkel,
Thomas Gieck, Martin Robbins, and
Nanette Stoflet, on behalf of themselves,
individually, and on behalf of all
others similarly situated, Plaintiffs,

v.

ALLIANCE HOLDINGS, INC.,
David B. Fenkell, Pamela Klute,
James Mastrangelo, Stephen W.
Pagelow, Jeffrey A. Seefeldt, Trachte
Building Systems, Inc. Employee
Stock Option Plan, Alliance Holdings,
Inc. Employee Stock Option Plan,
A.H.I., Inc., Alpha Investment
Consulting Group, LLC, John Michael
Maier, AH Transition Corporation,
and Karen Fenkell, Defendants;
Pamela Klute, James Mastrangelo, and
Jeffrey A. Seefeldt, Cross Claimants,

v.

Alliance Holdings, Inc., and Stephen
W. Pagelow, Cross Defendants.

09-cv-413-wmc
|
Signed 04/09/2014

**Attorneys and Law Firms**

Andrew W. Erlandson, Marie A. Stanton, Hurley, Burish & Stanton, S.C., Madison, WI, Karen L. Handorf, Michelle Yau, Robert Joseph Barton, Bruce Frank Rinaldi, Cohen Milstein Sellers & Toll PLLC, Washington, DC, for Plaintiffs.

Charles Clark Jackson, Emily Anne Glunz, Erin E. McAdams, James P. Looby, Katherine Elizabeth Kenny, Morgan, Lewis & Bockius LLP, Charles

B. Wolf, Patrick Williamson Spangler, Benjamin Hartsock, Vedder Price P.C., James J. Convery, Jeffrey P. Carren, Laner, Muchin, Chicago, IL, Christopher Alan Weals, Morgan, Lewis & Bockius LLP, Lars C. Golumbic, Sarah Adams Zumwalt, Willie E. Wilder, Groom Law Group, Chartered, Washington, DC, David Richard Johanson, Hawkins, Parnell, Thackston & Young, LLP, Napa, CA, Douglas Andrew Rubel, Hawkins, Parnell, Thackston & Young, LLP, Cary, NC, Lynn Marie Stathas, Reinhart Boerner Van Deuren S.C., Brian L. Anderson, DeWitt Ross & Stevens, Madison, WI, Alan I. Silver, Jonathan Paul Norrie, Kevin Patrick Hickey, Bassford Remele, Minneapolis, MN, Tara Michelle Mathison, Sorrentino Burkert Risch Kalter LLC, Waukesha, WI, for Defendants.

ORDER

WILLIAM M. CONLEY, District Judge

\*1 Before the court is a second motion by plaintiffs seeking preliminary approval of two additional class settlements: (1) a partial settlement with David Fenkell consisting of a $375,000 cash payment (and possibly more) in exchange for plaintiffs' release of their interest in Fenkell's Alliance ESOP account and (2) a settlement with the Alpha Investment Consulting Group, LLC and John Michael Maier (the "Alpha defendants"), whereby the Alpha defendants agree not to seek attorney's fees or costs and not to serve as fiduciaries in exchange for plaintiffs' economic interests in the ESOPs. (Dkt. #910.) The court previously granted preliminary approval for another set of class settlements, concerning different claims and other defendants. (Dkt. #889.) The court will also grant preliminary approval for these more recent settlements, as well as reset certain deadlines across all settlements and reschedule the fairness hearing for July 24, 2014, to take up all of the settlements for which the court has granted preliminary approval at one hearing.

**A. Preliminary Approval**

1. Based upon the court's review of plaintiffs' motion and all papers submitted in connection with this motion, the court preliminarily concludes that the proposed settlements are "within the range of possible approval." *Armstrong v. Bd. of Sch. Dirs. of City of Milwaukee*, 616 F.2d 305, 314 (7th Cir. 1980),

Chesemore v. Alliance Holdings, Inc., Not Reported in Fed. Supp. (2014)

2014 WL 12730484

*overruled on other grounds by Felzen v. Andreas, 134 F.3d 873 (7th Cir. 1998).*

2. Specifically, the court finds that the proposed settlements appear "fair, reasonable, and adequate." *Uhl v. Thoroughbred Tech. & Telecomms., Inc.*, 309 F.3d 978, 986 (7th Cir. 2002). More specifically, the court finds that (a) the settlement figures and other provisions falls within a reasonable range; (b) the settlement factors in defendants' ability to recover and to pay; (c) the settlement take into account the complexity, expense and duration of further litigation, including an appeal; (d) the settlement resulted out of arms-length negotiations; and (e) at this advanced stage of litigation, plaintiffs were well equipped to evaluate the merits of their case.

3. While the court is satisfied that the settlement is facially reasonable, it intends to scrutinize class counsel's application for attorneys' fees when the time comes for its final approval. Class counsel are put on notice that the court may use their hourly billing records and billing rates as a factor in determining an appropriate fee award, as well as that defendants and their counsel will not be precluded from taking any reasonable position with regard to such an award notwithstanding any provision in a settlement agreement to the contrary.

**B. Class Notice and Settlement Procedure**

1. The court approves plaintiffs' revised class notice and class questionnaire (dkt. #910-2), which includes the addition of the partial settlement with David Fenkell and the settlement with the Alpha defendants.

2. The content of the notice fully complies with due process and Fed. R. Civ. P. 23.

**\*2** 3. Pursuant to Fed. R. Civ. P. 23(c)(2)(B), a notice must provide:

> the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort. The notice must concisely and clearly state in plain, easily understood language: the nature of the action; the definition of the class certified; the class claims, issues, or defenses; that a class member may enter an appearance through counsel if the member so

desires; that the court will exclude from the class any member who requests exclusion, stating when and how members may elect to be excluded; and the binding effect of a class judgment on class members under Rule 23(c)(3).

Fed. R. Civ. P. 23(c)(2)(B).

4. The court finds the revised notice satisfies each of these requirements and adequately put class members on notice of the proposed settlements. Specifically, the notice describes the terms of the settlements, instructs class members about their rights and options under those settlements, adequately informs the class about the allocation of attorneys' fees, and provides specific information regarding the date, time, and place of the final approval hearing.

5. The court will, therefore, approve the following settlement procedure and timeline:

a) On or before April 16, 2014, defendants shall provide notices and materials required by CAFA, 28 U.S.C. § 1715(b), for the two new settlements.

b) On or before April 21, 2014, notice should be issued to the class members.

c) On or before May 19, 2014, class counsel shall file a declaration to the court confirming compliance with notice procedures.

d) On or before June 12, 2014, class counsel shall file a motion for attorney's fees and costs and a motion for service award for class representative.

e) Class members shall have until July 3, 2014, to review the terms of the settlement, return the questionnaire (for subclass members), or object.

f) On or before July 10, 2014, plaintiffs shall file a motion for final approval of the class action settlement.

g) The court will hold a fairness hearing on the class action settlement on July 24, 2014, at 1:00 p.m.

ORDER

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.

IT IS ORDER that plaintiffs' motion for preliminary approval of class action settlements (dkt. #910) is GRANTED.

IT IS ORDERED this 9th day of April, 2014.

**All Citations**

Not Reported in Fed. Supp., 2014 WL 12730484

---

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

**WESTLAW**   © 2022 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 2

G. F. v. Contra Costa County, Not Reported in Fed. Supp. (2015)

2015 WL 4606078

2015 WL 4606078
Only the Westlaw citation is currently available.
United States District Court, N.D. California.

G. F., et al., Plaintiffs,

v.

CONTRA COSTA

COUNTY, et al., Defendants.

Case No. 13–cv–03667–MEJ
|
Signed July 30, 2015

**Attorneys and Law Firms**

Daniel Simon Mason, Attorney at Law, Patrick Bradford Clayton, Zelle, Hofmann, Voelbel & Mason, LLP, San Francisco, CA, Mary–Lee Kimber Smith, Kara Jane Janssen, Sidney M. Wolinsky, Zoe Pershing–Foley Chernicoff, Disability Rights Advocates, Hernan Diego Vera, Laura Lynne Faer, Poonam Juneja, Public Counsel, Berkeley, CA, for Plaintiffs.

Kimberly Anne Smith, David Reis Mishook, Fagen, Friedman & Fulfrost, LLP, Oakland, CA, for Defendants.

**ORDER GRANTING PRELIMINARY APPROVAL**

MARIA–ELENA JAMES, United States Magistrate Judge

**INTRODUCTION**

*1 The parties in this case have reached a settlement. Through an unopposed Motion for Preliminary Approval of Settlement, they now seek an order (1) certifying the proposed class for settlement purposes, (2) granting preliminary approval of the Settlement Agreement, (3) directing notice to the Settlement Class, and (4) setting a Fairness Hearing and related dates. Dkt. No. 279. Having carefully considered the Motion and relevant legal authority, as well as the proposed Settlement Agreements and all supporting documents, the Court **PRELIMINARILY**

**APPROVES** the Settlement Agreements for the reasons set forth below. This Order additionally sets the schedule for related deadlines, amending Dkt. Nos. 284 and 285.

**BACKGROUND**

**A. Case History**
Plaintiffs G.F. (by and through her guardian ad litem, Gail F.), W.B., and Q.G. filed this action on behalf of themselves and all others similarly situated, alleging discrimination against a proposed class of youth with disabilities who are detained, or will be detained, at the Juvenile Hall located in Martinez, California ("Juvenile Hall"). *See* First Am. Compl. ("FAC"), Dkt. No. 87.

1. *Background*
The following background is taken from allegations in Plaintiffs' FAC:

Defendant Contra Costa County (the "County"), through its Probation Department, operates Juvenile Hall and is responsible for the care of youth detained there. *Id.* 35, 61. Juvenile Hall is a 290–bed, maximum-security detention facility, for youth up to age 18. *Id.* ¶ 61. Generally, Juvenile Hall provides temporary detention for pre-adjudicated youth awaiting hearings or sentencing, and adjudicated youth who are sentenced to a treatment or rehabilitation program that has a waiting list. *Id.* ¶ 62. It is generally not the final sentencing disposition for youth, except for those young people in the Youthful Offender Treatment Program ("YOTP") and for the Girls in Motion Program. *Id.* YOTP is a 30–bed boys' program designed for youth generally between 16 and 19 years of age. *Id.* ¶ 64. On average, YOTP can be completed in approximately fourteen months. *Id.* Juvenile Hall's one girls' housing unit includes the Girls in Motion Program, which can be completed in approximately four months. *Id.* ¶ 65. Additionally, youth found to be incompetent under the law also remain at Juvenile Hall and are supposed to receive competency training until they either become competent or are released. *Id.* ¶ 63. Such detentions can last for years. *Id.*

WESTLAW © 2022 Thomson Reuters. No claim to original U.S. Government Works. 1

G. F. v. Contra Costa County, Not Reported in Fed. Supp. (2015)

2015 WL 4606078

Juvenile Hall's solitary confinement policies are structured much like an adult detention facility, with varying levels of confinement, including Maximum Security, Security Risk, and Special Program. *Id.* 68–70. Maximum Security is the most restrictive, confining youth to their cells and prohibiting them from participating in any unit activity and from attending school and participating in educational services, including special education. *Id.* 71, 74. They are allowed out of their cell for only one hour per 24–hour period: 30 minutes in the morning and 30 minutes in the afternoon/evening. *Id.* ¶ 71, Security Risk is less restrictive, but still prohibits the youth from attending school and participating in educational services, including special education. *Id.* 76, 79. Security Risk youth are not permitted to participate in rehabilitative programs such as anger management classes or group counseling sessions. *Id.* ¶ 80. Youth on Security Risk are allowed out of their cell for one hour during a 24–hour period, 30 minutes on the morning shift and 30 minutes on the afternoon/evening shift. *Id.* ¶ 76. Finally, "Special Program" is used when a resident is habitually committing minor rule infractions. *Id.* ¶ 81. While on Special Program, supervisors have authority to impose restrictions on a youth's school attendance. *Id.* ¶ 82. Additionally, Special Program youth are not permitted to participate in rehabilitative programs, including anger management classes or group counseling sessions. *Id.* ¶ 84. Generally, youth on Special Program are let outside their cells twice per day for 45 minutes. *Id.* ¶ 81.

 **\*2**  There are other security restrictions that subject youth to more time in their cells than usual such as "Security Suspect" or "Suspect," where it is believed that a youth could be a serious threat to the community, or when he or she exhibits bizarre or suspicious behaviors indicating they may be a danger to themselves or others. *Id.* 85. On Suspect, a youth is not allowed to attend any off-unit activity in the assessment center, overflow classroom, or other location where the youth may come into contact with youth from other housing units. *Id.* Whenever the unit is engaged in one of these off-unit activities in which the youth on Suspect is prohibited from participating, the youth may be confined to his/her cell. *Id.*

Defendant Contra Costa Office of Education ("CCCOE"), in conjunction with the County Probation

Department, operates the public onsite school, Mt. McKinley, which provides educational services for youth held at Juvenile Hall. *Id.* ¶ 122. While on all school sites, students are under direct supervision of Probation personnel. *Id.* ¶ 124. Each classroom has students of varying ages and grade levels, and all students are taught the same lessons regardless of whether they learned the material already or not. *Id.* ¶ 125.

While in school, if a teacher believes a student does not complete a sufficient amount of work or has committed some other infraction, the teacher may request that the student be placed on "room time" and confined to their cell. *Id.* ¶ 86. Specifically, when a student engages in misconduct while in the classroom, CCCOE defers disciplinary measures to the Probation Department, thus leaving the decision as to the appropriate disciplinary measures for that student to Probation. *Id.* ¶ 87. Plaintiffs assert that CCCOE is fully aware that the punishment that Probation imposes may be solitary confinement without special education and related services. *Id.*

Plaintiffs contend youth can be locked in solitary confinement for anything, including disability-related behavior, and that youth are never given any guidance, written or verbal, as to what infractions will result in their being locked in solitary confinement or put on "room time." *Id.* ¶ 88. When youth are placed in solitary confinement, they are given a "due process" form that indicates which level of confinement they are in, but the form does not explain the reason why the youth was confined, and the youth is given no choice but to sign it. *Id.* ¶ 89. While there is a place on the due process form to write down the youth's side of the story, and a staff member is supposed to meet with the youth to discuss the confinement, this rarely occurs. *Id.* ¶ 90. Plaintiffs further contend that the due process form is not always provided to the youth and, thus, they do not have an opportunity to tell their side of the story. *Id.* Juvenile Hall does not contact the parents or guardians of students who are removed from class. *Id.* ¶ 188.

Plaintiffs assert that Defendants' solitary confinement policies and practices deny youth educational and rehabilitative services, which disproportionately burdens youth with disabilities who require additional assistance to access the general education curriculum

G. F. v. Contra Costa County, Not Reported in Fed. Supp. (2015)

2015 WL 4606078

and rehabilitative programs. *Id.* 2, 9. Without such assistance, youth with disabilities fall even further behind in education and rehabilitation than their non-disabled peers. *Id.* ¶ 9. Further, Plaintiffs contend that denial of access to these services in combination with solitary confinement causes their mental health to worsen, and they are not effectively deterred from future misconduct. *Id.* ¶ 2. Plaintiffs thus assert that it is more likely they will commit further infractions upon their release from solitary confinement and will once again be placed in solitary confinement and subject to further exclusions from and denials of education and rehabilitation, perpetuating the cycle of discrimination. *Id.* Consequently, Plaintiffs bring this action asserting Defendants have adopted and implemented policies and practices with regard to solitary confinement that have a disparate impact on youth with disabilities. *Id.* ¶ 297.

**\*3** According to Plaintiffs, Defendants have no policies specific to Juvenile Hall to identify students who may have a disability (i.e., "Child Find" policies) as mandated by law, but rather only have a policy to offer special education to students "*already identified* as having a disability." *Id.* ¶ 143 (emphasis in original); *see also id.* ¶ 128. Plaintiffs contend Defendants fail to identify students with disabilities who enter Mt. McKinley but may not yet have been identified as having a disability. *Id.* ¶ 142. Plaintiffs allege there is only one placement option for students with disabilities in Juvenile Hall: the general education classroom setting (i.e., the regular classroom), and further allege there is no special day class that would provide full-time (or even part-time) special education instruction. *Id.* ¶¶ 146–47. Plaintiffs also contend that Individualized Education Plans ("IEPs") are legally required for youth with disabilities, but assert Defendants have an established policy of simply disregarding those requirements, noting that the IEPs in Juvenile Hall are strikingly similar regardless of the students' varying disabilities, needs, and previous IEPs. *Id.* ¶ 150. Plaintiffs contend Defendants have no records to establish they are complying with their legal obligations and do not track whether the required minutes are provided to each student who is entitled to specialized academic instruction. *Id.* ¶ 157. Finally, Plaintiffs allege Juvenile Hall's IEPs do not consider disability-related behavior that may impact education, and Defendants do not rely on positive behavioral interventions and supports to counter behavior that impedes learning. *Id.* 166, 169.

