# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

IN RE FOREFRONT DATA BREACH LITIGATION

**Master File No. 21-cv-887**

This Document Relates to:  ALL ACTIONS

---

## DECISION AND ORDER

This class action lawsuit arises out of a ransomware cyberattack targeting Forefront Dermatology,[1] a group of more than 210 dermatologists practicing in over 195 locations in 22 states. The complaint alleges that the cyberattack compromised sensitive medical and personal information relating to 2,413,552 current and former patients and employees of Forefront. The named plaintiffs[2] bring this action on behalf of all such patients and employees.

Plaintiffs and Forefront have entered into a settlement agreement. In a prior order, I preliminarily approved the settlement and authorized notice to the proposed settlement class. Notice has been given, and this has resulted in one class member filing an objection to settlement approval and to plaintiffs' motion for attorneys' fees, costs, and named-plaintiff incentive awards. A final fairness hearing was held on March 1, 2023. In this opinion, I address plaintiffs' motion for final approval, their motion for attorneys' fees, costs, and incentive awards, and the objector's reasons for opposing these motions.

---

[1] The entities named as defendants are Forefront Dermatology, S.C., a Wisconsin service corporation, and Forefront Management, LLC, a Delaware limited liability company. In this opinion, I refer to these entities collectively as "Forefront" or "Forefront Dermatology."

[2] The named plaintiffs are Judith Leitermann, Lynn Anderson, and Milan E. Kunzelmann.

## I. BACKGROUND

According to the allegations of the consolidated class action complaint (ECF No. 35), a group of cybercriminals known as "Cuba Ransomware" gained unauthorized access to Forefront's patient and employee files on May 28, 2021 and June 4, 2021. The complaint does not allege whether Forefront paid the group a ransom, but presumably Forefront did not do so, because the group subsequently "dumped" some of Forefront's data onto the internet at the end of June 2021. The complaint alleges that the information accessed by the group (and possibly exfiltrated) may have included patient names, addresses, dates of birth, patient account numbers, health insurance plan member ID numbers, medical record numbers, dates of service, accession numbers, provider names, and medical and clinical treatment information. (Compl. ¶ 50.) The complaint also alleges that it is possible that the group accessed Social Security numbers. (*Id.* ¶ 51.) As a result of the ransomware attack, Forefront's patients and employees have been exposed to "a heightened and imminent risk of fraud and identity theft" and "must now and in the future closely monitor their financial accounts to guard against identity theft." (*Id.* ¶ 18.) The complaint alleges that class members "may also incur out of pocket costs for, e.g., purchasing credit monitoring services, credit freezes, credit reports or other protective measures to deter and to detect identity theft." (*Id.*) The complaint alleges that Forefront is liable to class members for this harm because it maintained inadequate safeguards to protect patient and employee information. Plaintiffs' legal theories include negligence, breach of implied contract, unjust enrichment, and breach of fiduciary duty.

During earlier proceedings, I appointed the law firms of Ahdoot & Wolfson, PC, and Milberg Coleman Bryson Phillips Grossman, PLCC, as interim co-lead counsel. After

plaintiffs filed the consolidated class action complaint, Forefront filed a motion to dismiss. While the motion to dismiss was pending, the parties participated in mediation with a private mediator. To facilitate mediation, Forefront produced documents that allowed plaintiffs' counsel to determine the scope of the ransomware attack, the nature of the personal information accessed, and the number of patients and employees impacted. After receiving this information, lead counsel concluded that no financial information was known to be compromised in the attack. (ECF No. 70 at 9 of 36.) However, some medical treatment information was compromised, as were the Social Security numbers of approximately 4,000 Forefront employees. At the fairness hearing, lead counsel stated that only 47 megabytes of data was exfiltrated, and that this data related to fewer than 2,000 class members. Additional information relating to other class members may have been accessed by the cybercriminals but was not exfiltrated. Lead counsel formed the opinion that the purpose of the attack was to extort a ransom payment from Forefront rather than to monetize class members' personal information by, for example, selling it to identity thieves.