#### 2. *The Litigation*

Plaintiffs originally filed this suit on August 8, 2013 and subsequently filed their FAC on December 24, 2013, bringing six causes of action against Defendants: (1) violation of Individuals with Disabilities Education Improvement Act ("IDEA"), 20 U.S.C. § 1400 et seq.; (2) violation of Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101; (3) violation of Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, et seq.; (4) violation of California Government Code section 11135; (5) violation of California Education Code for Special Education Requirements, Cal. Educ.Code §§ 56000, et seq.; and (6) violation of California Education Code for General Education Requirements. Plaintiffs filed their Motion for Class Certification contemporaneously with their original complaint, and subsequently re-filed their motion for class certification following the filing of the FAC. Dkt. Nos. 9, 93.

On January 24, 2014, Defendants filed Motions to Dismiss the FAC, Dkt. Nos. 113, 118, and on February 7, 2014, they filed their Oppositions to Plaintiffs' Motion for Class Certification, Dkt. Nos. 133, 136. All motions have been fully briefed, but upon notification about the parties' ongoing efforts to reach a mutually agreeable settlement, the Court deferred ruling on these motions. The parties filed their Motion for Preliminary Approval of their Settlement Agreements on June 30, 2014. Dkt. No. 279.

#### 3. *Settlement Negotiations*

The Parties have been engaged in ongoing settlement discussions for the majority of this case. Prior to filing the Complaint, Plaintiffs sent Defendants a pre-litigation demand letter in July of 2013. Smith Decl. ¶ 12, Dkt. No. 279–1. After filing this case, Plaintiffs met with the County and CCCOE on August 22, 2013 to discuss the possibility of engaging in settlement negotiations. *Id.* ¶ 13. On September 4, 2013, Plaintiffs made their first written settlement proposal to the County and CCCOE. *Id.* ¶ 14. Plaintiffs' counsel also met with County Counsel and Defendant Philip Kader, the County's Chief Probation Officer, on October 29, 2013 to discuss possible settlement

WESTLAW  © 2022 Thomson Reuters. No claim to original U.S. Government Works.  3

G. F. v. Contra Costa County, Not Reported in Fed. Supp. (2015)

2015 WL 4606078

options. *Id.* ¶ 15. Plaintiffs made their second written settlement proposal to both Defendants that same day. *Id.* 16. All parties met for a two-day in-person settlement conference before the Honorable James Warren (Ret.) on November 4 and November 7, 2013. *Id.* Although the parties were unable to reach agreement at that conference, they continued to discuss settlement options and exchanged written settlement proposals in February of 2014. *Id.* 17.

Additional in-person settlement conferences were held before Magistrate Judge Joseph C. Spero on August 26, 2014 with CCCOE, and on August 27, 2014 with the County. *Id.* ¶ 18. On September 17, 2014, all parties participated in a telephonic conference with Judge Spero. *Id.* ¶ 18. Plaintiffs then met in person with CCCOE on September 29, 2014 and with the County on September 30, 2014 to further discuss settlement proposals. *Id.* ¶ 20. Plaintiffs met with the County for further in-person settlement conferences before Judge Spero on November 13, 2014, January 22, 2015, and March 31, 2015. *Id.* ¶ 21. Plaintiffs met with CCCOE for a further inperson settlement conference before Judge Spero on November 20, 2014. *Id.* ¶ 22. Plaintiffs also met with CCCOE before a mediator, Robert D. Links, appointed through the Court's Alternative Dispute Resolution Program, on February 24, 2015, to address Plaintiffs' attorneys' fees and costs. *Id.* ¶ 23. Throughout this final settlement effort, the parties exchanged extensive written proposals. *Id.* ¶ 11. The final agreement with CCCOE (the "CCCOE Agreement") was fully executed on May 18, 2015, and the final agreement with the County (the "County Agreeement") was fully executed on May 19, 2015 (collectively, the "Settlement Agreements"). *Id.* ¶ 24; *see* Dkt. No. 279–2 ("CCCOE Agmt."); Dkt. No. 279–3 ("Cty.Agmt").

4. *Preliminary Approval Hearing & Subsequent Stipulations*

**\*4** On July 23, 2015, the Court held a hearing on the Motion for Preliminary Approval of the Settlement Agreements. Dkt. No. 286. The Court discussed a number of issues with the parties, including minor discrepancies between the proposed notice and the Settlement Agreements, as well as the potential deadlines for the proposed Fairness Hearing and related scheduling matters. The same day, Plaintiffs and CCCOE submitted a stipulation modifying one

portion of their agreement concerning the timing for when CCCOE was to pay Plaintiffs' Counsels' first attorneys' fee installment payment. Dkt. No. 283. The next day, the parties submitted a joint stipulation modifying their Agreements to reflect the following:

(1) The parties agree that any award of attorneys' fees to the Plaintiffs is subject to Court Approval;

(2) Revisions to the proposed class notice, addressing the Court's concerns at the Preliminary Approval Hearing; and

(3) Proposing a schedule for Final Approval, including the Fairness Hearing and related deadlines.

Dkt. No. 284.

**B. Settlement Terms**

As summarized by Plaintiffs (*see* Mot. 6–13), the terms of the settlements are as follows:

1. *The County Agreement*

a. *Room Confinement*

Under the County Agreement, Probation Staff will no longer use room confinement for discipline, punishment, administrative convenience, retaliation, staffing shortages or reasons other than a temporary response to behavior that threatens immediate harm to the youth or others. Cty. Agmt. at 5, § IV(D) (2). Additionally, Probation staff are prohibited from placing youth in continuous room confinement for longer than four hours. *Id.,* § IV(D)(3). After four continuous hours, staff must return the youth to the general population, develop "specialized individualized programming" for the youth, or consult with a qualified mental health professional about whether a youth's behavior requires that he or she be transported to a mental health facility. *Id.* As part of the expert review, discussed below, the experts will consider whether and under what conditions it would be appropriate for the youth to remain in room confinement after the initial four hour period as part of special individualized programming. *Id.* at 6, § IV(D) (5).

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.   4

G. F. v. Contra Costa County, Not Reported in Fed. Supp. (2015)

2015 WL 4606078

Further, Probation staff must develop special individualized programming for youth with persistent behavior problems that threaten the safety of youth or staff or the security of the facility and may not use room confinement as a substitute for special individualized programming. *Id.* at 5, § IV(D)(4). Special individualized programming includes the development of any individualized plan designed to improve the youth's behavior, which is created in consultation with the youth, Contra Costa County Mental Health ("County Mental Health") staff, and the youth's family members, when available. *Id.* at 5–6, § IV(D)(4)(a). The plan must identify the causes and purposes of the negative behavior, as well as concrete goals that the youth understands that he or she can work toward to be removed from special programming. *Id.* at 6, § IV(D)(4)(b). The special individualized programming calls for increased collaboration between staff members and the youth by requiring in-person supervision and educational service. *Id.,* §§ IV(D)(4)(c)–(f). Further, there must be daily review with the youth of his or her progress toward the goals outlined in his or her plan. *Id.,* § IV(D)(4)(g).

### b. Expert Review of Disability–Related Policies

The County will also retain Professor Barry Krisberg as an expert in this matter, and Professor Krisberg will work with Professor Edward Latessa to conduct a review of the County's policies and practices at the Juvenile Hall. *Id.,* § IV(A). Specifically, Professors Krisberg and Latessa will review policies and practices relating to: (a) room confinement; (b) use of behavior incentives; (c) coordination between CCCOE and the Probation Department, including but not limited to, the County's coordination with CCCOE on CCCOE's implementation of IEPs, Section 504 Plans[1], and behavior intervention plans; (d) identification, assessment and tracking of youth with disabilities who are detained at Juvenile Hall and referral systems to identify these youth for CCCOE and County Mental Health; (e) the implementation of Juvenile Detention Alternatives Initiative standard V.D.4., which specifies that disability must be considered in determining an appropriate response when assigning consequences. *Id.,* §§ IV(A)(1)(a)-(e). Following review by the experts of the above policies and practices, the

joint recommendations of Professors Krisberg and Latessa will be submitted to the County and Plaintiffs' counsel, and the County will implement those joint recommendations. *Id.,* § IV(A)(2). The Agreement also sets forth a dispute resolution process if the experts do not agree on recommendations. *Id.* at 3–4, §§ IV(A)(2)(a)–(e).

### c. Multi–Disciplinary Team Meetings

**\*5** The County Agreement calls for increased coordination between Probation, CCCOE, and County Mental Health through the use of multi-disciplinary team meetings, to be held at least once per month with additional meetings held as needed. *Id.* at 4, § IV(B). Such meetings will address the following subjects:

(a) Coordination of responses and interventions for individual youth who are having consistent and/ or chronic issues conforming their behavior to expectations, regardless of where or when the behavior occurs;

(b) Coordination of the provision of special education and counseling services to all eligible youth on all units;

(c) Discussion of provision of a continuum of placements based on the special education needs of youth in Juvenile Hall, including a process for approving and placing children in non-public schools and residential placements outside of the Juvenile Hall.

*Id.,* §§ IV(B)(1)–(3)

### d. Attendance at Individualized Education Plan Meetings

The County Agreement requires more involvement from Probation staff. Specifically, Probation staff will attend IEP meetings when requested to do so, and when the Probation Department has received prior written or oral consent from the education rights holder to attend, when certain conditions are met. *See id.* at 4–5, §§ IV(C)(1)–(2). These conditions include: (a) where the youth has been removed from the classroom or prevented from attending Mt. McKinley School for more than 9 school days in one school year for

G. F. v. Contra Costa County, Not Reported in Fed. Supp. (2015)

2015 WL 4606078

disciplinary reasons by the Probation Department and/ or CCCOE in response to conduct by the youth; (b) where a youth has been detained in the Juvenile Hall for 30 consecutive days or more and a special day class, residential treatment, or a non-public school placement is being recommended or requested as a placement option by CCCOE or the education rights holder for the youth; or (c) where a behavior support/intervention plan is being put in place for youth assigned to the Youthful Offender Treatment Program or the Girls in Motion program or youth who have been detained in the Juvenile Hall for 60 consecutive days or more. *Id.*

### e. *Duration of the Agreement, Monitoring, and Reporting*

The County Agreement consists of two primary phases: the Implementation Period and the Monitoring Period. The Implementation Period lasts 18 months, allowing for the experts to conduct their review, issue their expert report detailing their findings and recommendations, and for the County to train staff and revise policies to implement those recommendations. *Id.* at 6, § IV(E). Following that Period, there will be a Monitoring Period that lasts for 24 months, during which the experts will provide the parties with monitoring reports every 6 months. *Id.*

The parties will rely on benchmarks to show the County's compliance with the County Agreement during the initial phase of the Monitoring Period. *Id.,* § IV(E). The benchmark for compliance with the Agreement at the time of the first and second Monitoring Report will be 70% compliance. *Id.* The benchmark for the next year, during which the experts will provide their third and fourth Monitoring Reports, will be 80% compliance. *Id.* Thereafter and through the conclusion of the Monitoring Period, including the issuance of the fifth and final monitoring report, all units will be in substantial compliance with the provisions of this Agreement. *Id.*

### f. *Dispute Resolution*

 **\*6** To the extent disputes arise regarding the experts' recommendations and/or compliance with the County Agreement during the Monitoring Period, the parties will first meet and confer in a good faith attempt to resolve the dispute. *Id.* at 3, § IV(A)(2)(a). If they are unable to resolve the dispute through the meet and confer process, either Plaintiffs or the County may submit the matter to Judge Spero for purposes of mediation. *Id.* at 4, § IV(A)(2)(b). If the mediation is unsuccessful, the parties will submit the matter to the Court, and the decision of the Court will be appealable to the Ninth Circuit. *Id.* at 4, §§ IV(A)(2)(c)–(d). Attorneys' fees and costs for work performed in conjunction with dispute resolution may be awarded to the prevailing party in accordance with the standard set forth in *Christanberg Garment Company v. E.E.O.C.,* 434 U.S. 412 (1978). *Id.* § (IV)(A)(2)(e). If Plaintiffs are the prevailing party, the Court may, in its discretion, reduce the amount of attorneys' fees and costs awarded if it determines that the County's position(s) were reasonable, in whole or in part. *Id.*

### g. *Attorneys' Fees and Costs*

The County Agreement provides for the payment of $1,340,000 as full and final settlement of all attorneys' fees and costs related to this case and the named Plaintiffs' individual due process claims, as set forth in *Contra Costa County v. Barbara C.,* Civil Case No. C–14–00268 MEJ, *Contra Costa County v. CiCi C.,* Civil Case No. C–14–00269 MEJ, and *Contra Costa County v. Gail F.,* Civil Case No. C–14–00270 MEJ. *Id.* at 11–12, § IX.

### 2. *The CCCOE Agreement*

### a. *Expert Review of Educational Policies*

The CCCOE Agreement provides for CCCOE to retain an expert with expertise in: (1) the IDEA; (2) the Rehabilitation Act and the ADA; (3) California state law requirements pertaining to special education; and (4) the operation of juvenile court schools. CCCOE Agmt. at 2, § 4.1.1. This expert will conduct a review of CCCOE's policies, procedures and practices in the following areas: (a) Child Find obligations in accordance with the IDEA and related California law and the Rehabilitation Act for youth with suspected disabilities who are detained at Juvenile Hall; (b) development and implementation of IEPs and Section

WESTLAW  © 2022 Thomson Reuters. No claim to original U.S. Government Works.

G. F. v. Contra Costa County, Not Reported in Fed. Supp. (2015)

2015 WL 4606078

504 Plans in accordance with the IDEA and related California law and the Rehabilitation Act for all eligible disabled youth detained in Juvenile Hall; (c) discipline in accordance with applicable law for all eligible disabled youth detained in the Juvenile Hall; and (d) the obligations of CCCOE to coordinate with Probation regarding all matters in which CCCOE and Probation have joint or overlapping responsibilities, in accordance with relevant California law. *Id.* at 3–4, § 4.1.7.

To conduct this review, the expert will be given full and reasonable access to any and all information he or she deems necessary, including the following: (1) full access to the areas in which CCCOE operates; (2) the ability to talk with, consult with, and interview staff from CCCOE; (3) the ability to observe youth in the classroom setting, attend IEP meetings with the consent of the educational rights holder, observe youth during other special education related services, except for individual counseling services, and review recordings of IEP team meetings; (4) access to CCCOE records with the exception of private personnel files; and (5) the ability to conduct written surveys of youth detained in Juvenile Hall and to speak with small groups of students as needed. *Id.* at 4–5, § 4.1.8.

Based on this review, the expert will develop a report ("Expert Report") which will include all proposed revisions to policies, procedures, and practices that he or she recommends. *Id.* at 5, § 4.1.10. This report will be completed within six months of the commencement of the expert's review. *Id.* Following the issuance of the Expert Report, both Plaintiffs and CCCOE will have an opportunity to challenge any recommendation contained in the report on the basis that it is not required by and/or does not comply with federal and/or state law. *Id., § 4.1.11. Once all challenges have been resolved, CCCOE will adopt and implement the report. *Id., § 4.1.12.

### b. ADA Coordinator

 **\*7** CCCOE will designate at least one employee at the Juvenile Hall as responsible for coordinating ADA compliance ("ADA Coordinator"). This person will be responsible for ensuring compliance with the ADA generally and for investigating and responding to any ADA complaints. *Id.* at 6, § 4.2.1.

### c. Coordination with the County Probation Department

CCCOE shall use best efforts when implementing the Expert Report to coordinate and cooperate with other authorities operating in and providing services at Juvenile Hall, including, but not limited to, the County's Probation Department. *Id.* at 6, § 4.3.1.