After lead counsel analyzed the documents produced by Forefront, the parties participated in an all-day mediation. The mediation did not immediately result in settlement, but the parties continued to negotiate and eventually entered into a settlement agreement on August 31, 2022. (ECF No. 57-1.) The settlement agreement defines the following settlement class:

> [A]ll natural persons who are residents of the United States whose Personal Information was potentially compromised in the Ransomware Attack and were sent, either by U.S. Mail or e-mail, notice by Forefront that their Personal Information may have been compromised in the Ransomware Attack. Excluded from the Settlement Class are: (1) the Judges presiding

3

over the Action and members of their families; (2) Forefront, its subsidiaries, parent companies, successors, predecessors, and any entity in which Forefront or its parents, have a controlling interest, and its current or former officers and directors; (3) natural persons who properly execute and submit a Request for Exclusion prior to the expiration of the Opt-Out Period; and (4) the successors or assigns of any such excluded natural person.

(*Id.* § 1.45.) This class consists of more than 2.4 million members.

The primary benefit of the settlement is the establishment of a settlement fund of $3,750,000. All benefits to class members are to be paid from this fund. The settlement agreement allows class members to choose either a cash payment or one or more forms of relief designed to more directly address the risk of identity theft and any actual harm that class members may have suffered. More specifically, the latter option allows class members to claim: (1) credit monitoring and insurance services that include two years of three-bureau credit monitoring, up to $1 million of coverage for identify theft, fraud consultation, and identity theft restoration services; (2) payment to compensate for "Documented Losses," meaning monetary losses of up to $10,000 that are likely traceable to the ransomware attack; and/or (3) payment for time spent (up to 5 hours at $25 per hour) to prevent or mitigate fraud or identity theft following the announcement of the attack. The settlement also contains terms requiring Forefront to maintain certain data security measures for at least two years.

The settlement agreement provides that attorneys' fees, administrative costs, litigation expenses, and named plaintiff incentive awards are to be paid from the settlement fund. Lead counsel has requested a fee of $1.25 million, and the three named plaintiffs each request an incentive award of $2,500 (for a total of $7,500). Administrative expenses—that is, the expenses associated with providing notice to the class and otherwise administering the settlement—are estimated to be $682,346.32, and litigation

4

costs are $13,453.57. After deducting administrative expenses and litigation costs from the $3.75 million settlement fund, $3,054,200.11 remains for distribution to the class and to plaintiffs' counsel. Plaintiffs' requested attorneys' fee award amounts to about 41% of the amount remaining, and to one-third of the full settlement fund.

In a prior order, I preliminarily approved the settlement, appointed interim lead counsel as class counsel, and directed notice to the proposed class. At the fairness hearing, class counsel reported that, after notice was given, the settlement administrator received 36,850 total claims and determined that 35,272 were valid. This means that 1.46% of the defined class of 2.4 million submitted valid claims. There were 137 requests for exclusion (*i.e.*, opt-outs), and one objection. The objection was filed by class member Christopher Ian Pryby, who is pro se but also an attorney.

Of those who submitted valid claims for settlement benefits, 8,448 chose credit monitoring and insurance, 25 submitted claims for documented losses, 630 requested lost-time payments, and 26,439 elected the cash payment. The settlement fund is large enough to cover all claims for credit monitoring and insurance, documented losses, and lost time. Class counsel stated at the fairness hearing that each class member who elected the cash payment will receive $60.58.

## II. DISCUSSION

### A.   Compliance with CAFA Notice Requirement

Initially, the objector contends that the court cannot approve the settlement because the defendants failed to provide notice to the "appropriate state official[s]," as required by the Class Action Fairness Act of 2005 ("CAFA"). The relevant CAFA provision requires a defendant who is participating in a settlement to provide notice of the proposed

5

settlement to the "appropriate State official of each State in which a class member resides and the appropriate Federal official." 28 U.S.C. § 1715(b). A court may not issue an order giving final approval to a proposed settlement until 90 days after these officials are served with the required notice. *Id.* § 1715(d). In the present case, there is no dispute that Forefront, through the settlement administrator, served proper notice on the appropriate Federal official. (Because no defendant is a depository institution, the appropriate Federal official is the Attorney General of the United States. *Id.* § 1715(a)(1).) However, the objector contends that Forefront provided notice to the wrong state officials.