### d. Duration of Agreement, Monitoring, and Reporting

Following selection of the Expert and drafting and approval of the Expert Report, there will be a 24–month monitoring term. *Id.* at 5, § 4.1.12. During this time, the Expert will provide the parties with monitoring reports on a quarterly basis for the first 12 months and on a semiannual basis for the following 12 months. *Id.* at 6, § 5.2.

### e. Dispute Resolution

To the extent disputes arise regarding the Expert Report and/or compliance with the CCCOE Agreement during its term, the parties will first notify each other in writing and meet and confer in a good faith attempt to resolve the dispute. *Id.* at 7, § 6.2. If they are unable to resolve the dispute through the meet and confer process, Plaintiffs or CCCOE may submit the matter for mediation. *Id.* If the mediation is unsuccessful, the parties will submit the matter to the Court and the decision of the Court will be appealable in accordance with applicable law. *Id.*

### f. Attorneys' Fees and Costs

The CCCOE Agreement provides for the payment of $1,165,000 for reasonable attorneys' fees and costs incurred during the course of the lawsuit, with $70,000 of this amount put aside to compensate for fees, expenses and costs incurred in monitoring CCCOE's implementation of the Settlement Agreement. *Id.* at 11, §§ 12.2, 12.3.

G. F. v. Contra Costa County, Not Reported in Fed. Supp. (2015)

2015 WL 4606078

3. *General Provisions in Both Agreements*

a. *Release of Claims*

The proposed Settlement Agreements resolve all claims for injunctive relief brought by Plaintiffs. Except as discussed below, the settlements do not: (1) provide for any monetary relief to be paid to class members; (2) release any individual claims for damages, or otherwise affect the rights of class members to pursue individual claims for compensatory education or other individual relief under the IDEA and/or Section 504 of the Rehabilitation Act; and (3) do not affect any claims for reasonable accommodations related to physical access, communication access, and/or accommodations otherwise relating to hearing, vision and/or mobility disabilities arising under the ADA or the Rehabilitation Act. Cty. Agmt. at 10, § VI; CCCOE Agmt. at 10–11, § 11.

Under the County Agreement, however, the three named Plaintiffs have released their individual claims for compensatory education as a resolution of their related individual cases, *Contra Costa County v. Barbara C.,* Civil Case No. C–14–00268 MEJ, *Contra Costa County v. CiCi C.,* Civil Case No. C–14–00269 MEJ, and *Contra Costa County v. Gail F.,* Civil Case No. C14–00270 MEJ. Cty. Agmt. at 11, § VII. Specifically, the County will pay the named Plaintiffs a total of $1,140, representing the amount awarded to them for compensatory education by an administrative judge from the Office of Administrative Hearings ("OAH") following their filing of three separate individual due process administrative proceedings. *See* Mot. at 4–5 & 10 n.6. The County will provide these funds in exchange for Plaintiffs dismissing their cross appeals of the OAH's decisions. *Id.* at 10 n.6.

b. *Notice*

**\*8** If the Court preliminarily approves the Settlement Agreements and certifies the proposed class, the parties will initiate notice to the settlement class in the manner approved by this Court within 30 days of the Court's order preliminarily approving the agreements. Cty. Agmt. at 9, § V(F); CCCOE Agmt. at 9, § 8.4.12.

The parties will distribute the parties' proposed joint notice of class action settlement, which includes: a brief statement of the claims released by the Class; the date of the hearing on the Final Approval of the Agreements; the deadline for submitting objections to the Agreements; and the web page, address, and phone and fax numbers that may be used to obtain a copy of the Notice in the format and language requested. Cty. Agmt. at 9–10, § V(F); CCCOE Agmt. at 8–9, § 8.4. Notice will be posted in prominent places on each of the parties' websites as well as in Juvenile Hall's lobby and classrooms. Cty. Agmt. at 9–10, §§ V(F) (b), (c); CCCOE Agmt. at 9–10, §§ 8.4.1.3, 8.4.1.4. CCCOE will mail notice to the last known address of the educational rights holder of all youth currently receiving special education services at Mt. McKinley. CCCOE Agmt. at 9, § 8.4.1.2.

c. *Class Action Fairness Compliance*

Defendants will provide notice of the proposed Agreements as required by the Class Action Fairness Act (28 U.S.C. § 1715(b)), including to the U.S. Attorney General, the California Attorney General's Office, and/or any other necessary parties. Cty. Agmt. at 8, § V(D); CCCOE Agmt. at 8, § 8.3.1.

d. *Continuing Jurisdiction*

The Agreements provide for the Court to retain jurisdiction for purposes of approval and enforcement of any award of attorneys' fees and costs, as well for purposes of dispute resolution. Cty. Amgt. at 11, § VIII; CCCOE Agmt. at 10, § 10.1; *see also* Stipulation, Dkt. No. 284.

**LEGAL STANDARD**

The Ninth Circuit maintains a "strong judicial policy" that favors the settlement of class actions. *Class Plaintiffs v. City of Seattle,* 955 F.2d 1268, 1276 (9th Cir.1992). Nonetheless, a class action may not be settled without court approval. Fed.R.Civ.P. 23(e). When the parties to a putative class action reach a settlement agreement prior to class certification, "courts must peruse the proposed compromise to ratify

Case 1:21-cv-00887-LA  Filed 09/01/22  Page 48 of 76  Document 57

G. F. v. Contra Costa County, Not Reported in Fed. Supp. (2015)

2015 WL 4606078

both the propriety of the certification and the fairness of the settlement." *Staton v. Boeing Co.,* 327 F.3d 938, 952 (9th Cir.2003).

Courts generally employ a two-step process in evaluating a class action settlement. At the preliminary stage, the court must first assess whether a class exists. *Staton,* 327 F.3d at 952 (citing *Amchem Prods. Inc. v. Windsor,* 521 U.S. 591, 620 (1997)). Second, the court must determine whether the proposed settlement "is fundamentally fair, adequate, and reasonable." *Hanlon v. Chrysler Corp.,* 150 F.3d 1011, 1026 (9th Cir.1998). Where the parties reach a settlement prior to class certification, courts apply "a higher standard of fairness and a more probing inquiry than may normally be required under Rule 23(e)." *Dennis v. Kellogg Co.,* 697 F.3d 858, 864 (9th Cir.2012) (internal quotations and citation omitted). The Court's task at the preliminary approval stage is to determine whether the settlement falls "within the range of possible approval." *In re Tableware Antitrust Litig.,* 484 F.Supp.2d 1078, 1080 (N.D.Cal.2007) (internal quotations and citation omitted). "The initial decision to approve or reject a settlement proposal is committed to the sound discretion of the trial judge." *Class Plaintiffs,* 955 F.2d at 1276.

Preliminary approval of a settlement is appropriate if "the proposed settlement appears to be the product of serious, informed, non-collusive negotiations, has no obvious deficiencies, does not improperly grant preferential treatment to class representatives or segments of the class, and falls within the range of possible approval." *In re Tableware,* 484 F.Supp.2d at 1079 (internal quotations and citation omitted). The proposed settlement need not be ideal, but it must be fair and free of collusion, consistent with a plaintiff's fiduciary obligations to the class. *Hanlon,* 150 F.3d at 1027 ("Settlement is the offspring of compromise; the question we address is not whether the final product could be prettier, smarter or snazzier, but whether it is fair, adequate and free from collusion"). To assess a settlement proposal, courts must balance a number of factors:

**\*9** the strength of the plaintiffs' case; the risk, expense, complexity, and likely duration of further litigation; the risk of maintaining class action status throughout the trial; the amount offered in settlement; the extent of discovery completed and

the state of the proceedings; the experience and views of counsel; the presence of a governmental participant; and the reaction of the class members to the proposed settlement.

*Hanlon,* 150 F.3d at 1026 (citations omitted). The proposed settlement must be "taken as a whole, rather than the individual component parts" in the examination for overall fairness. *Id.* Courts do not have the ability to "delete, modify, or substitute certain provisions" because the settlement "must stand or fall in its entirety." *Id.*

If the court preliminarily certifies the class and finds the proposed settlement fair to its members, the court schedules a fairness hearing pursuant to Federal Rule of Civil Procedure 23(e)(2) to make a final determination of whether the settlement is "fair, reasonable, and adequate." Fed.R.Civ.P. 23(e)(2); *see also In re Google Referrer Header Privacy Litig.,* 2014 WL 1266091, at \*2 (N.D.Cal. Mar. 26, 2014).

## DISCUSSION

### A. Class Certification

The Court first considers whether this action is appropriate for class treatment. The Federal Rules of Civil Procedure describe four preliminary requirements for class certification: (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation. *See* Fed.R.Civ.P. 23(a)(l)–(4). If these requirements are satisfied, the Court then examines whether Plaintiffs have satisfied the requirements of Rule 23(b)(2). *Wal–Mart Stores, Inc. v. Dukes,* 131 S.Ct. 2541, 2548–49 (2011).

The parties have stipulated to the certification of a Settlement Class, defined as:

[A]ll youth with disabilities as defined under the ADA and the Rehabilitation Act who are currently detained at or who will be detained at the Contra Costa County Juvenile Hall.

Mot. at 14 (citing Cty. Agmt. at 2, §§ V.B.; CCCOE Agmt. at 2, §§ 3.2.1). The proposed class is identical to the proposed class definition set out in the FAC and the Class Certification Motions.

### 1. *Rule 23(a)*

G. F. v. Contra Costa County, Not Reported in Fed. Supp. (2015)

2015 WL 4606078

*a. Numerosity*

Rule 23(a)(1) provides that a class action may be maintained only if "the class is so numerous that joinder of all parties is impracticable." Fed.R.Civ.P. 23(a)(1). No specific number is required, although there is a presumption that a class with more than 40 members is impracticable to require joinder. *Ries v. Ariz. Bevs. U.S. LLC, Hornell Brewing Co.,* 287 F.R.D. 523, 536 (N.D.Cal.2012); *Bellinghausen v. Tractor Supply Co.,* 303 F.R.D. 611, 616 (N.D.Cal.2014) ("Where the exact size of the class is unknown but general knowledge and common sense indicate that it is large, the numerosity requirement is satisfied." (citation omitted)).

The numerosity requirement is satisfied here as the class contains at least 40 youth with disabilities currently in Juvenile Hall, with several hundred who will pass through it in the next year, and thousands who will enter it in the future. Smith Class Cert Deck ¶¶ 5–6, Dkt. No. 105–1. Between September 2012 and May 2013 alone, Mt. McKinley served 282 students who were identified as having a disability that required an IEP or Section 504 Plan. Mot. at 15 n.8 (citing Smith Class Cert Decl. ¶ 6).

*b. Commonality*

Rule 23(a)(1) requires some "questions of fact and law which are common to the class." To satisfy this requirement, the claims must "depend upon a common contention" such "that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal–Mart,* 131 S.Ct. at 2551. But this does not necessitate that "every question in the case, or even a preponderance of questions, is capable of class wide resolution." *Wang v. Chinese Daily News,* 737 F.3d 538, 544 (9th Cir.2013). "So long as there is 'even a single common question,' a would-be class can satisfy the commonality requirement of Rule 23(a)(2)." *Id.* (citing *Dukes,* 131 S.Ct. at 2556). "[C]ommonality cannot be determined without a precise understanding of the nature of the underlying claims." *Parsons v. Ryan,* 754 F.3d 657, 676 (9th Cir.2014) (citing *Amgen Inc. v. Conn. Ret. Plans & Trust Funds,* —— U.S. ——,

133 S.Ct. 1184, 1194–95 (2013); additional citation omitted). "In a civil rights suit, commonality is satisfied where the lawsuit challenges a system-wide practice or policy that affects all of its putative class members." *Armstrong v. Davis,* 275 F.3d 849, 868 (9th Cir.2001), *abrogated on other grounds as recognized by Harris v. Alvarado,* 402 Fed.Appx. 180, 181 (9th Cir.2010).

 **\*10** Commonality is satisfied here as the putative class members have in common their exposure to the systemic policies and practices applied in Juvenile Hall, and their claims share common questions of fact and law concerning (1) the educational services, including special education, provided (or not) by Defendants; (2) the facility's disciplinary policies surrounding room confinement, including whether youth's disabilities were taken into account in the disciplinary process. *See Parsons,* 754 F.3d at 678 (finding commonality satisfied and noting the "policies and practices" at issue were "the 'glue' that holds together the putative class ... either each of the policies and practices is unlawful as to every inmate or it is not.") The putative class members' claims share common questions of law concerning whether these policies and practices violate the IDEA, ADA, Section 504, California Government Code sections 11135 et seq., and California Education Code sections 56000 et seq. Accordingly, for settlement purposes, the Court finds commonality satisfied.

*c. Typicality*

Rule 23(a)(3) requires that the representative party's claim be "typical of the claim ... of the class." Fed.R.Civ.P. 23(a)(3). " 'Under this rule's permissive standards, representative claims are typical if they are reasonably co-extensive with those absent class members; they need not be substantially identical.' " *Parsons,* 754 F.3d at 685 (quoting *Hanlon,* 150 F.3d at 1020). "The test of typicality is 'whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct.' " *Id.* (quoting *Hanon v. Dataproducts Corp.,* 976 F.2d 497, 508 (9th Cir.1992)).

WESTLAW © 2022 Thomson Reuters. No claim to original U.S. Government Works.

10

G. F. v. Contra Costa County, Not Reported in Fed. Supp. (2015)

2015 WL 4606078

Typicality is met here: each named Plaintiff is or was (1) a youth with a disability; (2) detained at Juvenile Hall; and (3) subject to the systematic policies and practices at issue in this case. *See* Mot. at 17 (citing G.F. Decl., Dkt. No. 97; Q.G. Deck, Dkt. No. 98; Cici C. Deck, Dkt. No. 99). Specifically, each named Plaintiff was offered one educational placement (in the general classroom regardless of disability or prior IEP), denied access to special education and related services when in room confinement, and placed in room confinement without any disability-related inquiry. *Id.* (citing G.F. Decl.; Q.G. Decl.; Cici C. Decl.). Like the proposed class representatives, all members of the proposed Settlement Class are being or will be subjected to the systematic policies and practices at Juvenile Hall and have or will likely suffer injuries as a result. *See Parsons,* 754 F.3d at 685 (typicality satisfied where named plaintiffs: (1) allege the same or similar injury as the rest of putative class; (2) allege that injury is a result of a course of conduct that is not unique; and (3) allege that the injury follows from the course of conduct at the center of the class claims.). Accordingly, the Court finds the named Plaintiffs satisfy Rule 23(a)(3)'s typicality requirement.

### d. Adequacy of Representation

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." Fed.R.Civ.P. 23(a)(4). Due process concerns are central to this determination: "[A]bsent class members must be afforded adequate representation before entry of judgment which binds them." Hanlon, 150 F.3d at 1020 (citation omitted). Two questions must be considered in this determination: "(1) do the named plaintiffs and their counsel have any conflicts of interest with other class members, and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Id.*

First, there is no evidence the named Plaintiffs or their counsel have any conflicts of interest with other class members. *See* Hernandez, 305 F.R.D. at 160 ("Class representatives have less risk of conflict with unnamed class members when they seek only declaratory and injunctive relief."). Plaintiffs contend that "[t]heir individual pursuit of compensatory services for their

alleged injuries has not affected and will not affect their pursuit of class-wide declaratory and injunctive relief as this relief resolved the claims raised in the related but separate individual cases[.]" Mot. at 18. They further assert that the Settlement Agreements specifically carve out and reserve the class members' claims for compensatory education. *Id.*[2]

**\*11** Second, based on the information available, the Court is satisfied the named Plaintiffs and their counsel have and will continue to vigorously prosecute this action on behalf of the class. The named Plaintiffs share the same interests in declaratory and injunctive relief as the absent class members, including a common interest in improving the education and disciplinary programs at Juvenile Hall and Mt. McKinley.[3] According to Plaintiffs, "[b]ecause of their experiences with education and discipline at the Juvenile Hall and the profound, continuing impact that those experiences have had on their lives, they are each passionate about improving access to education at the Juvenile Hall, and they are ready and able to act as effective advocates on behalf of the class." Mot. at 18 (citing Smith Decl. ¶ 29).