CAFA defines "appropriate State official" as "the person in the State who has the primary regulatory or supervisory responsibility with respect to the defendant, or who licenses or otherwise authorizes the defendant to conduct business in the State, if some or all of the matters alleged in the class action are subject to regulation by that person." 28 U.S.C. § 1715(a)(2). The definition adds that, "[i]f there is no primary regulator, supervisor, or licensing authority, or the matters alleged in the class action are not subject to regulation or supervision by that person, then the appropriate State official shall be the State attorney general." *Id.* In the present case, Forefront concluded that no state in which a member resides has an agency that regulates the events described in the complaint. It therefore provided notice to the attorney general for each state. The objector contends that this was mistake because Forefront is a medical practice that is regulated by state medical licensing boards.

Forefront makes two arguments in response. First, it notes that medical boards typically regulate physicians and other medical professionals, and that no such person is a defendant in this case. Instead, the defendants are corporate entities through which the

6

physicians administer their practices. Second, Forefront contends that, even if some state medical boards have jurisdiction over the corporate entities associated with medical providers, their regulatory focus would be on the professional conduct of the providers rather than on the security of the practice's data-storage system. The objector responds by citing state statutes suggesting that the jurisdiction of some medical boards extends to corporate entities and that many states maintain ethical rules that prohibit providers from making unauthorized disclosures of patient information.

The parties have not cited, and I have not found, any cases interpreting CAFA's definition of "appropriate State official." However, it is evident that the purpose of providing notice to this official is to ensure that a state agency with specialized expertise in the subject matter of the litigation may apply that expertise to the proposed settlement and notify the court if it deems the settlement inadequate. *Cf. California v. IntelliGender, LLC*, 771 F.3d 1169, 1172 (9th Cir. 2014) (suggesting that the purpose of CAFA requirement of notice to appropriate state official is to grant the state an opportunity to comment or object if it deems the settlement inadequate to protect its citizens). The subject of the present case is data security, and to my knowledge no state medical board has expertise in this area. Rather, medical boards are generally concerned with the practice of medicine. It is true, as the objector points out, that most states have ethics rules that prohibit physicians from making unauthorized disclosures of patient information. But a rule prohibiting a physician from disclosing patient confidences is not equivalent to a regulatory standard governing the security of electronic data that includes patient information. Forefront represents that it is unaware of any regulations promulgated, or regulatory actions taken, by any state medical board regarding a physician's data security

7

practices. (ECF No. 76 at 5–6.) Moreover, the professional settlement administrator, who has administered other data-breach settlements involving protected health information, has never provided notice of a class settlement to a state medical board, and no court has deemed the failure to provide such notice noncompliance with CAFA. (Decl. of Brandon Schwartz ¶ 3, ECF No. 76-2.)

Ultimately, I do not believe that the CAFA notice provision was meant to be a trap for an unwary litigant. Perhaps some state's medical board would consider bringing ethics charges against a physician whose data security was extremely lax. But medical boards generally do not promulgate data-security regulations or investigate cyberattacks, and therefore I conclude that the matters alleged in this case are not regulated by state medical boards. Instead, I find that defendants satisfied CAFA by providing notice of the settlement to the attorneys general of the states in which class members reside.

## B.    Final Approval of Settlement Agreement

A court may approve a settlement only after finding it "fair, reasonable, and adequate" after considering whether:

> (A) the class representatives and class counsel have adequately represented the class;
>
> (B) the proposal was negotiated at arm's length;
>
> (C) the relief provided for the class is adequate, taking into account:
>
> > (i) the costs, risks, and delay of trial and appeal;
> >
> > (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;
> >
> > (iii) the terms of any proposed award of attorney's fees, including timing of payment; and
> >
> > (iv) any agreement [made in connection with the settlement]; and

8

(D) the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2).