The named Plaintiffs are represented by Disability Rights Advocates and Public Counsel.[4] These attorneys have substantial experience handling class actions and complex litigation and have done extensive work investigating the claims in this action. Faer Decl. ¶¶ 2–8, 10, Dkt. No. Dkt. No. 279–5; Smith Decl. ¶¶ 5–10, 32. They are also well-versed in disability and education law and have sufficient resources to continue to vigorously prosecute this case. Accordingly, the Court finds both the named Plaintiffs and their counsel as adequate representatives and appoints Disability Rights Advocates and Public Counsel as Class Counsel for settlement purposes.

### e. Summary

In light of the foregoing, the Court finds that Plaintiffs have satisfied Rule 23(a)'s four prerequisites to maintaining a class action. Accordingly, the Court turns to Rule 23(b) concerning the type of class action that may be maintained.

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.

G. F. v. Contra Costa County, Not Reported in Fed. Supp. (2015)

2015 WL 4606078

## 2. *Rule 23(b)(2)*

Plaintiffs seek to certify their proposed class under Rule 23(b)(2), which is satisfied if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole[.]" Fed.R.Civ.P. 23(b)(2). In *Wal–Mart,* the Supreme Court explained:

> the key to the (b)(2) class is "the indivisible nature of the injunctive or declaratory remedy warranted —the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them." [citation omitted]. In other words, Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class. It does not authorize class certification when each individual class member would be entitled to a *different* injunction or declaratory judgment against the defendant.

*Wal–Mart,* 131 S.Ct. at 2557 (emphasis in original). Civil rights class actions are primary candidates for Rule 23(b)(2) certification. *See Amchem,* 521 U.S. at 614 ("[c]ivil rights cases against parties charged with unlawful, class-based discrimination are prime examples" of Rule 23(b)(2) class actions); *see also Parsons,* 754 F.3d at 686 ("Although we have certified many different kinds of Rule 23(b)(2) classes, the primary role of this provision has always been the certification of civil rights class actions." (citing *Amchem,* 521 U.S. at 614)).

Plaintiffs meet Rule 23(b)(2)'s requirements as they seek declaratory and injunctive relief from Defendants' systematic policies and practices, which Plaintiffs allege violate their civil rights by depriving them of access to education, including special education and related services, as well as subjecting them to room confinement without regard for their disabilities and without appropriate education services. Plaintiffs' claims apply to all class members, and an injunction addressing the Defendants' allegedly unconstitutional policies and practices resolves those claims for all Plaintiffs. *See id.* at 688 (Rule 23(b)(2)'s "requirements are unquestionably satisfied when members of a putative class seek uniform injunctive or declaratory relief from policies or practices that are generally applicable to the class as a whole.").

Furthermore, while the Defendants' policies and practices concerning educational services and room confinement may impact individual class members in various ways and degrees, these policies and practices nonetheless "constitute shared grounds" for all of the individuals in the proposed class, demonstrating that Defendants have acted or refused to act on grounds that apply generally to the class. *Id.* As such, the Court finds that Rule 23(b)(2)'s requirements are satisfied for purpose of this Motion.

### 3. *Class Certification Summary*

**\*12** In view of the analysis above, the Court finds that Plaintiffs have satisfied the requirements of Rule 23(a)(1–4) and (b)(2). Accordingly, for purposes of this motion, the Court certifies the stipulated and proposed class listed above and appoints Disability Rights Advocates and Public Counsel as class counsel to effectuate the settlement.

## B. Preliminary Fairness Determination

The Court now examines the Settlement Agreements to ensure they are "fair, reasonable, and adequate." Fed.R.Civ.P. 23(e)(1)(C). As noted, when settlement occurs before formal class certification, settlement approval requires a higher standard of fairness in order to ensure that class representatives and their counsel do not secure a disproportionate benefit at the expense of the class. *Lane v. Facebook, Inc.,* 696 F.3d 811, 819 (9th Cir.2012). Nonetheless, "class action settlements do not need to embody the best result for preliminary approval," *In re Google,* 2014 WL 1266091, at \*6. "At this point, the court's role is to determine whether the settlement terms fall within a reasonable range of possible settlements, with 'proper deference to the private consensual decision of the parties' to reach an agreement rather than to continue litigating." *Id.* (quoting *Hanlon,* 150 F.3d at 1027).

"The Court may grant preliminary approval of a settlement and direct notice to the class if the settlement: (1) appears to be the product of serious, informed, non-collusive negotiations; (2) has no obvious deficiencies; (3) does not improperly grant preferential treatment to class representatives or segments of the class; and (4) falls within the range of possible approval." *Angell v. City of Oakland,* 2015 WL 65501, at \*7 (N.D.Cal. Jan. 5, 2015) (quoting

G. F. v. Contra Costa County, Not Reported in Fed. Supp. (2015)

2015 WL 4606078

*Harris v. Vector Mktg. Corp.,* 2011 WL 1627973, at *7 (N.D.Cal. Apr. 29, 2011) and *In re Tableware,* 484 F.Supp.2d at 1079)). "Closer scrutiny is reserved for the final approval hearing." *Harris,* 2011 WL 1627973, at *7.

### 1. *Settlement Negotiations*

The settlements in this case appear to be the product of serious, informed, non-collusive negotiations. Plaintiffs sent the Defendants a pre-litigation demand letter in July 2013, Smith Decl. ¶ 12, and after Plaintiffs filed this action, Defendants met with them on August 22, 2013 to discuss the possibility of engaging in settlement negotiations, *id.* 13. After Plaintiffs submitted two different settlement proposals and the parties maintained ongoing discussions, all parties met for a two-day, in-person settlement conference before the Judge Warren in November 2013. *Id.* 14–16. Although they were unable to reach an agreement, they continued to discuss settlement options and exchanged written proposals in February 2014. *Id.* ¶ 17.

In the meantime, "[t]he action was vigorously litigated and involved significant discovery, including depositions of each of the named Plaintiffs and voluminous written discovery including the production of extensive educational records for individual youth held at the Juvenile Hall." Mot. at 22. There were also two separate Motions to Dismiss, which were briefed concurrently with Plaintiffs' latest Class Certification Motion. *Id.* The action also involved filing administrative proceedings on behalf of each of the named Plaintiffs, all of which proceeded to hearing. *Id.* Accordingly, the Court accepts Plaintiffs' representation that when they and Defendants "agreed to explore settlement, both sides came to the negotiating table with extensive knowledge of the relevant facts, evidence, and law." *Id.*

 **\*13**  Judge Spero held in-person settlement conferences with Plaintiffs and CCCOE on August 26, 2014, and with Plaintiffs and the County on August 27, 2014. Smith Decl. ¶ 18. The parties continued to periodically meet with Judge Spero and held ongoing settlement negotiations for the next several months. *Id.* ¶¶ 18–23. According to Plaintiffs, "[m]any issues were heavily contested and the resulting compromises were based on a series of protracted negotiations involving careful deliberation by counsel for the Parties." Mot.

at 22–23. They state that the "settlement process was extensive, involved, and conducted at an arm's length." *Id.* at 22. Plaintiffs executed the final Agreement with CCCOE on May 18, 2015 and the final Agreement with the County on May 19, 2015. Smith Decl. ¶ 24.

Given the foregoing, it appears the parties' Settlement Agreements are based on an extensive and serious set of negotiations lasting virtually the duration of the litigation but while at the same time both parties continued to vigorously litigate the action, which in turn permitted them to become more informed about the facts of this case. Additionally, as Plaintiffs assert, "[t]he lack of collusion between the Parties is further evidences by the fact that the Parties did not negotiate Plaintiffs' attorney's fees or costs until after agreement was reached on the key merits issues." Mot. at 23. Likewise, "[t]he assistance of an experienced mediator in the settlement process confirms that the settlement is non-collusive." *Satchell v. Fed. Exp. Corp.,* 2007 WL 1114010, at *4 (N.D.Cal. Apr. 13, 2007). Accordingly, the process by which the parties reached their settlement weighs in favor of preliminary approval.

### 2. *The Presence of Obvious Deficiencies*

The Court must next analyze whether there are obvious deficiencies in the Settlement Agreements. The Court raised a handful of issues with the parties at the hearing, and having heard the parties' responses and in light of their recent stipulations, the Court is satisfied there are no obvious deficiencies in the parties' agreements.

First, the parties' recent stipulation addresses relatively minor discrepancies between the Settlement Agreements and the Class Notice, as well as clarifies that any award of attorneys' fees to Plaintiffs' counsel is subject to Court approval.[5] *See* Dkt. No. 284. Second, Plaintiffs and CCCOE also recently submitted a stipulation at the hearing indicating they agreed that CCCOE's first installment payment to Plaintiffs' counsel is payable within 60 days of the Court's issuance of final approval, whereas previously the CCCOE Agreement reflected that Plaintiffs' counsel would be paid on July 1, 2015, before the Court's approval. Dkt. No. 283. Finally, the Court asked counsel for all parties about their intent in structuring

G. F. v. Contra Costa County, Not Reported in Fed. Supp. (2015)

2015 WL 4606078

the settlement agreements in various ways, including their Alternative Dispute Resolution procedures in the event that the parties have future disputes on the implementation of the Settlement Agreements' terms, and the parties confirmed their intent in setting the procedures in the way they were laid out in the Agreements.

Accordingly, the lack of obvious deficiencies in the Settlement Agreements, with the submitted stipulations, weighs in favor of granting preliminary approval.

### 3. *Preferential Treatment*

The third factor the Court considers is whether the Settlement Agreements provide preferential treatment to any class member. Having reviewed the proposed Agreements, the Court finds there is no preferential treatment to any class member. The proposed relief does not single out any particular class member(s) but appears uniform. Additionally, the named Plaintiffs will not receive any incentive awards or any other preferential treatment through the Agreements.

**\*14** Under the County Agreement, the County will pay the named Plaintiffs a total of $1,140, which represents the amount awarded to them for the compensatory education by the OAH administrative judge following their filing of three individual due process administrative proceedings. *See* Mot. at 4–5 & 10 n.6. The County will provide these funds in exchange for Plaintiffs dismissing their cross appeals of the OAH's decisions. *Id.* at 10 n.6. In doing so, the named Plaintiffs release their individual claims for compensatory education against the County. *Id.* There is no indication this impacts the relief to the class, and Plaintiffs contend the "payments do not affect other class members' rights to bring their own claims for compensatory education based on their individual experiences in Juvenile Hall," noting that "those claims are specifically carved out and not released in the County Agreement." *Id.* (citing Cty. Agmt. at 10, § VI).

Accordingly, the Court finds that this factor weighs in favor of preliminary approval.

### 4. *Reasonable Range of Possible Approval*

Finally, the Court must determine whether the proposed settlement falls within the range of possible approval. To determine whether an agreement is fundamentally fair, adequate, and reasonable, the Court may preview the factors that ultimately inform final approval: (1) the strength of plaintiff's case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed, and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a governmental participant; and (8) the reaction of the class members to the proposed settlement. *Hanlon,* 150 F.3d at 1026.

The Court is satisfied that the *Hanlon* factors support preliminary approval. Although there is no "amount offered" in the Settlement Agreements, they provide for much of the relief originally sought by Plaintiffs, and it further appears the parties have conducted meaningful evaluations of the merits of this case to be able to reasonably evaluate their respective positions. As the Motion points out, each side contends it would have ultimately prevailed after continued and likely prolonged litigation, but both parties agree the risks presented by continued litigation would have been great. Mot. at 21. This case involves a number of complex legal and factual issues, and it appears that settlement at this time will avoid substantial additional costs to all parties, as well as avoid the delay and the risks presented by further litigation regarding issues addressed by settlements. It further appears that the Settlement Agreements were reached as the result of intensive, prolonged, serious, and non-collusive arms-length negotiations, through the assistance of experienced mediators. Finally, the Court has not received any reactions from class members at this time; the Court awaits those responses in conjunction with the Fairness Hearing.

### ORDER

In light of the foregoing analysis, the Motion for Preliminary Approval of Class Settlement is **GRANTED** as follows:

WESTLAW © 2022 Thomson Reuters. No claim to original U.S. Government Works.

G. F. v. Contra Costa County, Not Reported in Fed. Supp. (2015)

2015 WL 4606078

1) This Order incorporates by reference the definitions in the Settlement Agreements and all terms defined therein shall have the same meaning in this Order as set forth in the Settlement Agreements.

2) The proposed Settlement Class is hereby conditionally certified pursuant to Federal Rules of Civil Procedure 23(a) and (b)(2) for purposes of settlement. The Settlement Class is defined as:

> All youth with disabilities as defined under the ADA and the Rehabilitation Act who are currently detained at or who will be detained at the Contra Costa County Juvenile Hall.

Certification of the Settlement Class is solely for settlement purposes and without prejudice in the event the Settlement Agreements are not finally approved or otherwise do not take effect.

**\*15** 3) The Settlement Agreements are preliminarily approved as fair, adequate, and reasonable pursuant to Federal Rule of Civil Procedure 23(e).

4) The Court appoints and designates Plaintiffs G.F., by and through her guardian ad litem, Gail F.; W.B.; and Q.G as class representatives for settlement purposes only.

5) The Court appoints Disability Rights Advocates and Public Counsel as Class Counsel for the Settlement Class.

6) The Court approves the form and content of the proposed Notice of Proposed Settlement of Class Action Lawsuit ("Notice"), Dkt. No. 284–1, with one exception: the Notice must be modified to reflect the amended dates in this Order. The Court also approves the Notice Plan as set forth in the parties' Agreements in Dkt. Nos. 279–2 (CCCOE Agmt. at 8, § 8.4) and 279–3 (Cty. Agmt. at 9, § V(F)), as well as the parties' Stipulation in Dkt. No. 284. The deadline for distribution of the Notice to the class is **August 21, 2015.**

7) In the event the Settlement Agreements are not finally approved by the Court, or otherwise fail to become effective, neither Plaintiffs nor Plaintiffs' counsel shall have any obligation to repay the amounts disbursed to accomplish such notice and administration.

8) Any objections by members of the Settlement Class to the proposed Settlement Agreement shall be heard, and any papers submitted in support of said objection shall be considered by the Court at the Fairness Hearing only if, **by October 13, 2015,** such objector files with the Class Action Clerk of the United States District Court for the Northern District of California, 450 Golden Gate Avenue, San Francisco, CA 94102: (1) a notice of his/her objection and a statement of the basis for such an objection; and/or (2) if applicable, a statement of his/her intention to appear at the Fairness Hearing. A member of the Settlement Class need not appear at the Fairness Hearing in order for his/her objection to be considered. Any Settlement Class member who does not make his/her objection in the manner provided for in this Order shall be deemed to have waived such objection.

9) Plaintiffs shall file their motion for approval of attorneys' fees and costs **by September 29, 2015.**

10) No later than **October 29, 2015,** the Parties shall file all papers in support of the Application for Final Approval of the Settlement Agreements and/or any papers in response to any valid and timely objection submitted to the Court, and shall serve copies of such papers on each other and upon any objector who has complied with the provisions of Paragraph 8 of this Order. Counsel for the Parties will also file with the Court sworn statements evidencing compliance with the notice provisions of this Order.

11) A Fairness Hearing shall be held before this Court on **November 12, 2015,** at 10:00 a.m. in Courtroom B, 15th Floor, 450 Golden Gate Avenue, San Francisco, California to determine all necessary matters concerning the Settlement Agreements, including: whether the proposed Settlement Agreements' terms and conditions are fair, adequate, and reasonable; whether Plaintiffs' Counsel's attorneys' fees and reimbursement of expenses should be approved; and whether an order approving the Settlement Agreements and dismissing the Litigation on the merits and with prejudice against the Named Plaintiffs and the Settlement Class, subject to the Court retaining jurisdiction to administer and enforce the Settlement Agreements, should be entered.

G. F. v. Contra Costa County, Not Reported in Fed. Supp. (2015)

2015 WL 4606078

**\*16** 12) The Fairness Hearing may, without further notice to the Settlement Class (except those who have filed timely objections or entered appearances), be continued or adjourned by order of the Court.

13) Counsel for the Parties are hereby authorized to utilize all reasonable procedures in connection with the administration of the Settlement Agreements which are not materially inconsistent with either this Order or the terms of the Settlement Agreements.

14) All pending pretrial deadlines are hereby vacated.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2015 WL 4606078

## Footnotes

1    Section 504 Plans refer to plans established in accordance with the Rehabilitation Act.

2    The County Agreement also states: "The Named Plaintiffs agree not to retain Disability Rights Advocates and Public Counsel to pursue any individual claims against the County, or any of its employees or departments through the Term of the Agreement." Cty. Agmt. at 11, § VI.