In addition to the Rule 23(e)(2) considerations, the Seventh Circuit has identified the following general principles to guide a court's evaluation of a settlement: (1) the strength of the class's case, (2) the complexity and expense of further litigation, (3) the amount of opposition, (4) the reaction of class members to the settlement, (5) the opinion of competent counsel, and (6) the stage of the proceedings and the amount of discovery that was completed. *Martin v. Reid*, 818 F.3d 302, 306 (7th Cir. 2016). The Seventh Circuit has stressed that the first factor—the strength of the class's case—is the most important. *Id.*

For many of the above factors, little discussion is warranted. I find that class representatives and class counsel have adequately represented the class, that the proposed settlement was negotiated at arm's length, and that the settlement treats class members equitably relative to each other. The amount of opposition to the settlement and the reaction of class members are factors that favor approval. Out of a class of 2.4 million, only 137 individuals have opted out, and there is only one objection. A claims rate of 1.46% is generally in line with the rate experienced in other data breach class actions. For example, in a similar case involving the settlement of a medical data breach, the Western District of Wisconsin experienced a claims rate of approximately 1%. *Fox v. Iowa Health Sys.*, No. 18-C-327, 2021 WL 826741, at *2 (W.D. Wis. March 4, 2021) (notice sent to 1.4 million class members); Fox ECF No. 106, ¶ 18 (16,488 claim forms received with one month left in claims period).

The remaining Rule 23 factor is the adequacy of the relief provided, and this is generally what the remaining Seventh Circuit factors are designed to assess. Here, I find that the relief provided is adequate. Indeed, the relief may very well be the most that the class could gain even after a trial. As alleged in the complaint, the harm this data breach caused to class members consisted of "a heightened and imminent risk of fraud and identity theft" that would require them to "closely monitor their financial accounts to guard against identity theft." (Compl. ¶ 18.) The complaint alleges that class members "may also incur out of pocket costs for, e.g., purchasing credit monitoring services, credit freezes, credit reports or other protective measures to deter and to detect identity theft." (Id.) The settlement benefits directly respond to these harms. Class members had the option of selecting two years of credit monitoring and identity theft insurance that would relieve them of having to personally monitor their accounts and would provide them with insurance in the event of a loss. Those class members who already spent time taking protective measures could claim lost-time payments of up to $125. And those class members who already experienced a loss attributable to the breach could receive compensation up to $10,000. Finally, the settlement includes injunctive relief that is designed to minimize the possibility of a future data breach that again compromises the personal information that continues to remain on file at Forefront.

The objector contends that the settlement is inadequate because, if all class members chose to accept the cash payment, the amount received would be trivial. (The objector contends that the amount would be $0.75 and class counsel concede that the amount would be no more than $1.56.) But I do not see why the adequacy of the settlement should be measured by the amount each class member would receive if each

10

chose the cash payment. As discussed, the settlement provides for other benefits that more directly respond to the harm that class members allegedly suffered, including credit monitoring and insurance and compensation for actual losses. A class member would likely deem these benefits worth more than $1.56. Class counsel has submitted a declaration from an expert who values the credit monitoring and insurance services as being worth $720 per class member ($30 per month x 24 months). (ECF No. 57-5, ¶¶ 5–6.) The objector challenges this valuation. However, I do not believe that it is necessary to put a precise value on these services. The important point is that the services redress the primary harm caused by the ransomware attack—a risk of future identity theft—and therefore represent adequate compensation. Indeed, because the services redress this harm, the cost of the services may be an appropriate measure of the class's damages at trial. This is why I said above that the settlement may represent the best outcome even after a trial.[3]