3    Although the named Plaintiffs are not currently detained at Juvenile Hall, they were each detained there at the time this suit was filed, and at the time of this Motion, Plaintiff G.F. was still under eighteen years old. Mot. at 18 n.9.

4    Plaintiffs were also represented by Zelle Hofmann Voelbel & Mason LLP and Paul Hastings LLP but these firms do not seek to be appointed as class counsel.

5    While the Court is not approving the requested attorneys' fees and costs at this stage, the Court notes that before Final Approval, class counsel must support these requests with affidavits and documents that demonstrate such requests are reasonable, given the time spent on the litigation. See *McCabe v. Six Continents Hotels, Inc.,* 2015 WL 3990915, at \*8 (N.D. Cal. June 30, 2015).

---

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:21-cv-00887-LA   Filed 09/01/22   Page 56 of 76   Document 57

# TAB 3

2009 WL 276519
Only the Westlaw citation is currently available.
United States District Court,
W.D. Wisconsin.

Kenneth IRISH, Denise Marshall, Allen
Moore, and Scott Stillwell on behalf
of themselves and all others similarly
situated, a class action, Plaintiffs,

v.

BNSF RAILWAY COMPANY,
Burlington Northern Santa Fe Railway
Corporation, William Barbee, Francis
A. Weber, John Doe # 1, John Doe #
2, ABC Insurance Company and Def
Insurance Company,[1] Defendants.

No. 08-cv-469-slc.
|
Feb. 4, 2009.

West KeySummary

1      **Removal of Cases** 🔑 Constitutional
        and Statutory Provisions

        Proposed class met the numerosity
        requirement for federal jurisdiction under
        the Class Action Fairness Act ("CAFA").
        The proposed class was drawn so broadly
        that it could have included up to 369
        different persons and entities affected by
        flooding allegedly caused by a railroad
        and its employees. It was irrelevant that
        less than 100 people actually had joined
        the class at the time the railroad removed
        it, and it was irrelevant that the affected
        landowners predicted that less than 100
        people actually would join the lawsuit. 28
        U.S.C.A. §§ 1332(d), 1332(d)(1)(B).

**Attorneys and Law Firms**

Matthew C. Allen, Kopp, Mckichan, Geyer, Skemp &
Stombaugh, LLP, Platteville, WI, for Plaintiffs.

Timothy R. Thornton, Briggs and Morgan, P.A.,
Minneapolis, MN, for Defendants.

OPINION AND ORDER

BARBARA B. CRABB, District Judge.

 **\*1**  Plaintiffs Kenneth Irish, Denise Marshall, Allen
Moore and Scott Stillwell filed this class action in the
Circuit Court for Grant County, Wisconsin, seeking
damages resulting from a 2007 flood in the town of
Bagley, Wisconsin. Plaintiffs contend that the damages
were caused by man-made, preventable flooding
onto plaintiffs' property attributable to the failure
of defendants BNSF Railway Company, Burlington
Northern Santa Fe Railway Corporation, William
Barbee, Francis A. Weber and John Does # 1 and # 2 to
design, construct and maintain the railway bridge and
bridge trestle in and near Bagley.

Defendants removed the suit to this court under the
Class Action Fairness Act, 28 U.S.C. § 1332(d),
whereupon plaintiffs filed a motion to remand it to state
court, contending that it does not meet the criteria for
federal diversity jurisdiction under either the diversity
provisions of § 1332(a) or the special provisions of §
1332(d). As to § 1332(a), they argued that plaintiffs
were not of diverse citizenship from defendants. As
to § 1332(d), they argued that defendants had nothing
but speculation to support their contentions that the
plaintiff class would consist of 100 persons or more
and that the damages sought would exceed $5,000,000.
They asserted in addition that their suit fell within one
of the exceptions to the Act.

Because John Shabaz was on medical leave when
the case was filed, it was assigned to United States
Magistrate Stephen L. Crocker, pending the parties'
determination whether they would agree to have him
preside over the case. The parties have made their
determination; the case will be assigned to a visiting
federal judge for trial. Until that assignment can be

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.                                    1

made, I will decide any substantive issues that must be resolved.

The magistrate judge filed a report and recommendation under 28 U .S.C. § 636(b)(1), dkt. # 27, recommending denial of plaintiffs' motion to remand and their accompanying motion for fees and costs incurred in bringing the motion. (Although § 636(b)(1)(A) does not include motions to remand among the list of pretrial matters that magistrate judges cannot determine, these motions are sufficiently similar to the matters that are specifically prohibited that it was appropriate for the magistrate judge to proceed by report and recommendation, particularly when the motion to remand concerns a class action.) The magistrate judge found that plaintiffs had not acted fraudulently in naming Wisconsin residents Barber and Weber as defendants but that the case should stay in federal court because it met the requirements of the Class Action Fairness Act (which does not require complete diversity between plaintiffs and defendants). He found that the plaintiff class was likely to encompass 100 or more persons, 28 U.S.C. § 2241(d)(5)(B); plaintiffs' damages could easily exceed $5,000,000, § 2241(d)(2); and the case did not fit within either of the Act's express exceptions to federal jurisdiction. § 1332(d)(4)(A) & (B)

 **\*2** Plaintiffs filed 26 pages of objections, focusing solely on the magistrate judge's determination that the plaintiff class would exceed 100. They have not objected to his determination that the damages could exceed $5,000,000 or his conclusion that the case does not come within any exception to the Act.

## OPINION

Motions to remand raise interesting questions about the placement of the burden of proof and the standard of proof that the party with the burden must meet in order to establish the existence of federal jurisdiction. The Court of Appeals for the Seventh Circuit took on these questions in *Meridian Security Ins. v. Sadowski,* 441 F.3d 536 (7th Cir.2006). (The case arose under the Telephone Consumer Protection Act, 47 U.S.C. § 227, but the discussion of pleading standards and procedures is applicable to any case in which the existence of diversity jurisdiction is at issue.) Meridian

filed the suit in federal court under § 1332(a), alleging diversity of citizenship between it and its insured and seeking a declaratory judgment that it did not have to indemnify its insured for damages incurred in sending unsolicited advertising faxes to prospective customers. After discussing the proper treatment of an indemnity claim in determining the amount in controversy, the court of appeals turned to the district court's holding that remand to state court was proper because Meridian had not proved by "a reasonable probability that jurisdiction existed." The court disavowed this reasonable probability language as infelicitous and misleading. *Id.* at 540.

The court of appeals acknowledged that the proponent of jurisdiction has the burden of proof, but the burden applies only to contested jurisdictional facts, which must be proven by a preponderance of the evidence. *Id.* at 542. "[J]urisdiction itself is a legal conclusion, a *consequence* of facts rather than a provable "fact." *Id.* at 541. When it comes to a claim for damages, for example, once the proponent of jurisdiction has made a good faith claim (if she is the plaintiff bringing suit in federal court) or a good faith estimate (if she is a removing defendant), supported by uncontested factual allegations or contested factual allegations that have been established in an evidentiary hearing by admissible evidence, federal jurisdiction follows unless the judge concludes that it is legally impossible for the recovery to exceed the jurisdictional minimum. *Id.* at 542-43. Uncertainty about the plaintiff's ability to prove his claim or about the final amount of damages does not justify dismissal. *Id.* at 543.

*Meridian Security Ins.* concerned the amount in dispute, but the holding of the case applies equally to the prediction of class size, an element not present in the mine run diversity case but critical to removal under the Class Action Fairness Act. In this case, plaintiffs listed by name in their complaint 53 class members who were either representative plaintiffs or "other retained plaintiff class members" not named as representative plaintiffs. Plaintiffs described the remaining, unnamed members of the plaintiff class as including all

 **\*3** those persons, including occupants and owners, those government organizations, those non-profit organizations and those businesses, including insurers, and subrogees, who were damaged or

injured by these man-made, preventable floodings and water invasions ... minor children, relatives and other home companions of the plaintiff class members residing within and/or occupying the homes.

Plts.' Cpt., dkt. # 2, at 7, ¶¶ 5 & 7. At paragraph 42 of their complaint, plaintiffs alleged that, in addition to the 53 named representative plaintiffs and retained plaintiff class members, "at least another 25 households have been affected and therefore the total number of Plaintiff Households affected approximates 58 with at least 74 adult household members affected. The Plaintiff Class is so numerous that joinder of each and every member of the Plaintiff Class is impracticable...."

When defendants removed this case, they argued that plaintiffs' pleadings showed that the class encompassed more than 100 persons, when the households, government offices and commercial enterprises were included, along with children and other as yet unnamed occupants of property in Bagley. In affidavits submitted in opposition to plaintiffs' motion to remand, defendants submitted exhibits from the Begley public property records showing that 286 separately deeded properties were located within the geographical class area described in the complaint and that the properties are owned by 369 different persons and entities. The magistrate judge considered this evidence in reaching his decision that 100 persons or more fell within plaintiffs' class definition. § 1332(d)(1)(B) ("The term 'class members' means the persons (named or unnamed) who fall within the definition of the proposed or certified class in a class action.")

Plaintiffs take issue with the magistrate judge's consideration of the evidence defendants submitted, asserting that he should have ignored it because it was untimely and inadmissible. According to plaintiffs, defendants had only one opportunity and one way in which to introduce any evidence, which was by attaching admissible documents to their notice of removal. When they failed to do this, defendants lost their chance to try to show that plaintiffs' proposed class encompassed 100 members or more. In support of their argument, plaintiffs cite *Chase v. Stop 'n Save Warehouse Foods, Inc.,* 110 F.3d 424 (7th Cir.1997), but misconceive its holding. In *Chase,* the court of appeals ruled that a court could look outside the record

to determine whether the amount in controversy had been met for removal of a diversity action, but that in doing so, the court "is limited to examining only that evidence of amount in controversy that was available at the moment the petition for removal was filed." *Id.* at 428 (citing *In re Shell Oil Co.,* 970 F.2d 355 (7th Cir.1992) (per curiam)). In neither *Chase* nor *Shell* did the court of appeals hold that a party is limited to only the evidence it submits with its notice of removal. Rather, the court held that a party cannot rely on any action or change in circumstances occurring after removal to support a remand. In both cases, the court of appeals held that a plaintiff could not avoid federal court by filing a stipulation after removal saying that he or she was seeking less than the jurisdictional amount as damages. Instead, the court is to examine the grounds for jurisdiction as of the time the notice of removal was filed.

**\*4** In this case, defendants did not cite newly created evidence in support of their brief in opposition to remand; they simply adduced evidence of the facts that existed as of the time plaintiffs filed their complaint in state court. The evidence was neither untimely nor inadmissible. (Plaintiffs say that the evidence was not certified or sworn to as required under Fed.R.Civ.P., but they are wrong.) The magistrate judge acted properly when he considered it.

Plaintiffs' overarching objection goes to the magistrate judge's decision that the plaintiff class could encompass more than 100 persons. They do not contest the accuracy of the tax records or property descriptions, but argue that the evidence was insufficient to support the magistrate judge's finding because it does not establish that every resident of Bagley incurred damages. They say that defendants did not show either that all of the residents were home when the flooding occurred and living within the path of the flooding or that each resident sustained the specific and multi-faceted damage that each representative plaintiff and retained plaintiff class member has alleged and which class membership requires. Moreover, they assert, defendants have not shown that all of the residents can satisfy the "geography test," which requires a showing that each potential plaintiff lived "upstream and/or tributary to" the Glass Hollow Drain.

A fair reading of the pleadings shows that plaintiffs anticipated that the class would be greater than the 53 persons named in the complaint. Why else would plaintiffs provide in their complaint for a third group of plaintiffs? That they thought the class would grow is evident from their use of the words, "at least" in referring to the number of class members and the total number of affected households in paragraphs 41 and 42 of the complaint. This alone would be sufficient to meet the Act's requirement of 100 plaintiffs, but defendants demonstrated that several hundred persons could fall within the class definition. At this point, the only question is whether plaintiffs have shown that it is a legal certainty that this jurisdictional requisite will not be met. *Meridian Security Ins.*, 441 F.3d at 541. As the magistrate judge concluded, it is not.

One final matter. Plaintiffs included in their objections a complaint that the magistrate judge acted improperly when he consulted the internet to determine the corporate defendants' net worth. Having abandoned any objection to the conclusion that the damages could exceed $5,000,000, they have no reason to object to his going outside the record to consider this fact. In any event, it had no bearing on the question of damages; the record proof on that point shows that the homes and personal property subjected to flooding are worth more than $5,000,000. The assessed value of the homes in the area exceeds $9,000,000 and the homes are only one category of damages claimed.

ORDER

IT IS ORDERED that the report and recommendation issued by the United States Magistrate Judge on January 5, 2009, is ADOPTED and the motion to remand filed by plaintiffs Kenneth Irish, Denise Marshall, Allen Moore and Scott Stillwell is DENIED, as is their requests for fees and costs incurred in seeking remand.

REPORT AND RECOMMENDATION

STEPHEN L. CROCKER, Magistrate Judge.

REPORT

**\*5** This is the class action lawsuit by a group of citizens in the Village of Bagley blaming the defendant railroad and its employees for the flood of 2007. Plaintiffs filed their lawsuit in Grant County Circuit Court; defendants promptly removed it to this court, fearing that they would get homered and asserting fraudulent spoilation of diversity by plaintiffs. Plaintiffs hotly dispute these contentions.

Before the court for report and recommendation is plaintiffs' motion to remand their case to state court.[1] Although plaintiffs' joinder of non-diverse defendants is not fraudulent, this case *does* fall within the jurisdictional grant of the Class Action Fairness Act, 28 U.S.C. § 1332(d). Therefore, I am recommending that this court deny the motion to remand and decline to award plaintiffs their fees and costs.

On May 16, 2008, the named plaintiffs filed this proposed class action for negligence and nuisance on behalf of a group of residents of Bagley, Wisconsin whose homes and property were damaged when Glass Hollow Creek flooded in July 2007, allegedly as a result of defendants' failure to clear obstructions from the trestle supporting a railroad bridge over Glass Hollow Drain. On May 16, 2008, plaintiffs brought suit in Grant County Circuit Court. The case was randomly assigned to the Hon. George S. Curry, who on May 20, 2008, notified the parties that his son, Nathan Curry, is employed as an attorney in the law firm representing plaintiffs in this lawsuit and invited the parties to file a motion for recusal if they deemed it necessary.[2]

On August 11, 2008, defendants removed this case to federal court. Defendants argue that diversity jurisdiction exists either under 28 U.S.C. § 1332(a) or under the Class Action Fairness Act, now codified as 28 U.S.C. § 1332(d). On September 22, 2008, plaintiffs filed a motion to remand their lawsuit to the Grant County Circuit Court. Dkt. 12.

From the complaint and the documents submitted by the parties, and solely for the purpose of deciding this motion for remand, I draw the following facts:

ALLEGATIONS OF FACT

WESTLAW  © 2022 Thomson Reuters. No claim to original U.S. Government Works.

Plaintiffs Kenneth Irish, Denise Marshall, Hollie Moore and Scott Stillwell are residents and property owners in Bagley, Wisconsin. They have brought suit on behalf of and as representatives of a class of persons who are residents and property owners in Bagley, Wisconsin. The class described in the complaint includes those persons, including owners and occupants (including minor children, relatives and other home companions) and those governmental organizations, non-profit organizations and businesses situated upstream of and/or tributary to the Glass Hollow Drain near Bagley, whose property was damaged or harmed by flooding that occurred on July 17 and 18, 2007. There are 286 deeded parcels owned by 369 people that fit within plaintiff's geographic definition of the class. At the time of removal 53 persons within 33 households already had joined this class, and on plaintiffs' information and belief, at least another 25 Bagley households had been affected by the flooding. *See* Complaint, Attachment A to removal petition (dkt.1), at Section III, pp. 7-11.

 **\*6** Plaintiffs in their complaint seek damages for real property damage and destruction, reduced market value caused by the flood, damages for personal property damage, including the contents of all homes and motor vehicles, clean up and restoration expenses, damages for inconvenience, stress and other anxieties, punitive damages, and statutory treble damages for willful, wanton and reckless behavior by railroad employees under Wis. Stat. § 195.35. Complaint, Exh. A to dkt. 1, at Section IX, pp. 19-20. As of October, 2008, the assessed valuation of the parcels of property within the geographic boundaries set forth in the complaint totaled $9,642,140.