The objector contends that the credit monitoring and insurance services are inadequate relief because many class members likely were victims of prior data breaches involving companies other than Forefront and likely received similar services as compensation for those breaches. However, even if this were true, it would not follow that additional credit monitoring is worthless or of trivial value. Any credit monitoring provided

---

[3] Moreover, given the lack of evidence that this data breach resulted in the exfiltration of large volumes of data, it is unlikely that any amount of litigation would result in a common fund large enough to pay all 2.4 million class members a substantial cash payment. Assuming that $10 is the minimum cash payment that could be described as substantial, the settlement fund would have to be at least $24 million to fund such payments. A settlement of that size is unlikely in this case given the lack of evidence that class members are subject to a high risk of identity theft.

in past settlements may have expired or be on the verge of expiring. The services provided by this settlement—which last for two years and which a class member may defer by up to one year (Settlement Agmt. § 3.2(a))—would thus be an additional, significant benefit.

The objector also takes issue with class counsel's concession that "no financial information was known to be compromised in the Ransomware Attack." (ECF No. 70 at 9 of 36.) He contends that, if this is true, then the settlement should not be focused on mitigating financial losses.[4] However, the settlement appropriately focuses on mitigating the risk of *identity theft*, not merely financial losses. Although financial information (such as credit card numbers) may not have been stolen, other forms of personal information that could be used to commit identity theft were compromised, including names, addresses, dates of birth, and medical record numbers. (ECF No. 70 at 9 of 36.) For this reason, class members are exposed to a risk of identity theft. Credit monitoring and identity-theft insurance is therefore an appropriate remedy.

The objector next contends that the option to claim up to $10,000 in documented losses is inadequate relief because actual losses from identity theft may not materialize for some time. But it is credit monitoring and insurance that is intended to protect against such future losses. The $10,000 option is intended to provide compensation for identity theft that has already occurred and that therefore cannot be redressed by credit insurance purchased today. So again, the settlement provides nearly complete relief: the payments

---

[4] The objector also suggests that counsel should not have made this concession. But if counsel's investigation revealed that the class could not prove that financial information was compromised, then this concession was appropriate.

12

for lost time and documented losses compensate for past incidents of identity theft and costs that class members have already incurred to protect themselves, and the credit monitoring and insurance services protect against the risk of future identity theft. Notably, class members were entitled to make claims for all three benefits, meaning that every class member was eligible for complete relief. (Settlement Agmt. § 3.2.)

The objector also contends that the relief is inadequate because it does not provide compensation for emotional harm that class members might have experienced from knowing that their private dermatology records may have been accessed by third parties. Plaintiffs respond that claims involving emotional-distress damages are generally not amenable to resolution on a class basis because emotional harm is subjective. I agree with plaintiffs' assessment. In his brief, the objector describes extreme examples of embarrassing medical records, including images of a patient's genitals or buttocks or records of a venereal disease. (ECF No. 66 at 4.) But not all class members will have records that are this embarrassing, and the objector describes no practical method for processing individualized claims for emotional distress. I also note that the record casts doubt on the notion that cybercriminals stole large volumes of medical records and intend to use them to embarrass class members. As noted, class counsel reports that only 47 megabytes of data were exfiltrated, and counsel does not believe that the cybercriminals intend to monetize the stolen data. Based on this record, I conclude that it is highly unlikely that plaintiffs could prove that class members are at a high risk of experiencing, as the objector puts it, "widespread public ridicule" from disclosure of their medical records. (ECF No. 66 at 4.) Thus, the lack of a specific remedy in the settlement for claims of emotional harm does not render the relief inadequate.

For these reasons, I conclude that the settlement benefits, when compared against the strength of the plaintiffs' case, are adequate. Class members are unlikely to recover materially greater benefits through further litigation. Thus, the risks and delays associated with additional litigation are not warranted.