Defendant Burlington Northern Santa Fe Corporation is a corporation with its headquarters and principal place of business in the State of Texas. Defendant Burlington Northern Santa Fe Railway Company is a wholly owned subsidiary of Burlington Northern Santa Fe Corporation with its headquarters and principal place of business in the State of Texas.

Defendant Francis Weber, a resident of Bagley, Wisconsin, is employed by defendant Burlington Northern Santa Fe Railway Company as a flagman. His job duties include maintenance of the track infrastructure, including the construction, inspection and repair of the track; cutting brush, trees and vegetation and clearing the right-of-way of litter and cargo spillage; and maintenance of the trackbed, including cutting rail, manually compressing ballast, removing and installing ties, and lifting, rolling and adjusting rails. Weber has no direct responsibility for inspecting or repairing railroad bridges or trestles.

Defendant William Barbee is a resident of Holmen, Wisconsin, and is employed by defendant Burlington Northern Santa Fe Railway Company as a roadmaster. His job duties include planning, coordinating, prioritizing and supervising maintenance crews to ensure track structure is maintained and upgraded to meet Burlington Northern Santa Fe Railway Company and federal standards. In addition, he conducts track inspections and maintains contact with field personnel to ensure compliance with quality and safety guidelines. He also works with local and state agencies to create good public relations. Barbee has no direct responsibility for inspecting or repairing railroad bridges or trestles.

Defendants John Does 1 and 2 are fictitious names for two adult residents of the State of Wisconsin employed by Burlington Northern Santa Fe Railway Company. Their job duties include inspecting, investigating, monitoring and maintaining the Burlington Northern Trestle. In their motion to remand, defendants identify John Does 1 and 2 as Jeffrey Haas and Louis Welte, who are responsible for bridge and bridge trestle maintenance. Hass lives in Iowa and Welte lives in Illinois.

Defendants ABC and DEF insurance companies are fictitious names for insurance companies who had a policy of liability insurance with one of the defendants insuring them against liability for certain accidents.

 **\*7** The Village of Bagley, Wisconsin (approx.pop.330) sits at the southwestern edge of Wisconsin on the banks of the Upper Mississippi River. Glass Hollow Creek runs through Bagley. Defendant Burlington Northern Santa Fe Railway Corporation owns and maintains railway tracks that run parallel to the Mississippi, through Bagley and across Glass Hollow Creek. Burlington Northern owns and maintains a bridge and bridge trestle that run over the creek. Defendants Burlington Northern

Case 1:21-cv-00887-LA   Filed 09/01/22   Page 62 of 76   Document 57

Railway Company, Burlington Northern Corporation, Francis Weber, William Barbee and John Does 1 and 2 allegedly failed properly to design, construct, investigate, clean or maintain the bridge trestle. As a result, on July 17 and 18, 2007, the trestle was obstructed by silt, debris and other materials, which prevented rainfall runoff from flowing through the trestle.

Late on the night of July 17, 2007 through the morning of July 18, 2007, a torrential rain (described in the La Crosse Tribune as a "500-year rain") deluged Bagley with over seven inches of rain. According to plaintiffs, because the railroad's bridge trestle was clogged with debris and unable to allow drainage, Glass Hollow Creek overflowed its banks and caused "catastrophic man-made flooding including ... surface water invasions and ... sanitary water invasion." Widespread flooding damaged most of the village's homes and businesses. Fifty-three property owners in 33 Bagley households have joined plaintiff's lawsuit; at least 25 other households have been affected by the flood.

ANALYSIS

I. Remand Standard

The burden of establishing federal diversity jurisdiction in a removal case rests on the party seeking removal on diversity grounds. *Tylka v. Gerber Products Co.,* 211 F.3d 445, 448 (7th Cir.2000). In determining whether removal was proper under 28 U.S.C. § 1441, it is presumed that plaintiffs may choose their own forum; therefore, a district court must construe the removal statute narrowly and resolve any doubts regarding subject matter jurisdiction in favor of remand. *Doe v. Allied-Signal, Inc.,* 985 F.2d 908, 911 (7th Cir.1993); *People of the State of Illinois v. Kerr-McGee Chemical Corp.,* 677 F.2d 571, 576 (7th Cir.1982).

In this case, defendants seek removal from plaintiffs' state court action on alternative theories of diversity jurisdiction: (1) traditional diversity, codified under 28 U.S.C. § 1332(a) and (2) the expanded form of diversity for certain large-stakes, multi-state class actions codified under the Class Action Fairness Act Defendants bear the burden of establishing at least one

of these diversity theories. I deal with these contentions in turn:

II. Diversity Jurisdiction under § 1332(a)

Defendants contend that the parties in this case actually are diverse because plaintiffs fraudulently joined two in-state defendants, William Barbee and Francis Weber, for the purpose of defeating complete diversity. In addition, defendants argue that Barbee and Weber are not the "real parties in interest" because plaintiffs primarily seek recovery against defendant Burlington Northern; therefore, joinder of the in-state defendants is "improper" and their citizenship should be disregarded when determining diversity.

A. Fraudulent Joinder

**\*8** A plaintiff cannot avoid a federal forum by fraudulently joining parties in order to defeat diversity jurisdiction, and F.R. Civ. P. 21 allows a federal court to dismiss any party who is fraudulently joined. *Schwarz v. State Farm Mutual Auto. Insurance Co.,* 174 F.3d 875, 878 (7th Cir.1999); *Faucett v. Ingersoll-Rand Mining & Machinery Co.,* 960 F.2d 653, 654 (7th Cir.1992). Defendant bears the burden of showing establish fraudulent joinder. *Bodine's, Inc. v. Federal Insurance Co.,* 601 F.Supp. 47, 49 (N.D.Ill.1984); *see also* 16 Moore's Federal Practice § 107.14[2][c] at 107-62-63 (2008). To establish fraudulent joinder, "defendant must show that, after resolving all issues of fact and law in favor of the plaintiff, the plaintiff cannot establish a cause of action against the in-state defendant." *Id.; see also Faucett,* 960 F.2d at 654-55; *Poulos,* 959 F.2d at 73. If plaintiffs cannot maintain their suit against the in-state defendants as a matter of law, then defendants' motion for removal would be proper. *Poulos,* 959 F.2d at 73.

But even if plaintiffs named Barbee and Weber with intent to thwart removal, a litigation strategy intended to defeat jurisdiction, by itself, does not support a finding of fraudulent joinder. *See, e.g., Saltire Industry, Inc. v. Waller, Landsden, Dortch & Davis,* 491 F.3d 522, 530 (6th Cir.2007);. *Wolf v. Bankers Life and Casualty Co.,* 519 F.Supp.2d 674, 682-83 (W.D.Mich.2007). The court in *Minogue v. Modell,* 2006 WL 1704932 (N.D.Oh.2006), put it bluntly:

Attempts to create or defeat diversity jurisdiction are nothing new. Litigants have a long history of gaming parties and claims to obtain or avoid federal diversity jurisdiction.

*Id.* at *4.

Even so, the court in *Minogue* noted that fraudulent joinder is determined solely on the basis of the claims, that plaintiff's motive is irrelevant, and that all doubts are resolved in favor of remand. *Id.* (Dicta).

On the other hand, if joinder of a company's employees can be characterized only as an unfair sham, then there is fraud, and the joinder is improper. *See, e.g., Legg v. Wyeth,* 428 F.3d 1317, 1320 (11th Cir.2005). Joinder is fraudulent when "there has been outright fraud in plaintiff's pleading of jurisdictional facts," *Gottlieb v. Westin Hotel Co.,* 990 F.2d 323, 327 (7th Cir.1993), or when plaintiffs join a party or parties against whom they *cannot* recover. *Poulos v. Naas Foods, Inc.,* 959 F.2d 69, 73 (7th Cir.1992). Defendants contend that plaintiffs have engaged in both types of fraud in order to avoid federal jurisdiction and to preserve this case in state court where plaintiffs believe they would have a more favorable forum.

Common sense supports the notion that plaintiffs gain nothing necessary by naming individual railroad employees such as Barbee and Weber-or John Does 1 and 2-as defendants. Their employer, defendant Burlington Northern, likely will indemnify them, so that the allegations against Barbee and Weber will be imputed to Burlington Northern. Perhaps it should not be surprising that some of the representative plaintiffs have reached out to the Weber family-their neighbors, perhaps their friends, until now-to assure the Webers that nobody wants them to be put at risk and that plaintiffs' lawyers assure that this lawsuit will not cost the Webers a dime. In short, joinder of the Wisconsin defendants is transparently tactical but this does not, without more, make it fraudulent.[3]

**\*9** To establish fraud, defendants contend that regardless what might be true as to the other defendants, as a matter of *law,* Barbee and Weber cannot be held liable to plaintiffs in this lawsuit. The lynchpin question when assessing this contention is whether Barbee and Weber can be said as a matter of law to have had no duty of care to these

plaintiffs.[4] Wisconsin law starts with the hopelessly broad exhortation that "everyone has a duty of care to the whole world." *Miller v. Wal-Mart Stores, Inc.,* 219 Wis.2d 250, 260, 580 N.W.2d 233, 238 (Wis.1998). A narrower, more practical formulation is that "[t]he duty of any person is the obligation of due care to refrain from any act which will cause foreseeable harm to others even though the nature of that harm and the identity of the harmed person or harmed interest is unknown at the time of the act...." *Rockweit v. Senecal,* 197 Wis.2d 409, 419-20, 541 N.W.2d 742, 747 (Wis.1995). The duty extends to omissions by individuals who may cause harm. *Wal-Mart Stores, Inc.,* 219 Wis. at 260, 580 N.W.2d at 238.

As a flagman for the railroad, Weber was responsible for maintenance of the track infrastructure and trackbed as well as clearing the right-of-way of litter and cargo spillage. Weber affidavit, dkt. 16, at ¶ 3. As roadmaster for the railroad, Barbee was responsible for maintaining track structures, performing track inspections, insuring compliance with quality and safety guidelines, and working with local, county and state agencies to create good public relations. Barbee affidavit, dkt. 17, at ¶ 3. In short, both Barbee and Weber had duties to insure that defendants' railways were properly maintained. Plaintiffs allege that Barbee and Weber violated these duties by failing to inspect, investigate, monitor or maintain the Burlington Northern bridge trestle. Although Barbee's and Weber's job description duties focus on the tracks and railways, for the purpose of determining tort liability, it is neither unrealistic nor unreasonable to infer that their duty of care extended to ensuring that the areas surrounding the tracks and rail lines were not likely to harm other people in the vicinity. They were actually out there on site, with inspection responsibilities; therefore, if there was a blockage on the trestle severe enough to be noticeable to someone on the tracks, then it is not legally implausible for plaintiffs to suggest that Barbee and Weber owed a duty of care to plaintiffs. Put another way, however unlikely an actual finding of liability against these two men, I cannot find that plaintiffs simply *cannot* recover against Barbee and Weber.

Defendants point out that Barbee and Weber's explicit job duties and responsibilities did "not include the inspection, maintenance or monitoring of bridges

or bridge trestles." Barbee affidavit, dkt. 17, at ¶ 4; Weber affidavit, dkt. 16, at ¶ 4. In addition, defendants have submitted the affidavits of BNSF employees Louis Welte (a resident of Illinois whose job title is "Supervisor of Structures") and Jeffrey Haas (a resident of Iowa whose job title is "Bridge Inspector") who expressly state that *they* were (and are) responsible for supervising and inspecting the bridge and bridge trestles in and around Bagley, Wisconsin, and that Barbee and Weber were not. Haas affidavit, dkt. 19, at ¶¶ 3-4, Welte affidavit, dkt. 18, at ¶¶ 3-4. As defendants acknowledge, Barbee and Weber are defendants John Does 1 and 2, who are described in ¶¶ 21-30 of plaintiffs' complaint.

 **\*10** The fact that plaintiffs named John Does 1 and 2 as defendants in addition to Barbee and Weber undercuts the inference that plaintiffs intentionally named Barbee and Weber as defendants *in place of* the railroad employees actually responsible for bridge and trestle inspection and maintenance, an inference that would have supported defendants' assertion of fraud. Rather, plaintiffs have cast a wide net, asserting tortious conduct by every single railroad employee who had any inspection, reporting or repair responsibilities with regard to the trestle, the bridge on the trestle or the track near and over the bridge.

This is a common pleading tactic and it is not necessarily improper. Defendants have not shown that Barbee and Weber had no duty of care as a matter of law. The fact that Barbee and Weber's specific job duties did not extend to supervising the bridge or trestle does not foreclose the possibility that they had a common law duty to report obvious hazards associated with the trestle that might cause injury to area residents. Under Wisconsin law, employees are not exempt from common law negligence simply because they are not responsible for a specific element of their job. *See Wal-Mart Stores, Inc.,* 219 Wis. at 259-261, 580 N.W.2d at 237-238; *see also, McNeese by Eisenberg v. Pier,* 174 Wis.2d 624, 631, 497 N.W.2d 124, 127 (Wis.1993) (" 'the particular conduct of a defendant is not examined in terms of whether or not there is a duty to do a specific act, but rather whether the conduct satisfied the duty placed upon individuals to exercise that degree of care as would be exercised by a reasonable person under the circumstances.' "). An employee has a duty to exercise ordinary care when

either doing something or failing to do something that "a reasonable person would foresee that by his or her action or failure to act, he or she will subject a person or property to an unreasonable risk of injury or damage." *Wal-Mart Stores, Inc.,* 219 Wis. at 261, 580 N.W.2d at 238.[5]

Obviously, there are some gigantic material fact questions that have to be answered before liability vests for *any* defendant, including: (1) Was the trestle obstructed by debris in July '07? (2) Was any such obstruction sufficiently obvious to be seen by railroad employees working in the area? (3) Would any such obstruction have raised a genuine sufficiently foreseeable risk of possible flooding as to trigger a duty for railroad employees to report and to act? (4) Was the obstruction big enough and the risk of flooding from that obstruction foreseeable enough that even railroad workers with no direct responsibility for the bridge or the trestle should have seen it and should have reported it? (5) If there actually was an obstruction, was it a proximate cause of the flooding that occurred during the "500-year rain" on July 17-18, 2007? Then there are fact questions regarding what, if anything, Barbee, Weber, Haas and Welte saw, suspected, knew, said, did, or failed to say or failed to do.[6] But these all are fact questions and it at this early phase of this lawsuit, it appears that they all are disputed. Defendants cannot show by a preponderance of the evidence that, as a matter of law, Barbee and Weber owed no duty of care to any of these plaintiffs and that plaintiffs cannot recover against them. *See, e.g., Oshana v. Coca-Cola Co.,* 472 F.3d 506, 511 (7th Cir.2006).

 **\*11** Defendants argue that plaintiffs' lawyers violated Rule 11 by including Barbee and Weber as defendants. Defendants contend that because members of plaintiffs class communicated to Francis Weber's wife that they knew he was not responsible for the flood, plaintiffs' lawyers were aware that Weber was not actually responsible and therefore his joinder was fraudulent and done for the sole purpose of defeating diversity. Defendants' argument is unpersuasive. Whether members of plaintiffs' class told Mrs. Weber that they knew defendant Weber was not responsible for the flooding has no bearing on whether he was legally responsible or liable for any of the damage caused by the alleged man-made flooding. As individuals who are responsible for maintenance and

safety of the railways around Bagley, it was not mere speculation on the part of plaintiffs' lawyers to include Barbee and Weber as liable for the injuries suffered by the proposed plaintiff class. Therefore, the joinder of Barbee and Weber is not fraudulent.

**B. Real Party in Interest**
In addition, defendants suggest that plaintiffs' joinder of the in-state defendants should be disregarded because they are merely "nominal defendants" and not the real party in interest. "A federal court must disregard nominal or formal parties and rest jurisdiction only upon the citizenship of real parties to the controversy." *Navarro Savings Assn. v. Lee,* 446 U.S. 458, 461, 100 S.Ct. 1779, 64 L.Ed.2d 425 (1980). In determining the "real party in interest," a court should look to "the essential nature and effect of the proceedings," *Adden v. Middlebrooks,* 688 F.2d 1147, 1150 (7th Cir.1982) and whether the party has "a substantial stake in the outcome of the case." *Wisconsin v. Abbott Laboratories,* 341 F.Supp.2d 1057, 1061 (W.D.Wis.2004). Also, the real party in interest is the party "who, according to the applicable substantive law, has the duty sought to be enforced or enjoined." *Eichmann v. Hunter Automated Machinery, Inc.,* 167 F.Supp.2d 1070, 1072 (E.D.Wis.2001); *cf. Adden v. Middlebrooks,* 688 F.2d at 1153 ("It is appropriate for a federal court to consider state law as a factor in determining whether the State is the real party in interest.")