## C.     Attorneys' Fees

The objector next challenges class counsel's request for a $1.25 million fee award. He starts by arguing that class counsel inadequately notified the class about the intended fee request. Under Federal Rule of Civil Procedure 23(h)(1), notice of the fee motion must be "directed to class members in a reasonable manner." Here, notice of the fee motion was directed to class members primarily through the settlement website, which is the same website that class members used to submit claims for settlement benefits and to request exclusion from the class. (Settlement Agmt. § 6.7; Decl. of Brandon Schwartz ¶ 7.) From its inception, the settlement website included a section about "The Lawyers Representing You." (Settlement Agreement Ex. D.) This section was drafted in question-and-answer format and contained two questions, one of which was "How will Class Counsel be paid?" (*Id.* (Question 27).) Immediately under this question, the answer stated, "Class Counsel will file a motion asking the Court to award them attorneys' fees of up to a maximum of 33 1/3% of the $3.75 million Settlement Fund (i.e., $1,250,000), plus reasonable costs and expenses." (*Id.*) The answer also stated as follows:

> Class Counsel's application for attorneys' fees and expenses, and Service Awards will be made available on the Settlement Website at www.forefrontsettlement.com before the deadline for you to comment or object to the Settlement. You can request a copy of the application by contacting the Settlement Administrator, at [toll free number].

14

(*Id.*) Counsel's fee motion was filed on January 3, 2023, and it was made available on the settlement website before January 24, 2023, the deadline for filing objections. (Pryby Objection at 7, ECF No. 66.)

The objector contends that the above notice was inadequate because the class did not receive a "message" about the motion for attorneys' fees after it was filed. (*Id.*) The objector does not explain what sort of "message" he thinks was required, but presumably he means an email notice or written notice by mail. I conclude that this was not required. As noted, the settlement website contained information about counsel's anticipated fee request and advised class members that they would be able to find the actual fee motion on the website after it was filed. Any class member who was interested enough to review the motion would have been able to find and review it. Providing separate notice of the fee motion to class members would have generated additional administrative costs and reduced the settlement fund. The minimal benefit to the class of such separate notice would not have justified its cost. Accordingly, I find that notice of the fee motion was directed to the class in a reasonable manner.

Next, the objector challenges the overall reasonableness of the fee request. In assessing the reasonableness of an attorney fee award for a class action settlement, district courts should "do their best to award counsel the market price for legal services, in light of the risk of nonpayment and the normal rate of compensation in the market at the time." *Camp Drug Store, Inc. v. Cochran Wholesale Pharm. Inc.*, 897 F.3d 825, 832–33 (quoting *In re Synthroid Mktg. Litig.*, 264 F.3d 712, 718 (7th Cir. 2001)). Factors that bear on the market price for legal fees include the risk of nonpayment, the quality of the

attorney's performance, the amount of work necessary to resolve the litigation, and the stakes of the case. *Id.* at 693.

In the present case, class counsel proposes that the fee award be calculated using a percentage of the common fund rather than through use of the lodestar method. *See In re Stericycle Sec. Litig.*, 35 F.4th 555, 560 n.2 (7th Cir. 2022) (noting that district court may use either the percentage method or lodestar method). Because class counsel accepted this case on a contingent-fee basis, I find the percentage method appropriate for assessing fees. *See Gaskill v. Gordon*, 160 F.3d 361, 362 (7th Cir. 1998) ("When a class suit produces a fund for the class, it is commonplace to award the lawyers for the class a percentage of the fund, in recognition of the fact that most suits for damages in this country are handled on the plaintiff's side on a contingent-fee basis." (Citations omitted)). The Seventh Circuit has recognized that a typical contingent fee is between 33 and 40 percent, although it is usually smaller when a multimillion-dollar judgment is obtained. *Id.* The court has also suggested that, in consumer litigation, the presumption should be that attorneys' fees awarded to class counsel not exceed a third or at most a half of the total amount of money going to class members and their counsel. *Pearson v. NBTY, Inc.*, 772 F.3d 778, 782 (7th Cir. 2014).