In this case, plaintiffs have brought negligence and nuisance claims against all defendants. As discussed above, an element of both claims is whether the defendants owed a duty of care to the plaintiffs, and under Wisconsin law, plaintiffs could sustain these claims against the corporate and the individual defendants, both in-state and out-of-state. Defendants cannot establish as a matter of law that Barbee and Weber owed no duty to plaintiffs. To the contrary and with full appreciation for defendants' arguments, it is reasonable to infer that each man had such a duty. Therefore, at this stage, Barbee and Weber cannot be called "nominal defendants" because they have a substantial stake in these proceedings.

Defendants argue that Barbee and Weber are not the real parties in interest because plaintiffs predominantly seek recovery against Burlington Northern and

plaintiffs do not allege any acts by Barbee and Weber distinct from the other defendants. Although defendant Burlington Northern undoubtedly would bear the brunt of any finding of liability and damages, the real party in interest inquiry does not depend on which party has the deepest pocket. *Wausau Tile, Inc. v. County Concrete Corp.,* 226 Wis.2d 235, 543-54, 593 N.W.2d 445, 454 (Wis.1999)("A real party in interest is 'one who has a right to control and receive the fruits of litigation.' ") Regardless what their neighbors are purporting to them, and regardless how minuscule their roles in the events that unfolded, Barbee and Weber are parties with a stake in the litigation and they each have a legal interest to protect. *Id.* ("The basic test is ... whether the defendant will be fully protected when the judgment in behalf of the plaintiff is discharged.").

**\*12** Even if the claims against Barbee and Weber are not distinct from those against defendant Burlington Northern, this does not establish that these men are nominal parties. As explored in the previous section, each and every defendant might be at fault for breach of his/its duty of care based on different acts and omissions. At this early stage of the lawsuit, plaintiffs are not required to know the details of each defendant's involvement in the design, construction, inspection and maintenance of the bridge and its trestle. It is sufficient that plaintiffs provide defendants notice of their claims, which they have done. Although the most likely outcome is that Weber and Barbee will be shunted to the periphery of this case (or out of it), this is irrelevant to the decision on diversity. "There is never a presumption in favor of federal jurisdiction, but rather the basis for such jurisdiction must be affirmatively evidenced by the party invoking it." *Adden v. Middlebrooks,* 688 F.2d at 1150. Barbee and Weber are not nominal parties. They are properly joined as defendants. Thus, plaintiffs' motion to remand on the ground that this court lacks subject matter jurisdiction under 28 U.S.C. § 1332(a) should be granted, *unless* the Class action Fairness Act dictates otherwise. And it does:

**III. Class Action Fairness Act Jurisdiction**
Defendants invoke CAFA as a basis for this court's jurisdiction over plaintiffs' lawsuit. CAFA creates federal jurisdiction over (and thus allows removal of) multi-state class actions with substantial stakes. *Bullard v. Burlington Northern Santa Fe Railway Co.,*

535 F.3d 759, 761 (7th Cir.2008). CAFA allows federal courts to exercise jurisdiction over class actions where only minimal diversity exists between the parties and the amount in controversy exceeds $5,000,000 in the aggregate and the number of members of all proposed classes is 100 members or more. 28 U.S.C. § 1332(d)(2) & (d)(5)(B); 5 *Moore Federal Practice*, § 23.63[2][a], at 23-308, -309 (2008). If these criteria are met, there are three exceptions to CAFA jurisdiction.

As always, the party asserting federal jurisdiction bears the burden of proving its existence. *Hart v. FedEx Ground Package System Inc.,* 457 F.3d 675, 679-80 (7th Cir.2006); *Brill v. Countrywide Home Loans, Inc.,* 427 F.3d 446, 447 (7th Cir.2005); *see also Bullard v. Burlington Northern Santa Fe Railway Co.,* 556 F.Supp.2d 858, 859 (N.D.Ill.2008). Here, defendants have a shot at establishing CAFA jurisdiction if they can demonstrate that, within the limits of the claims actually made by plaintiffs regarding their proposed class, there is a reasonable probability that the jurisdictional requirements will be met. *Brill,* 427 F.3d at 449; *see also In Re Shell Oil Co.,* 970 F.2d 355, 356 (7th Cir.1992) ("Jurisdiction is determined as of the instant of removal."). "[P]art of the removing party's burden is to show not only what the stakes of the litigation could be, but also what they are given the plaintiff's actual demands." *Brill,* 427 F.3d at 449; *see also St. Paul Mercury Indemnity Co. v. Red Cab Co.,* 303 U.S. 283, 291-93, 58 S.Ct. 586, 82 L.Ed. 845 (1938). In this case, defendants must demonstrate that plaintiffs' proposed class contains at least 100 members and that the amount in controversy exceeding $5,000,000. 28 U.S.C. § 1332(d)(2) & (d)(5)

**\*13** With respect to plaintiffs' proposed class, defendants argue that plaintiff's class is drawn so broadly that it *could* include up to 369 different persons and entities. Dft. Br., dkt. 14, at 19-20. Defendants base this argument on the 2007 Real Estate Tax record for the deeded parcels located within the geographical area described by plaintiff's class, which shows 286 deeded properties owned by 369 different persons. Borg Affidavit, dkt. 15, Ex. 4 & 5. Also, according to evidence offered by defendants, most of the homes in Bagley were affected by the flooding. Borg Affidavit, dkt. 15, Ex. 2. In addition, the area described by the complaint has a tax assessed value in excess of $9,000,000. Dft. Br., dkt. 14, at 19-20.

In reply, plaintiffs do not dispute the accuracy of defendants' numbers. Instead, plaintiffs contend that because significantly less than 100 people have joined the class the class so far, and because the class has not expanded in the year since plaintiffs filed their class action, it is unlikely ever to equal or exceed 100 members.

But § 1332(d)(1)(B) states that

> The term "class members" means the persons (named or unnamed) *who fall within the definition of the proposed or certified class* in a class action. [Emphasis added].

Then § 1332(d)(5)(B) states that CAFA shall not provide original federal jurisdiction in any class action in which "the number of members of all *proposed* plaintiff classes in the aggregate is less than 100." [Emphasis added].

Therefore, the relevant question is whether 100 or more people fall within the definition of the class proposed by the plaintiffs in their complaint. *See Cunningham Charter Corp. v. Learjet, Inc.,* --- F.Supp.2d ----, 2008 WL 3823710 at \*4, n. 3 (S.D.Ill., Aug.13, 2008) (exact size of the class need not be determined until later; defendant's burden is simply to show that there are at least 100 potential class members). The indisputable answer to this question is "Yes." Therefore, it is irrelevant that less than 100 people actually had joined the class at the time defendant removed it, and it is irrelevant that plaintiffs predict that less than 100 people actually will join their lawsuit. The proposed class hasn't even been certified yet, so no one has been required to make a final decision whether s/he wants to get in or stay out.[7] Plaintiffs, who carefully crafted their complaint to evade federal diversity jurisdiction were not as careful to avoid CAFA. Now it's too late:

> While plaintiffs undoubtedly possess some power to seek to avoid federal jurisdiction by defining a proposed class in particular ways, they lose that power once a defendant has properly removed a class action to federal court. Whether defendants have satisfied requirements of CAFA, including its 100-person minimum threshold, is determined at the time of removal

*Bullard v. Burlington Northern Santa Fe Railway Co.,* 556 F.Supp.2d 858, 860 (N.D.Ill.2008), quoting *Hart* 457 F.3d at 681 (in turn quoting S. Rep. 14, 109th Cong. 1st Sess. 43 (2005)).

**\*14** In short, plaintiffs' proposed class meets CAFA's numerosity threshold.

Plaintiffs assert that their lawsuit does not meet CAFA's damage threshold of five million dollars, but clearly it does. Plaintiffs are seeking compensatory, consequential, incidental, against a baseline of $9 million in real property, plus personal property damage to the furniture, possessions and motor vehicles associated with hundreds of residences, and all concomitant emotional distress experienced by the property owners. The requested actual damages are well past the five million dollar mark and we haven't even factored in plaintiffs' demand for statutory treble damages for recklessness, plus their demand for punitive damages against a railroad company whose market capitalization exceeded $25 billion and had fiscal year profits in 2008 of $1.8 billion[8] As a result, defendants have met their burden in establishing that plaintiffs' proposed class action falls within the jurisdiction of CAFA.

Even so, plaintiffs would be entitled to remand if they establish that their case fits within one of CAFA's two express exceptions, the home-state or local controversy provisions, § 1332(d)(4)(A) & (B). It is plaintiffs' burden to prove the exception: "whenever the subject matter of a case qualifies it for removal, the burden is on a plaintiff to find an express exception.' " *Hart,* 457 F.3d at 680-81 (citing *Breur v. Jim's Concrete of Brevard, Inc.,* 538 U.S. 691, 698, 123 S.Ct. 1882, 155 L.Ed.2d 923 (2003)); *see also Serrano v. 180 Connect, Inc.,* 478 F.3d 1018, 1019 (9th Cir.2007); *Frazier v. Pioneer Americas LLC,* 455 F.3d 542, 546 (5th Cir.2006).

To remand under the local-controversy exception, plaintiffs must show that two-thirds of the plaintiffs and at least one defendant from whom significant relief is sought and whose alleged conduct forms a significant basis for the claims of the plaintiff class are citizens of the state in which the suit was originally filed. 28 U.S.C. § 1332(d)(4)(A)(i)(I)-(II). In addition, the principal injuries resulting from defendants' alleged

conduct must also occur in said state. 28 U.S.C. § 1332(d)(4)(A)(i)(III).

Every member of plaintiffs' class is from Wisconsin and all of their injuries occurred in Bagley. The parties dispute whether the remaining prongs of the local controversy exception apply. Plaintiffs offer no proof that the relief sought from the in-state defendants-Weber and Barbee-is "significant" or that these in-state defendants' actions form a "significant" part of plaintiffs' claims; in fact, their brief merely parrots the language of the statute. Plt. Br., dkt. 13, at 8-10. Plaintiffs raise no additional arguments in their reply brief. Plt. Reply, dkt. 23.) Because plaintiffs bear the burden of persuasion, this lack of evidence would be sufficient to dismiss plaintiffs' assertion that the local controversy exception applies.

However, the few facts before this court prove the opposite: the acts and omissions attributed to Weber the flagman and Barbee the roadmaster do not form a significant basis of plaintiffs' claims and plaintiffs could not obtain "significant relief" from them. Relief is "significant" if relief sought from the in-state defendants forms a significant portion of the entire relief sought. *Evans v. Walter Industries, Inc.,* 449 F.3d 1159, 1167 (11th Cir.2006); *see also Robinson v. Cheetah Transportation,* No. 06-0005, 2006 WL 468820, at \*3 (W.D. LA Feb. 27, 2006) ("whether a putative class seeks significant relief from an in-state defendant includes not only an assessment of how many members of the class were harmed by the defendant's actions, but also a comparison of the relief sought between all defendants and each defendant's ability to pay a potential judgment"); *Kearns v. Ford Motor Co.,* No. 05-5644, 2005 WL 3967998, at \*10 (C.D.Cal.2005). When interpreting "significant basis," courts have followed a similar approach, holding that a defendant's conduct forms a "significant basis" of the plaintiff class' claim when it represents a large part of the claim. *See Matera v. Clear Channel Communications, Inc.,* 239 F.R.D. 70, 78-79 (S.D.N.Y.2006) (in-state defendant employed a majority of proposed plaintiff class and would bear a large portion of relief sought); *see also Evans,* 449 F.3d at 1166-68.

**\*15** Interpreting "significant" to mean the larger portion or a sizeable portion comports with the intent

of CAFA to limit these exceptions to truly in-state disputes. *Cf. Evans,* 449 F.3d at 1163 ("CAFA's language favors federal jurisdiction over class actions and CAFA's legislative history suggests that Congress intended the local controversy exception to be a narrow one, with all doubts resolved 'in favor of exercising jurisdiction over the case.' ") *See also* S.Rep. No. 109-14, at 40 (2005), *as reprinted in* 2005 U.S.C.C.A.N. 3 (providing the example of the relative insignificance of an insurance salesman in a class action for fraud against the insurance company).

As noted in Section II above, Weber and Barbee had no actual job responsibilities regarding the bridge or the trestle and there is no allegation in the complaint that they assumed a *de facto* duty to the plaintiffs based on what they might have seen that their co-workers with genuine responsibilities for the bridge and the trestle did not. The joinder of Weber and Barbee to this lawsuit may not be fraudulent, but it is palpably tactical: these men were added to the lawsuit to defeat diversity, not because there is anything significant about their acts or omissions that would have caused the Bagley flood. Equally clearly, plaintiffs are not seeking significant relief from Weber and Barbee. These guys are line workers who probably don't have two spare nickels to rub together once the bills get paid, and some of their former friends who now are suing them are on record disavowing any intent to recover any relief from them at all. This lawsuit is a battle between a Wisconsin village and a Texas railroad. Weber and Barbee are insignificant pawns sacrificed by plaintiffs in the opening skirmish over jurisdiction. Therefore, the local controversy exception does not apply in this case.

Next, under the home-state exception, the district court shall decline jurisdiction when "two-thirds or more of the members of all the proposed plaintiff classes in the aggregate, and the primary defendants, are citizens of the State in which the action was originally filed." 28 U.S.C. § 1332(d)(4)(B). Because all of the plaintiffs are from Wisconsin, the question is whether the primary defendants are from Wisconsin. Plaintiffs focus entirely on the question whether defendants Barbee and Weber are properly defined as "primary defendants." As noted above, they are not. They're not even *secondary* defendants; tertiary best describes their role in these proceedings. But

even if Weber and Barbee were to qualify as primary defendants, then Jeffrey Haas (from Iowa) and Louis Welte (from Illinois) would qualify as well, not to mention the railroad from Texas. By this measure, 60% of the "primary" defendants would be from outside Wisconsin.

Although the Seventh Circuit has not addressed whether 1332(d)(4)(B) requires all or merely some of the primary defendants to be from the same state as two-thirds of plaintiffs, other courts have found the statute requires that *all* of the primary defendants must be from the plaintiffs' home state. *See Anthony v. Small Tube Mfg. Corp.,* 535 F.Supp.2d 506, 515 (E.D.Pa.2007); *Brook v. United Health Group Incorporated,* 2007 WL 2827808 (S.D.N.Y. Sept, 27, 2007); *Robinson,* 2006 WL 3322580, at *3 ("evident from the statute's use of the phrase 'the primary defendants' rather than 'a primary defendant', 'the plain language of the statute requires remand only when all of the primary defendants are residents of the same state in which the action was originally filed' "); *cf. Frazier v. Pioneer Americas LLC,* 455 F.3d 542, 546 (5th Cir.2006). This reading is in line with the intent of the exception, namely to remand a case to state court when it is almost entirely an in-state dispute. The instant lawsuit is not primarily an in-state dispute.

**\*16** Plaintiffs have one last shot at remand: a federal court may decline to exercise jurisdiction under CAFA even though the jurisdictional elements are present if the interests of justice and the totality of the circumstances dictate otherwise. The interest of justice inquiry under CAFA allows the court to consider factors such whether the claims involve matters of national or interstate interest, what law will govern the parties dispute, whether the class action has been pled to avoid federal jurisdiction, whether the action was brought in a forum with a distinct nexus with the class members and whether the proposed plaintiffs' class is predominantly composed of citizens from the state in which the action was filed. 28 U.S.C. § 1332(d)(3) (A)(E).

However, a court may consider these factors only if more than one-third and less than two-thirds of plaintiffs' class and the primary defendants are citizens of the same state. 28 U.S.C. § 1332(d)(3). Plaintiffs' class is composed entirely of Wisconsin

Case 1:21-cv-00887-LA    Filed 09/01/22    Page 69 of 76    Document 57

residents. Second, as discussed in reference to the home state exception, the use of the phrase "the primary defendants" requires that all of the primary defendant be citizens of the state in which the action was originally filed. The railroad is a primary defendant-and by any logical measure the *only* primary defendant-and it is not a citizen of Wisconsin. Therefore, the court cannot consider whether the interests of justice counsel in favor of remand to state court.