Here, class counsel proposes a fee of one-third of the $3.75 million settlement fund, or $1.25 million. After deduction of administrative costs ($682,346.32) and litigation expenses ($13,453.57), the total amount going to class members and their counsel is $3,054,200.11. The fee award is approximately 41% of this amount. This is in line with the Seventh Circuit's presumption that counsel receive no more than one-third or half of the total amount going to class members and their counsel and the court's observation

16

that a typical contingent fee is between 33 and 40 percent. Although the total settlement could be described as a multimillion-dollar settlement, it is by no means a "megafund" and is not such a large settlement that a fee in the usual range for contingent fees is inappropriate. *Cf. In re Anthem, Inc. Data Breach Litig.*, No. 15-MD-02617, 2018 WL 3960068, at *28 (N.D. Cal. Aug. 17, 2018) (awarding fee of 27% of $115 million "megafund" rather than requested fee of 33%).

The objector does not explicitly contend that a fee award of 40% is unreasonable in this case. Instead, he points out that counsel represented that the fee would be approximately 40% of the fund remaining after deduction of expenses, when in fact it would be 41%. (ECF No. 66 at 9–10.) But the objector does not argue that the additional 1% renders the fee unreasonable. Again, the Seventh Circuit has indicated that a fee as high as 50% of the total settlement less expenses could be appropriate in consumer cases. Here, counsel's fee request is for a third of the total settlement fund, which is generally considered a standard contingency fee. The fee percentage becomes 41% after costs are deducted, but a difference of 1% is not significant in a case of this size. The difference is about $30,500, which when divided by the number of class members yields about 1 cent each. Even if this amount were divided by only the number of class members who elected the cash option (26,439), each class member's award would be increased by only $1.13, which is trivial. Thus, I conclude that a fee that amounts to 41% of the settlement fund after expenses are deducted is reasonable.

The objector next contends that class counsel has failed to justify its requested fee by submitting the information the court would need to perform a "lodestar crosscheck" on the fee, including a statement of the number of hours spent on the litigation and an hourly

rate. However, the Seventh Circuit has held that such a lodestar crosscheck is unnecessary. *Stericycle*, 35 F.4th at 567 n.9. Moreover, I do not believe that a lodestar crosscheck would be useful in this case. The market rate for plaintiff's counsel in a damages case is generally a contingent fee, *Gaskill*, 160 F.3d at 362–63, and any lodestar calculation would be artificial. Identifying a reasonable hourly rate for attorneys who normally work on contingency would be particularly difficult.

Although lodestar information was not required and would not have been helpful, I must give some weight to the early stage at which the case settled. *Stericycle*, 35 F.4th at 566. "All other things being equal, a case that settled before the motion-to-dismiss stage, for instance, would be expected to result in a lower fee than a case that proceeded all the way to trial or beyond." *Id.* Notably, the objector does not contend that class counsel's fee should be reduced based on early settlement. Moreover, I do not find it necessary to reduce the fee for this reason. Class counsel performed significant work by researching the facts and potential claims, drafting a 51-page consolidated amended complaint, evaluating the discovery material provided by defendants to prepare for mediation, and participating in the mediation and subsequent settlement negotiations. Further, class counsel has participated in settlement administration and must remain involved until all settlement benefits are distributed. In my estimation, class counsel's work has been of high quality.

The objector also contends that class counsel has overstated the risk of nonpayment. Here, he cites a study showing that 50% of data-breach cases produce a settlement. (ECF No. 66 at 12 (citing Sasha Romanosky et al., *Empirical Analysis of Data Breach Litigation*, 11 J. Empirical Legal Stud. 74 (2014).) But contingent-fee litigation

inherently carries risks of nonpayment and delay in payment, and therefore a contingent fee is generally higher than what counsel would have received had they been guaranteed a fee based on an hourly rate. The objector's statistics regarding a 50% settlement rate confirm that class counsel in data-breach cases are not guaranteed a fee. Moreover, those statistics do not suggest to me that a reduction in counsel's requested fee is warranted. A 50% settlement rate does not seem any higher than the rate one would expect in other areas of litigation in which lawyers typically receive a 33% contingency fee, such as personal injury cases. And in this case, specifically, a motion to dismiss was pending at the time of settlement. Had the motion been granted, class counsel would not have received any fee. Thus, having considered the risk of nonpayment and the other relevant factors, I conclude that a fee amounting to one-third of the gross settlement is reasonable.