In summary, defendants have shown that this court has jurisdiction under CAFA and plaintiffs cannot show that any of CAFA's jurisdictional exceptions apply. Therefore, plaintiffs' motion for remand to the Grant County Circuit Court should be denied.

RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1)(B) and for the reasons stated above, I recommend that the motion to remand filed by plaintiffs Kenneth Irish, Denise Marshall, Hollie Moore and Scott Stillwell be DENIED and that their request for attorney's fees be DENIED.

UNITED STATES DISTRICT COURT WESTERN DISTRICT OF WISCONSIN

120 N. Henry Street, Rm. 540 Post Office Box 591 Madison, Wisconsin 53701

Chambers of Telephone STEPHEN L. CROCKER (608) 264-5153 U.S. Magistrate Judge

January 5, 2009

Matthew C. Allen

Kopp, McKichan, Geyer, Skemp & Stombaugh, LLP P.O. Box 253

Platteville, WI 53818

Timothy R. Thornton

Briggs and Morgan, P.A.

80 South Eighth Street, Suite 2200 Minneapolis, MN 55372
Re: *Kenneth Irish, et al. v. Burlington Northern Santa Fe Railway Co.,* et al. Case No. 08-cv-469-slc

Dear Counsel:
The attached Report and Recommendation has been filed with the court by the United States Magistrate Judge.

The court will delay consideration of the Report in order to give the parties an opportunity to comment on the magistrate judge's recommendations.

In accordance with the provisions set forth in the memorandum of the Clerk of Court for this district which is also enclosed, objections to any portion of the report may be raised by either party on or before January 5, 2009, by filing a memorandum with the court with a copy to opposing counsel.

 **\*17** If no memorandum is received by January 5, 2009, the court will proceed to consider the magistrate judge's Report and Recommendation.

Sincerely,

/s/ M. Hardin for
Connie A. Korth

Secretary to Magistrate Judge Crocker

Enclosures

cc: Honorable Barbara B. Crabb, District Judge

MEMORANDUM REGARDING REPORTS AND RECOMMENDATIONS

Pursuant to 28 U.S.C. § 636(b), the district judges of this court have designated the full-time magistrate judge to submit to them proposed findings of fact and recommendations for disposition by the district judges of motions seeking:

  (1) injunctive relief;

  (2) judgment on the pleadings;

WESTLAW  © 2022 Thomson Reuters. No claim to original U.S. Government Works.

(3) summary judgment;

(4) to dismiss or quash an indictment or information;

(5) to suppress evidence in a criminal case;

(6) to dismiss or to permit maintenance of a class action;

(7) to dismiss for failure to state a claim upon which relief can be granted;

(8) to dismiss actions involuntarily; and

(9) applications for post-trial relief made by individuals convicted of criminal offenses.

Pursuant to § 636(b)(1)(B) and (C), the magistrate judge will conduct any necessary hearings and will file and serve a report and recommendation setting forth his proposed findings of fact and recommended disposition of each motion.

Any party may object to the magistrate judge's findings of fact and recommended disposition by filing and serving written objections not later than the date specified by the court in the report and recommendation. Any written objection must identify specifically all proposed findings of fact and all proposed conclusions of law to which the party objects and must set forth with particularity the bases for these objections. An objecting party shall serve and file a copy of the transcript of those portions of any evidentiary hearing relevant to the proposed findings

or conclusions to which that party is objection. Upon a party's showing of good cause, the district judge or magistrate judge may extend the deadline for filing and serving objections.

After the time to object has passed, the clerk of court shall transmit to the district judge the magistrate judge's report and recommendation along with any objections to it. The district judge shall review de novo those portions of the report and recommendation to which a party objects. The district judge, in his or her discretion, may review portions of the report and recommendation to which there is no objection. The district judge may accept, reject or modify, in whole or in part, the magistrate judge's proposed findings and conclusions. The district judge, in his or her discretion, may conduct a hearing, receive additional evidence, recall witnesses, recommit the matter to the magistrate judge, or make a determination based on the record developed before the magistrate judge.

NOTE WELL: A party's failure to file timely, specific objections to the magistrate's proposed findings of fact and conclusions of law constitutes waiver of that party's right to appeal to the United States Court of Appeals. *See* *United States v. Hall,* 462 F.3d 684, 688 (7th Cir.2006).

**All Citations**

Not Reported in F.Supp.2d, 2009 WL 276519

Footnotes

1   Defendant BNSF Railway Company has advised the court that it was identified erroneously as Burlington Northern Santa Fe Railway in plaintiffs' complaint. I am correcting the record to show its correct name.

1   We are proceeding by way of report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) because the parties declined to consent to my jurisdiction over this case and no Article III Judge has yet agreed to take this case. In the absence of an assigned district judge, I am submitting this report to Chief Judge Barbara Crabb for decision after the time for objections has run.

2   I mention Judge Curry only because the parties do. Because neither side accepted Judge Curry's invitation to seek recusal, there is no point speculating about what might have happened.

3   Defendants cite these back-channel contacts to support a Rule 11argument that plaintiffs' attorneys are engaged in a cruel, cynical manipulation of jurisdiction that this court should not condone. But the question is not whether plaintiffs have let their attorneys persuade them to do something that shames them, it is whether these acts sufficiently establish the legal concept of fraudulent joinder. Plaintiffs could have avoided this

dilemma by dropping their neighbors from this lawsuit and allowing it proceed in their nearby federal court, but they don't want to do that, so here we are.

4  The three elements of actionable negligence are (1) a duty owed to the plaintiff; (2) a breach thereof; and (3) an injury proximately caused by the breach. *Walker v. Bignell*, 100 Wis.2d 256, 262, 301 N.W.2d 447, 451 (1981). In the instant case, at this early stage, breach and proximate cause are disputed fact questions that cannot be a basis for finding fraudulent joinder of Barbee or Weber.

5  Suppose Barbee and Weber had been inspecting track together near Glass Hollow Creek when they saw that the trestle was severely damaged and might collapse under the weight of a fast-approaching freight train. Haas and Welte were not in the vicinity; if they had seen this damage in the past, they had not reported it. Would it be reasonable for Barbee and Weber to take the position that they had no duty to report what they saw because they don't do trestles? Would the owners of the freight that plunged from the collapsed bridge be legally barred from naming Barbee and Weber in their subsequent lawsuit because their job descriptions did not assign them the tasks of inspecting bridges and trestles? These questions virtually answer themselves.

6  There also are significant questions about whether this lawsuit is appropriately maintained as a class action, but those questions are not relevant to determining whether Barbee or Weber are fraudulently joined to this lawsuit.

7  A cynic might suspect that some villagers are waiting until after remand to join this lawsuit so as to ensure that the actual number of class members did not prematurely exceed 100. This court is too pollyannaish to suspect such tactical maneuvering. But it doesn't matter: the statutory inquiry is objective. The only way that plaintiffs could have evaded CAFA's numerical threshold would have been to have defined their class so that no more than 99 people possibly would fit the definition.

8  *See http://resources. bnet.com/topic/Burlington+northern+santa+fe+corp.+and+ dividend.html*

---

**End of Document**                                               © 2022 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW    © 2022 Thomson Reuters. No claim to original U.S. Government Works.                15

**TAB 4**

2018 WL 11236460
Only the Westlaw citation is currently available.
United States District Court, W.D. Wisconsin.

Teriana JONES and Bethany Morrissey,
on behalf of themselves and a
class of employees and/or former
employees similarly situated, Plaintiffs,
v.
CRUISIN' CHUBBYS GENTLEMEN'S
CLUB, PTB, Inc., Timothy D.
Roberts, Kenneth C. Roberts, and
Lantz Ray Roberts f/k/a Thomas
Lantz Douglas, Defendants.

17-cv-125-jdp
|
Signed 11/21/2018

**Attorneys and Law Firms**

Kara M. Burgos, James Stephan Naugler, Nathan
Patrick Skemp, Moen, Sheehan, Meyer, Ltd., La
Crosse, WI, Paul A. Kinne, Gingras, Cates & Luebke,
S.C., Madison, WI, for Plaintiffs.

Anthony J. Steffek, Davis & Kuelthau, S.C., Green
Bay, WI, Laurie E. Meyer, Davis & Kuelthau, S.C.,
Milwaukee, WI, for Defendants.

OPINION and ORDER

JAMES D. PETERSON, District Judge

 **\*1** In this class and collective action, plaintiffs
Teriana Jones and Bethany Morrissey are proceeding
on claims that defendants Cruisin' Chubbies
Gentlemen's Club, PTB, Inc., Timothy D. Roberts,
Kenneth C. Roberts, and Lantz Ray Roberts failed
to pay their employees in accordance with the Fair
Labor Standards Act and state law. The parties have
reached a settlement and they have filed a motion for
preliminary approval. Dkt. 169. Plaintiffs also filed
a motion for attorney fees and costs. Dkt. 171. For
the reasons explained below, the court will deny the

parties' motions without prejudice and give them an
opportunity to provide the needed information that is
missing from their motions. Plaintiffs also recently
filed a request for a status update, Dkt. 172, which is
rendered moot by this order.

BACKGROUND

Plaintiffs are exotic dancers who worked for
defendants. Plaintiffs raised claims that they were
classified incorrectly as independent contractors rather
than employees, so they were not receiving a minimum
wage or overtime pay, as required by the FLSA and
state law. Plaintiffs also asserted that defendants were
violating the law by retaining some of their tips.

The court certified a class under Federal Rule of
Civil Procedure 23(b)(3) and a collective under 29
U.S.C. § 216(b) of individuals who worked as exotic
dancers at Cruisin' Chubbys Gentlemen's Club on or
after February 22, 2014. Dkt. 101. The court later
dismissed several entities because they did not qualify
as plaintiffs' employer and denied plaintiffs' motion
for summary judgment. Dkt. 158.

ANALYSIS

Under the terms of the proposed settlement agreement,
defendants agree to pay a total of $400,000, which
includes $133,320 in attorney fees, $4,366.04 in
expenses, and $262,313.96 for the class members.[1]
The award for the class members includes incentive
awards of $10,000 for Jones and $8,000 for Morrissey.
Of the remaining 244,313.96, half of it will be
distributed equally among the class members; the other
half will be distributed on a pro rata basis as determined
by the number of shifts each employee worked
during the class period. Any unclaimed shares will be
divided between the class members and defendants; the
defendants will receive half and half will be distributed
to the class members on a per capita basis. In exchange
for the settlement, class members will release all wage-
and-hour claims against defendants up to the date that
the court approves the agreement. The named plaintiffs
also agree that they will not work for the defendants in
the future.

WESTLAW    © 2022 Thomson Reuters. No claim to original U.S. Government Works.    1

Under Federal Rule of Civil Procedure 23(e), the court must approve any class settlement and may do so only after the class members have had an opportunity to object and the court has held a hearing and concluded that the terms of the agreement are fair, reasonable, and adequate. In this circuit, the practice is for the court to give its preliminary approval after reviewing the proposed settlement and then to give final approval after notifying the class members and holding a hearing. *E.g., Armstrong v. Bd. of Sch. Dirs. of City of Milwaukee*, 616 F.2d 305, 314 (7th Cir. 1980); *Groshek v. Great Lakes Higher Educ. Corp.*, No. 15-cv-143-jdp, 2016 WL 4690318, at *1 (W.D. Wis. Apr. 13, 2016); *In re Nat'l Collegiate Athletic Ass'n Student-Athlete Concussion Injury Litig.*, No. 13 C 9116, 2016 WL 3854603, at *3 (N.D. Ill. July 15, 2016). The question at the preliminary stage is whether the proposed settlement is "within the range of possible approval." *Armstrong*, 616 F.2d at 314; *In re Gen. Motors Corp. Engine Interchange Litig.*, 594 F.2d 1106, 1124 (7th Cir. 1979); *Stewart v. Marshall Etc, Inc.*, No. 14-CV-1002-NJR-PMF, 2015 WL 5120817, at *1 (S.D. Ill. Aug. 28, 2015). At the final stage, the court must give greater scrutiny to the settlement, considering various factors such as the strength of the case compared to the settlement amount; the complexity, length, and expense of the litigation; any opposition to settlement; the opinion of competent counsel; and the stage of the proceedings (including the amount of discovery completed) at the time of settlement. *Wong v. Accretive Health, Inc.*, 773 F.3d 859, 863-64 (7th Cir. 2014); *Synfuel Techs., Inc. v. DHL Express (USA), Inc.*, 463 F.3d 646, 653 (7th Cir. 2006).

**\*2** Before the court will give preliminary approval of the settlement, the parties will need to clarify several issues. First, the parties will need to explain in greater detail how they determined a fair settlement amount. They provide almost no information in their motion about the process they used to calculate the class's potential damages and failed to explain why they believed the amount going to each class member represents a fair settlement of her actual damages. Without that information, the court will not be able to make a determination whether the settlement is fair. *Reynolds v. Beneficial Nat. Bank*, 288 F.3d 277, 284–85 (7th Cir. 2002) (generally, parties and court should "quantify the net expected value of continued litigation

to the class" and "estimate[ ] the range of possible outcomes").

Second, counsel for plaintiffs will need to justify their request for fees. They did not provide their billing records or otherwise explain why they believe their request is reasonable. Before the court can approve counsel's fee request, counsel will have to provide the court the information it needs to assess reasonableness. *Williams v. Rohm and Haas Pension Plan*, 658 F.3d 629, 635 (7th Cir. 2011) ("When attorney's fees are deducted from class damages, the district court must try to assign fees that mimic a hypothetical ex ante bargain between the class and its attorneys. The court must base the award on relevant market rates and the ex ante risk of nonpayment."). Counsel should also provide enough information for the court to assess reasonableness under a lodestar approach.

Third, the parties should explain why they believe it is reasonable to return half of any unclaimed amounts to defendants. The parties neither cited any authority for this approach nor provided any justification for it. Particularly because it is not clear how many class members are likely to claim their settlement (the parties provide no data on that issue), the court must ensure that defendants are not receiving an unjustified back-door reduction of the settlement. *Cf. Pearson v. NBTY, Inc.*, 772 F.3d 778, 786–87 (7th Cir. 2014) (invalidating provision in settlement agreement that returns attorney fees to the defendant if the court reduces the fees).

Fourth, and perhaps most relevant to the preliminary approval stage, the parties will need to elaborate on their efforts to provide notice to the class. The parties appear to acknowledge that there are class members who have not yet received notice of the case. They say that they will "make reasonable efforts" to locate those class members and that defendants "shall assist" in that pursuit, Dkt. 170, at 5, but they do not say how many class members have not received notice and they do not describe the efforts they will take to find those class members. Rule 23(c)(2)(B) requires "the best notice that is practicable under the circumstances." The court cannot determine whether plaintiffs are satisfying this requirement without a description of the efforts they are taking.

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.   2

Fifth, the parties do not explain why they believe that a single mailing to a residential address is sufficient, which is important in light of the difficulties that the parties have had providing notice. For example, the parties do not explain whether they explored the possibility of providing notice through of combination of U.S. mail and email to reach a greater number of class members.

Finally, the parties say that more individuals may come forward, alleging that they are class members. If that happens, the parties "shall work collaboratively to determine whether such persons should be included as Class Members." Dkt. 170, at 6. But the parties do not describe the process or criteria they will use to make that determination and they do not identify what they will do in the event that they cannot agree on whether an individual should be included in the class. The parties should clarify that issue as well.

ORDER

**\*3** IT IS ORDERED that

1. The parties' motion for preliminary approval and request for attorney fees, Dkt. 169 and Dkt. 171, are DENIED without prejudice.

2. Plaintiffs' motion for a status update, Dkt. 172, is DENIED as moot.

3. The parties may have until December 11, 2018, to file a revised motion for preliminary approval of the settlement.

**All Citations**

Slip Copy, 2018 WL 11236460

Footnotes

1    In its request for fees, plaintiffs say that they are seeking $133,333.33 in fees. Dkt. 171. The court has relied on the amount stated in the motion for preliminary approval so that the total payment by defendants is exactly $400,000.

**End of Document**                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.