Accordingly, plaintiffs' request for a fee $1.25 million will be approved.

**D. Litigation Expenses**

Plaintiffs seek reimbursement of $13,453.57 in litigation expenses. These expenses consist primarily of meditation and expert-witness fees but also include things such as court fees and telephone charges. The objector does not claim that any specific expense is unreasonable, but he contends that counsel should have provided "documentation" other than their sworn declarations to support reimbursement. (ECF No. 66 at 14.) However, I conclude that additional documentation is not required. Class counsel has itemized their costs by category (ECF No. 71 at 2), which is sufficient. "[T]the amount of itemization and detail required is a question for the market. If counsel submit bills with the level of detail that paying clients find satisfactory, a federal court should not

19

require more." *Synthroid*, 264 F.3d at 722. Here, I would be surprised if paying clients require their counsel to submit phone bills and invoices for other costs when they seek reimbursement. Accordingly, I will approve counsel's request for reimbursement.

## E.    Class Representative Incentive Awards

Finally, the three named class representatives request incentive awards of $2,500 each, for a total of $7,500. The objector challenges these awards on the ground that the representatives have not shown that they did "[anything] more than any civil litigant does." (ECF No. 66.) But this misses the point of incentive awards. Class actions often serve as vehicles to aggregate claims that would ordinarily be too small to justify individual lawsuits. *Rand v. Monsanto Co.*, 926 F.2d 596, 599 (7th Cir. 1991), *overruled on other grounds by Chapman v. First Index, Inc.*, 796 F.3d 783 (7th Cir. 2015). Because of the low stakes of any individual claim, no injured party has an incentive to do the work that a plaintiff in ordinary civil litigation would do. But a class action cannot be brought without a named plaintiff, and the purpose of the incentive award is to "induce individuals to become named representatives." *Synthroid*, 264 F.3d at 722. In the present case, no individual class member has a substantial claim for damages that would justify an individual lawsuit. Thus, the possibility of an incentive award was needed to induce class members to become named representatives. The incentive awards are therefore appropriate even though the class members may have done nothing more than any civil litigant would have done.

The Seventh Circuit has instructed district courts to consider the following factors when determining whether an incentive award is appropriate: "the actions the plaintiff has taken to protect the interests of the class, the degree to which the class has benefitted

20

from those actions, and the amount of time and effort the plaintiff expended in pursuing the litigation." *Cook v. Niedert*, 142 F.3d 1004, 1016 (7th Cir. 1998). Having considered these factors, I conclude that incentive awards of $2,500 are warranted. This is a modest sum and appropriate compensation for the work the class members did in reviewing pleadings and settlement documents, providing information about their claims, and gathering documents. Accordingly, the incentive awards will be approved.

### III. CONCLUSION

For the reasons stated, **IT IS ORDERED** that plaintiffs' motion for final approval of the settlement (ECF No. 69) is **GRANTED**. The court will separately enter an order granting final approval that is based on plaintiffs' proposed order (ECF No. 70-5) and contains the details of settlement administration.

**IT IS FURTHER ORDERED** that plaintiffs' motion for attorneys' fees, costs, expenses, and service awards for class representatives (ECF No. 61) is **GRANTED**.

**IT IS FURTHER ORDERED** that the objector's motion for leave to file a response opposing the motion for final approval (ECF No. 73) is **GRANTED**.

**FINALLY, IT IS ORDERED** that the Clerk of Court enter judgment and close these consolidated cases.

Dated at Milwaukee, Wisconsin, this 22nd day of March, 2023.


/s/Lynn Adelman
LYNN ADELMAN
United States District Judge

21